## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| AHOLD USA, INC.;<br>CÉSAR CASTILLO, INC.;<br>FWK HOLDINGS, L.L.C.;<br>KPH HEALTHCARE SERVICES, INC., a/k/a KINNEY DRUGS, INC.; and<br>ROCHESTER DRUG CO-OPERATIVE, INC.; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACTAVIS HOLDCO U.S., INC.;<br>APOTEX CORP.;<br>AUROBINDO PHARMA USA, INC.;<br>CITRON PHARMA LLC;<br>DR. REDDY'S LABORATORIES, INC.;<br>FOUGERA PHARMACEUTICALS INC.;<br>G&W LABORATORIES, INC.;<br>GLENMARK PHARMACEUTICALS, INC.;<br>HERITAGE PHARMACEUTICALS, INC.;<br>IMPAX LABORATORIES, INC.;<br>LANNETT COMPANY, INC.;<br>MYLAN INC.;<br>MYLAN PHARMACEUTICALS INC.;<br>OCEANSIDE PHARMACEUTICALS, INC.;<br>RAJIV MALIK;<br>PAR PHARMACEUTICAL COMPANY, INC.;<br>PERRIGO NEW YORK, INC.;<br>SANDOZ, INC.;<br>SUN PHARMACEUTICAL INDUSTRIES, INC.;<br>TARO PHARMACEUTICALS U.S.A., INC.;<br>TEVA PHARMACEUTICUALS USA, INC.;<br>VALEANT PHARMACEUTICALS NORTH AMERICA LLC;<br>VALEANT PHARMACEUTICALS INTERNATIONAL; and<br>ZYDUS PHARMACEUTICALS (USA), INC.,<br><br>Defendants. | HON. CYNTHIA M. RUFE<br><br>JURY TRIAL DEMANDED |

## DIRECT PURCHASER CLASS ACTION COMPLAINT

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................1

    A.   Each of the Generic Drugs in MDL 2724 is Part of An Overarching Fair Share Agreement in the Generic Drug Industry.................................................3

    B.   The Generic Drug Industry's Closely-Knit and Highly Social Culture Enabled the Overarching Fair Share Agreement to Thrive for Years. ........................................5

        1.   The Fair Share Agreement was applied across multiple generic drugs at a time and was especially effective when new entrants came to market or when generic drug manufacturers decided to exit a market. ......................6

        2.   The conspirators disciplined conduct inconsistent with the Fair Share Agreement and took steps to conceal their activities.................................7

    C.   Generic Drug Manufacturers Continue to Be Under Extensive Scrutiny by Government Regulators. ...............................................................................8

    D.   The Existence of the Fair Share Agreement within the Generic Drug Industry and as to the Named Generic Drugs Is Supported by Other Factors. ...........................11

    E.   Direct Purchasers Paid More Than They Would Have for the Named Generic Drugs But-For the Fair Share Agreement.........................................................12

II.   JURISDICTION AND VENUE ......................................................................13

III.   PARTIES .........................................................................................................14

    A.   Plaintiffs.....................................................................................................14

    B.   Defendants ..................................................................................................15

    C.   Co-Conspirators .........................................................................................22

IV.   INTERSTATE TRADE AND COMMERCE ................................................23

V.   FACTUAL ALLEGATIONS ..........................................................................24

    A.   Competition Between Generic Drugs Historically Has Been Keen. ....................24

        1.   Generic drugs should lead to lower prices..............................................24

        2.   Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive..............27

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

B.    Defendants and Their Co-Conspirators Participated in an Overarching Fair Share Agreement to Thwart Competition in the Generic Drug Industry.........................30

C.    Pursuant to the Fair Share Agreement, Defendants and Their Co-Conspirators Agreed to Fix, Maintain, Stabilize, and Raise Prices, Rig Bids, and Engage in Market and Customer Allocation of Generic Drugs ...............................................35

      a.    acetazolamide..................................................................................39

           (1)    acetazolamide tablets ...........................................40

           (2)    acetazolamide capsules .......................................44

      b.    fosinopril hydrochlorothiazide.......................................................48

      c.    glipizide-metformin ........................................................................51

      d.    glyburide-metformin .......................................................................54

      e.    leflunomide ....................................................................................56

      f.    meprobamate...................................................................................58

      g.    metronidazole .................................................................................60

           (1)    metronidazole cream............................................61

           (2)    metronidazole jelly.............................................63

           (3)    metronidazole lotion ...........................................65

           (4)    metronidazole vaginal.........................................67

      h.    nimodipine .....................................................................................70

      i.    nystatin...........................................................................................73

           (1)    nystatin cream ....................................................73

           (2)    nystatin ointment................................................77

           (3)    nystatin tablets ...................................................80

      j.    paromomycin ..................................................................................86

      k.    theophylline....................................................................................88

      l.    verapamil........................................................................................90

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

| | | (1) | verapamil tablets | 91 |
| | | (2) | verapamil capsules | 92 |
| | m. | | zoledronic acid | 95 |
| D. | | | Defendants' Anticompetitive Conduct Relating to Doxycycline and Glyburide Further Demonstrates Defendants' Overarching Fair Share Agreement | 97 |
| | a. | | doxycycline | 97 |
| | | (1) | doxy DR | 97 |
| | | (2) | doxy mono | 104 |
| | b. | | glyburide | 108 |
| E. | | | The Existence of the Fair Share Agreement within the Generic Drug Industry and as to the Named Generic Drugs Is Supported by Other Factors. | 110 |
| VI. | | | CLASS ACTION ALLEGATIONS | 111 |
| VII. | | | ANTITRUST INJURY | 113 |
| VIII. | | | TOLLING OF THE STATUTE OF LIMITATIONS | 114 |
| IX. | | | CLAIM FOR RELIEF | 117 |
| X. | | | PRAYER FOR RELIEF | 118 |
| XI. | | | JURY TRIAL DEMANDED | 120 |

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

## EXHIBITS

| | |
|---|---|
| **EXHIBIT A** | MDL 2724 GENERIC DRUGS AS OF JUNE 2018 |
| **EXHIBIT B** | HISTORY OF GOVERNMENT INVESTIGATIONS AND OTHER PUBLIC REPORTS CONCERNING ANTICOMPETITIVE CONDUCT IN THE GENERIC DRUG INDUSTRY |
| **EXHIBIT C** | LIST OF GENERIC DRUG MANUFACTURERS KNOWN TO HAVE RECEIVED A DOJ SUBPOENA RELATING TO ANTICOMPETITIVE CONDUCT IN THE GENERIC DRUG INDUSTRY |
| **EXHIBIT D** | TRADE ASSOCIATION CONTACTS AS TO THE NAMED GENERIC DRUGS |
| **EXHIBIT E** | GENERIC PHARMACEUTICAL ASSOCIATION BOARD OF DIRECTORS 2010 TO 2017 |
| **EXHIBIT F** | SUMMARY OF ECONOMIC FACTORS INDICATING COLLUSION IN THE GENERIC DRUG INDUSTRY |
| **EXHIBIT G** | DEFENDANTS' INVESTOR COMMUNICATIONS |

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

## I.   INTRODUCTION

1.      In the pharmaceutical industry the entry of generic versions of branded drugs should result in aggressive price competition, which, in turn, dramatically reduces prices for drug wholesalers, retail pharmacies, consumers, and third-party payors.  Thus, traditionally, generic drugs have been a relative healthcare bargain.  However, due to alleged anticompetitive activity by Defendants and co-conspirators, pricing dynamics in the generic drug industry changed.

2.      Government investigations have revealed that this change in pricing dynamics was the result of widespread and long-running collusion among generic manufacturers to thwart the economic benefits of generic competition.[1]  The scope of this collusion is massive, encompassing myriad drugs and involving nearly all of the significant generic drug manufacturers operating in the United States.  Pursuant to this overarching scheme (the "Fair Share Agreement"), generic drug manufacturers agreed to suppress competition among themselves so that they could fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of many dozens (if not hundreds) of generic drugs.

3.      This Complaint – filed by Direct Purchaser Class Plaintiffs'[2] in this multidistrict litigation – concerns additional generic drugs that were subject to the Fair Share Agreement: acetazolamide, fosinopril hydrochlorothiazide ("fosi-HCTZ"), glipizide-metformin, glyburide-metformin, leflunomide, meprobamate, metronidazole, nimodipine, nystatin, paromomycin, theophylline, verapamil and zoledronic acid ("Named Generic Drugs").  All but one of these

---

[1] *See, e.g.*, Plaintiff States' Consolidated Amended Complaint ("Plaintiff States' CAC"), No. 2:17-cv-03768, ECF 14 (public version) & ECF 15 (under seal version) (filed June 18, 2018), at ¶ 11 ("the conduct is pervasive and industry-wide and the schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition").

[2] Ahold USA, Inc., César Castillo, Inc., FWK Holdings, L.L.C., KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc., and Rochester Drug Co-Operative, Inc.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

generic drugs (metronidazole) is already the subject of pending complaints in MDL 2724. Exhibit A (MDL 2724 Generic Drugs as of June 2018).

4.      The Defendants as to the Named Generic Drugs in this Complaint are Actavis Holdco U.S., Inc. ("Actavis"); Apotex Corp. ("Apotex"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); G&W Laboratories, Inc. ("G&W"); Glenmark Pharmaceuticals, Inc. ("Glenmark"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mylan Inc. and Mylan Pharmaceuticals, Inc. (together, "Mylan"); Par Pharmaceutical, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. and Fougera Pharmaceuticals Inc. (together, "Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals U.S.A., Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); Valeant Pharmaceuticals North America LLC, Valeant Pharmaceuticals International, and Oceanside Pharmaceuticals, Inc. (together, "Valeant"), Zydus Pharmaceuticals USA, Inc. ("Zydus"), and Rajiv Malik ("Malik"). Each of the Defendants and their co-conspirators (defined *infra* at ¶¶ 71- 77) are generic drug manufacturers or employees of generic drug manufacturers. Each of these Defendants is already a defendant in MDL 2724 except for G&W and Valeant.

5.      The allegations herein are based on Direct Purchaser Class Plaintiffs' personal knowledge of the matters relating to themselves and upon information and belief as to all other matters. Parts of Direct Purchaser Class Plaintiffs' allegations are based on information made public during ongoing government investigations into anticompetitive conduct in the generic drug industry. Certain other parts of Direct Purchaser Class Plaintiffs' allegations are based on investigation conducted by and under the supervision of Direct Purchaser Class Plaintiffs' counsel.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

**A.    Each of the Generic Drugs in MDL 2724 is Part of An Overarching Fair Share Agreement in the Generic Drug Industry.**

6.      MDL 2724 encompasses actions in which:

(a) plaintiffs assert claims for price fixing of generic drugs in violation of the Sherman Act and/or state antitrust laws on behalf of overlapping putative nationwide classes of direct or indirect purchasers of generic pharmaceuticals; (b) the average market price of the subject generic pharmaceutical is alleged to have increased between 2012 and the present; (c) defendants are alleged to have effectuated the alleged conspiracy through direct company-to-company contacts and through joint activities undertaken through trade associations, in particular meetings of the Generic Pharmaceutical Association; and (d) the allegations stem from the same government investigation into anticompetitive conduct in the generic pharmaceuticals industry.[3]

7.      In August 2017, Direct Purchaser Class Plaintiffs filed consolidated amended

class action complaints concerning generic drug manufacturers' unlawful scheme to fix,

stabilize, and raise prices, rig bids, and engage in market and customer allocation of numerous

generic drugs: albuterol, amitriptyline, baclofen, benazepril hydrochlorothiazide, clobetasol,

clomipramine, desonide, digoxin, divalproex, doxycycline, econazole, fluocinonide, glyburide,

levothyroxine, lidocaine-prilocaine, pravastatin, propranolol,[4] and ursodiol. *See* Exhibit A

(MDL 2724 Generic Drugs as of June 2018).  Although it is true that, in August 2017, Direct

Purchaser Class Plaintiffs proceeded with separate complaints as to separate generic drugs, even

---

[3] MDL Doc. No. 194; *see also* MDL Doc. Nos. 417, 425 (transferring state actions).  It is now apparent that the conduct began before 2012. *See also* Plaintiff States' CAC at ¶¶ 91 (noting that "general rules of the road have been in place since at least 2006"); End-Payer Class Action Complaint, No. 2:18-cv-02401-CMR, ECF 1 (filed on June 7, 2018), at ¶ 101 ("Inter-defendant communications were commonplace in the industry and dated as far back as 2006. Starting in at least 2011, if not before, Defendants implemented anti-competitive agreements to increase the prices and allocate the markets of at least the Drugs at Issue, and possibly many more."); *see also infra* at ¶¶ 14, 117 and specific allegations as to metronidazole and nystatin.

[4] For propranolol, Direct Purchaser Class Plaintiffs filed a notice of the previously filed complaint and a copy thereof because the Honorable Jed S. Rakoff of the United States District Court for the Southern District of New York denied the fully briefed and argued motion to dismiss in that case. *See* Notice Regarding Propranolol Complaint, No. 2:16-PP-27241-CMR, ECF 62 (filed on Aug. 15, 2017).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

those almost year-old complaints noted that conduct as to those generic drugs "is part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals."[5]

8.      As described herein, Defendants and their co-conspirators' anticompetitive conduct as to the Named Generic Drugs is part of an industry-wide, overarching "fair share" conspiracy (Fair Share Agreement) involving at least the Named Generic Drugs and the numerous generic drugs previously-filed on.  Under this Fair Share Agreement, each generic drug manufacturer was entitled to its fair share of the generic drug industry "sandbox."  Pursuant to this overarching scheme, generic drug manufacturers agreed to suppress competition among themselves so that they could fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of many dozens (if not hundreds) of generic drugs.

9.      Each conspirator's share was determined through various factors, such as the timing of market entry, number of ostensible competitors already in the market, and relationships between the conspirators concerning other generic drugs.  Generally speaking, under the Fair Share Agreement, if a generic manufacturer is the first to enter with a particular generic drug then it is entitled to a larger share of the market; conversely, generic manufacturers that enter later are typically entitled to a smaller share.  The common understanding and goal of the Fair Share Agreement is for generic drug manufacturers to achieve artificially inflated prices because no generic manufacturer is incentivized to compete for additional market share by eroding price. Thus, under the Fair Share Agreement generic drug manufacturers simply had no need to compete because each generic drug manufacturer was "playing nice in the sandbox."

---

[5] *See, e.g.*, Consolidated Direct Purchaser Class Action Complaint, No. 16-DX-27241-CMR, ECF 83, at ¶ 3 (filed on Aug. 15, 2017).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

10.     "Playing nice in the sandbox" entailed, among other things, getting along with ostensible competitors, communicating with them frequently about customers, prices, and/or bids, and not disturbing their share of the generic drug industry sandbox.  If everyone adhered to the Fair Share Agreement and regularly socialized to keep information flowing then additional profits were guaranteed for each generic drug manufacturer without the hassle of free market competition.  This is what happened – at the expense of Direct Purchaser Class Plaintiffs and the proposed Class.

**B.     The Generic Drug Industry's Closely-Knit and Highly Social Culture Enabled the Overarching Fair Share Agreement to Thrive for Years.**

11.     Playing nice in the sandbox was facilitated by generic manufacturer employees frequently communicating and socializing both in-person at near constant trade association events, via telephone and texting, or via other electronic means (*e.g.*, email, social media platforms, LinkedIn, WhatsApp).  *See, e.g.*, Exhibit D (Trade Association Contacts as to the Named Generic Drugs); Exhibit E (Generic Pharmaceutical Association Board of Directors 2010 to 2017); *infra* at ¶¶ 113-16, 468 and allegations as to specific generic drugs.[6]  In addition to in-person communications at trade association events, generic drug manufacturers' employees frequently met in less formal settings such as happy hours, dinners, lunches, golf outings, etc. Impromptu get-togethers were easy because many generic pharmaceutical manufacturers are headquartered in relatively close geographic proximity throughout the mid-Atlantic.

---

[6] Such trade associations include, but are not limited to, the Generic Pharmaceutical Association ("GPhA") (now called the Association for Accessible Medicines), the Healthcare Distribution Management Association ("HDMA") (now called the Healthcare Distribution Alliance), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), the National Association of Chain Drug Stores ("NACDS"), Efficient Collaborative Retail Marketing ("ECRM"), and the National Pharmacy Forum ("NPF").  *See also, e.g.*, Consolidated Direct Purchaser Class Action Complaint, No. 16-DX-27241-CMR, ECF 83, at Section V.C (filed on Aug. 15, 2017) (trade association and generic drug industry communication allegations as to doxycycline).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

12.     In addition to the numerous opportunities for interaction, many generic drug manufacturer employees (including, for example, so called National Account Managers or "NAMs") moved from generic drug manufacturer to generic drug manufacturer while preserving former co-worker contacts, and thus furthered the interwoven, cooperative generic drug industry culture.

13.     The coziness and chattiness among generic drug manufacturer employees facilitated "playing nice in the sandbox" and allowed for the overarching fair share conspiracy to blossom. Open communications with ostensible competitors were merely part of the "toolkit" by which employees were successful in their jobs and achieved higher profits for their employers.

14.     Because generic drug manufacturers and their employees are repeat players who routinely encounter the same ostensible competitors, their Fair Share Agreement – to eschew price competition and allocate markets and customers – became the "rules of the road" that govern their overarching conspiracy. There are indications that such general fair share rules of the road have been in place in some corners of the generic drug industry as far back as 2006 and may have governed behavior concerning hundreds of generic drugs.

**1.      The Fair Share Agreement was applied across multiple generic drugs at a time and was especially effective when new entrants came to market or when generic drug manufacturers decided to exit a market.**

15.     The overarching anticompetitive conduct was often not conducted on a generic drug by generic drug basis. Generic drug manufacturers were generally aware of each manufacturer's entire portfolio of generic drugs. As such, achieving a fair share as to one generic drug could involve horse trading across other generic drugs. For instance, generic drug manufacturers might give up customers on one generic drug based as a quid pro quo for customers from other generic drug manufacturers on a different generic drug.

- 6 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

16.     This understanding regarding fair share was particularly effective when a new generic drug manufacturer entered the market – a time when, in a competitive market, prices should go down.  As part of the Fair Share Agreement, a generic drug manufacturer set to launch a generic drug would often approach or be approached by existing generic drug manufacturers prior to market entry.  This allowed for a fair share understanding to be reached prior to the new generic manufacturer entering the market and allowed for artificially inflated prices to be maintained.

17.     The Fair Share Agreement allowed generic drug manufacturers to enjoy high profits without the threat of competition.  Further, as the industry grew more comfortable with the Fair Share Agreement, generic drug manufacturers became bolder and would, at times, substantially raise generic drug prices.  Although such large price increases would be risky in a competitive market where customers could simply buy from lower priced rivals, the conspirators knew that competition would not be forthcoming pursuant to their overarching Fair Share Agreement.  The conspirators reached an understanding that their industry compatriots would not violate the rules of the road; that is, to maintain artificially inflated prices by allocating generic drugs and customers.

### 2.     The conspirators disciplined conduct inconsistent with the Fair Share Agreement and took steps to conceal their activities.

18.     The means and methods of how the overarching combination and conspiracy operated included rebalancing market share as well as disciplining conduct inconsistent with the Fair Share Agreement.

19.     For example, the conspirators periodically rebalanced market share by allocating customers.  For instance, if it was determined that Generic Drug Manufacturer A had less than its fair share, then, pursuant to the overarching Fair Share Agreement, Generic Manufacturer B

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

would "walk away" from a customer or customers by informing them of a significant price increase. Generic Drug Manufacturer A would then submit a bid at an amount slightly less than Generic Drug Manufacturer B. Generic Drug Manufacturer A and Generic Drug Manufacturer B would continue to engage in such conduct until they reached their agreed-upon fair share.

20.     The conspirators also disciplined any generic drug manufacturer who behaved inconsistently with the Fair Share Agreement. Take, as another example, a situation where Generic Drug Manufacturer C violates the larger understanding of fair share and attempts to compete on price and gain market share. In such instances, Generic Drug Manufacturer C would be viewed as "irresponsible" and would be disciplined by employees of Generic Manufacturers A and B.

21.     Generic drug manufacturers knew that their conduct was illegal, and they took extensive measures to conceal their activities even, in some instances, intentionally destroying evidence of their incriminating communications. For instance, conspirators warned their employees not to leave any written or electronic record of their collusive contacts with erstwhile competitors.

**C.     Generic Drug Manufacturers Continue to Be Under Extensive Scrutiny by Government Regulators.**

22.     Defendants' and their co-conspirator generic drug manufacturers' conduct has resulted in extensive scrutiny by federal and state regulators, including by the Antitrust Division of the United States Department of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and the Plaintiff States.[7]

---

[7] *See* Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

23.     Since that time, the Plaintiff States' case has significantly expanded.  Recently,

the Plaintiff States represented to this Court that:

> To date Plaintiff States have identified evidence of illegal
> agreements relating to nearly 200 additional drugs – and that
> number is expected to increase as the investigation develops
> further.    For some  [generic drug] manufacturers,  the
> anticompetitive agreements affect most, if not all, of the products
> they sell.[8]

24.     The DOJ has also continued to issue subpoenas.  For example, in April 2018,

Aceto Corporation reported that:

> In connection with the DOJ's ongoing investigation into marketing
> and pricing practices throughout the generic pharmaceutical
> industry, Aceto Corporation (the "Company") received a subpoena
> from the Antitrust Division of the U.S. Department of Justice (the
> "DOJ"). The Company is one of many operating companies in the
> generic pharmaceutical industry to receive a subpoena from the
> DOJ relating to its years-long investigation into the industry. The
> Company is currently preparing its response to the subpoena.[9]

25.     And in May 2018, Mallinckrodt plc reported that it too had received a subpoena:

> *Generic Pricing Subpoena.* In March 2018, the Company received
> a grand jury subpoena issued by the U.S. District Court for the
> Eastern District of Pennsylvania pursuant to which the Antitrust
> Division of the Department of Justice is seeking documents
> regarding generic products and pricing, communications with
> generic competitors and other related matters. The Company is in

---

[8] Opp. by Plaintiff States Connecticut and New York to Certain Defs.' Mot. to Enforce
the Court's Procedural and Discovery Orders, MDL Doc. No. 600 (filed May 31, 2018), at 7-8;
*id.* at 3 ("Plaintiff States' ongoing investigation . . . is much broader [than the 15 Heritage-
focused drugs in the Plaintiff States' Consolidated Amended Complaint] and has greatly
expanded since filing the Consolidated Complaint in October 2017.  Plaintiff States are currently
investigating collusive conduct relating to nearly 200 additional drugs – and expect to file one or
more additional lawsuits based on that conduct at the appropriate time.  A large majority of the
conduct under investigation is not the subject of any action pending in this MDL."); *id.* at 4 ("the
additional potential corporations and individuals involved in this collusion vastly exceed those
named in the Consolidated Complaint [] [and] the time periods of the collusion being
investigated often differs significantly from the time periods of the collusion in the Consolidated
Complaint").

[9] Aceto Corporation 10-Q (filed on May 7, 2018).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

the process of responding to this subpoena, and the Company intends to cooperate fully in the investigation.[10]

26.     And in June 2018, Defendants Taro and Dr. Reddy's separately reported in SEC filings that they had recently received civil investigative demands from the DOJ:

> On May 10, 2018, Taro U.S.A. received a Civil Investigative Demand from the United States Department of Justice pursuant to the False Claims Act seeking information relating to corporate and employee records, generic pharmaceutical products and pricing, communications and/or agreements with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters. Taro U.S.A. is in the process of reviewing and responding to the Civil Investigative Demand.[11]

> On May 15, 2018, Dr. Reddy's Laboratories, Inc. received a Civil Investigative Demand from the Civil Division of the U.S. DOJ, enquiring whether there have been any violations of the U.S. False Claims Act, arising from allegations that generic pharmaceutical manufacturers, including us, have engaged in market allocation or price fixing agreements, or paid illegal remuneration, and caused false claims to be submitted in violation of the said Act. We intend to fully cooperate with the DOJ in responding to the demand and cooperate with the investigation.[12]

27.     These recent subpoenas and investigative demands are in addition to the many other generic manufacturers that have publicly reported that they too have received subpoenas. *See* Exhibit C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena Relating to Anticompetitive Conduct in the Generic Drug Industry).

28.     In April 2018, Bloomberg reported that the DOJ is close to filing charges against generic manufacturers and additional generic manufacturer executives.[13]

---

[10] Mallinckrodt plc 10-Q (filed on May 8, 2018).

[11] Taro 20-F (filed on June 21, 2018).

[12] Dr. Reddy's 20-F (filed on June 15, 2018).

[13] David McLaughlin and Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), *available at* https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

- 10 -

29.     During a rare public comment on the DOJ's investigation at the American Bar Association's May 2018 Antitrust in Healthcare Conference, a DOJ official stated:

> [T]he Division's focus on detecting and deterring collusion in crucial industries for U.S. consumers includes an investigation into price fixing, bid rigging, and market allocation agreements in the generic pharmaceuticals industry. Millions of Americans purchase prescription drugs every year to treat acute and chronic health conditions. In 2017, for example, nearly 3.9 billion generic prescriptions were dispensed, accounting for 89% of all prescriptions filled in the United States, but only 26% of drug spend. Because so many Americans rely on access to these generic drugs as a more affordable alternative to brand-name drugs, it is critical that those markets remain competitive.
>
> In recent years, however, there have been large price spikes for certain generic drugs – and the Division's investigation into this market has revealed that some corporations and executives have sought to enrich themselves at the expense of consumers who rely on these critical medications. It is hard to imagine a more brazen antitrust crime than colluding to take money out of the pockets of seniors and others whose health depends on prescription drugs.
>
> The Division filed its first charges in this investigation in late 2016. Two executives, the former CEO and former president of a generic pharmaceutical company, were charged with price fixing, bid rigging and customer allocation for an antibiotic and a drug used to treat diabetes. Both have pleaded guilty and both have agreed to cooperate in the Antitrust Division's investigation, which is ongoing.[14]

**D.    The Existence of the Fair Share Agreement within the Generic Drug Industry and as to the Named Generic Drugs Is Supported by Other Factors.**

30.     In addition to the data analysis and conspiracy evidence set forth herein, other factors support the existence of the Fair Share Agreement as to the Named Generic Drugs:

1) the sweeping ongoing investigations by the DOJ and the Plaintiff States' of "pervasive and industry-wide" collusion among many generic pharmaceutical manufacturers, as well as other public reports indicating widespread collusion;[15]

---

[14] Barry Nigro, Deputy Assistant Attorney General, DOJ, Keynote Remarks at the American Bar Association's Antitrust in Healthcare Conference (May 17, 2018).

[15] Plaintiff States' CAC at ¶ 11; *see also* Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

2) frequent communications and meetings among generic drug manufacturers' employees including the Defendants here;[16]

3) factors showing that the generic pharmaceutical industry is susceptible to collusion;[17] and

4) investor communications reflecting, among other things, that Defendants' profits increased during the relevant time period.[18]

**E.     Direct Purchasers Paid More Than They Would Have for the Named Generic Drugs But-For the Fair Share Agreement.**

31.     The present Complaint provides specific allegations regarding illegal agreement as to the specific Named Generic Drugs, but these Named Generic Drugs are part and parcel of the larger overarching conspiracy.  Direct Purchaser Class Plaintiffs are investigating additional generic drugs and will likely file additional complaints at the appropriate time.

32.     As a result of Defendants' and their co-conspirators' efforts to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of the Named Generic Drugs, direct purchasers paid, and continue to pay, supra-competitive prices for the Named Generic Drugs.

33.     Direct Purchaser Class Plaintiffs, on behalf of themselves and members of the proposed Class, seek damages caused by Defendants' and co-conspirators' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, as to the Named Generic Drugs.

---

Drug Industry); Exhibit C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena Relating to Anticompetitive Conduct in the Generic Drug Industry).

[16] Exhibit D (Trade Association Contacts as to the Named Generic Drugs); Exhibit E (Generic Pharmaceutical Association Board of Directors 2010 to 2017).

[17] Exhibit F (Summary of Economic Factors Indicating Collusion in the Generic Drug Industry).

[18] Exhibit G (Defendants' Investor Communications).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

## II.    JURISDICTION AND VENUE

34.    This Court has jurisdiction over the subject matter of this action as it arises under

Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15

U.S.C. § 15.  Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

35.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C.

§ 1391(b), (c), and (d), because, during the Class Period, Defendants transacted business

throughout the United States, including in this District, Defendants resided, were found, or had

agents within this District, and a portion of the affected interstate trade and commerce discussed

below was carried out in this District.

36.    During the Class Period, Defendants sold and distributed generic drugs in a

continuous and uninterrupted flow of interstate commerce, which included sales of the Named

Generic Drugs in the United States, including in this District.  Defendants' conduct had a direct,

substantial, and reasonably foreseeable effect on interstate commerce in the United States,

including in this District.

37.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each

Defendant: (a) transacted business throughout the United States, including in this District;

(b) participated in the selling and distribution of the Named Generic Drugs throughout the United

States, including in this District; (c) had and maintained substantial contacts within the United

States, including in this District; and/or (d) was engaged in an unlawful conspiracy to artificially

inflate prices that was directed at and had the intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

## III.    PARTIES

### A.    Plaintiffs

38.    Plaintiff Ahold USA, Inc. ("Ahold") is a Maryland corporation with its principal places of business in Quincy, Massachusetts and Carlisle, Pennsylvania.  During the Class Period, Ahold purchased one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, Ahold paid supracompetitive prices for these purchases and was injured by the illegal conduct alleged herein.

39.    Plaintiff César Castillo, Inc. ("CCI") is a Puerto Rico corporation with its principal place of business in Rio Piedras, Puerto Rico.  During the Class Period, CCI purchased one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, CCI paid supracompetitive prices for these purchases and was injured by the illegal conduct alleged herein.

40.    Plaintiff FWK Holdings, LLC ("FWK") is an Illinois corporation with its principal place of business in Glen Ellyn, Illinois.  FWK is the assignee of antitrust claims possessed by Frank W. Kerr Company ("Kerr") and brings this action as successor-in-interest to Kerr's claims arising from its purchase of one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, FWK, through assignor Kerr, paid supracompetitive prices for these purchases and was injured by the illegal conduct alleged herein.

41.    Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("KPH") is a New York corporation with its principal place of business in Gouverneur, New York.  KPH operates retail and online pharmacies in the Northeast under the name Kinney Drugs, Inc.  During the Class Period, KPH purchased one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, KPH paid

- 14 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

supracompetitive prices for these purchases and was injured by the illegal conduct alleged herein.

42.     Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a New York corporation with its principal place of business in Rochester, New York.  During the Class Period, RDC purchased one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, RDC paid supracompetitive prices for these purchases and was injured by the illegal conduct alleged herein.

## B.     Defendants

### *Actavis*

43.     Defendant Actavis Holdco U.S., Inc. ("Actavis") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceuticals U.S., Inc. acquired Allergan plc's generics business (including Actavis).  During the Class Period, Actavis sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### *Apotex*

44.     Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida.  During the Class Period, Apotex sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### *Aurobindo*

45.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey.  During the Class Period,

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

Aurobindo sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Citron*

46.    Defendant Citron Pharma LLC ("Citron") is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey.  During the Class Period, Citron sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Dr. Reddy's*

47.    Defendant Dr. Reddy's Laboratories ("Dr. Reddy's") is a Delaware corporation with its principal place of business in Princeton, New Jersey.  During the Class Period, Dr. Reddy's sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*G&W*

48.    Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey.  During the Class Period, G&W sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

*Glenmark*

49.     Defendant Glenmark Pharmaceuticals, Inc. ("Glenmark") is a Delaware corporation with its principal place of business in Mahwah, New Jersey.  During the Class Period, Glenmark sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Heritage*

50.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in East Brunswick, New Jersey.  Heritage is a subsidiary of Emcure Pharmaceuticals Ltd. ("Emcure").  During the Class Period, Heritage sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Impax*

51.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business in Hayward, California.  In 1999, Global Pharmaceutical Corporation merged with Impax Pharmaceuticals, Inc. to become Impax.  Impax continues to sell generic drugs through its Global Pharmaceutical division.  During the Class Period, Impax sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

- 17 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

*Lannett*

52.      Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  During the Class Period, Lannett sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Mylan*

53.      Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

54.      Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.

55.      Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  In this Complaint, Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are referred to together as "Mylan."  During the Class Period, Mylan sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

56.      Defendant Rajiv Malik ("Malik") is an individual residing at 605 Grandview Drive, Gibsonia, Pennsylvania.  During the Class Period, Malik has acted as the President and Executive Director of at least Mylan N.V., which is the parent company of Defendants Mylan Inc. and Mylan Pharmaceuticals, Inc.  In his role as President of Mylan N.V., Malik is responsible for overseeing the sales and marketing of Mylan's generic pharmaceutical business, which is accomplished at least in part through acting on behalf of Defendant Mylan.  During the

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

time Malik was employed by Mylan, he also worked for other Mylan entities such as Mylan, Inc. Before coming to Mylan, Malik worked at various other generic pharmaceutical manufacturers such as Matrix Laboratories Limited, Ranbaxy Laboratories (now part of Sun), and Sandoz.

*Par*

57.     Defendant Par Pharmaceutical Companies, Inc. ("Par") is a Delaware corporation with its principal place of business in Chestnut Ridge, New York.  Par is a subsidiary of Endo International plc ("Endo"), an Irish pharmaceutical company.  During the Class Period, Par sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Perrigo*

58.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in the Bronx, New York.  During the Class Period, Perrigo sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Sandoz*

59.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey.

60.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  Foguera is a wholly-owned subsidiary of Defendant Sandoz, Inc.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

61.      In this Complaint, Sandoz Inc. and Fougera Pharmaceuticals Inc. are referred to together as "Sandoz." During the Class Period, Sandoz sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Sun*

62.      Defendant Sun Pharmaceutical Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. In late 2012, Sun acquired URL Pharma, Inc. ("URL") with its principal place of business in Philadelphia, Pennsylvania. URL is a wholly-owned subsidiary of Sun. URL as a group includes five wholly-owned subsidiaries, including Mutual Pharmaceutical Company, Inc. Sun also does business under the name Caraco Pharmaceutical Laboratories, a company Sun acquired in 1997. During the Class Period, Sun sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Taro*

63.      Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli pharmaceutical company. In 2010, Sun Pharmaceutical Industries, Inc.'s Indian-parent company Sun Pharmaceutical Industries Ltd. acquired a controlling stake in Taro Pharmaceutical Industries, Ltd. During the Class Period, Taro sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

*Teva*

64.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Pennsylvania corporation with its principal place of business in North Wales, Pennsylvania.  During the Class Period, Teva sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Valeant*

65.     Defendant Valeant Pharmaceuticals International ("Valeant International") is a Canadian company with its principal place of business in Bridgewater, New Jersey.  Valeant International was a California company until September 2010, when it merged with Biovail Corporation, a Canadian company.  To lower its overall tax rate, Valeant International structured the merger to make Biovail the technical acquirer, but the combined company kept Valeant's name and executives and is managed out of Valeant's New Jersey offices.  Valeant also has a dozen other United States commercial locations and manufacturing facilities.

66.     Defendant Valeant Pharmaceuticals North America LLC ("Valeant North America") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.  Valeant North America is a wholly-owned subsidiary of Valeant International.

67.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Aliso Viejo, California.  Oceanside is a wholly-owned subsidiary of Defendant Valeant.

68.     In this Complaint, Valeant International, Valeant North America, and Oceanside are referred to together as "Valeant."  During the Class Period, Valeant sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and

- 21 -

engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Zydus*

69.     Defendant Zydus is a New Jersey corporation with its principal place of business in Pennington, New Jersey.  During the Class Period, Zydus sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

70.     Defendants and their officers, agents, employees, or representatives engaged in the conduct alleged herein while actively involved in the management of Defendants' business and affairs.

**C.     Co-Conspirators**

71.     Known and unknown co-conspirators also participated in the Fair Share Agreement as alleged herein.

72.     Defendants' co-conspirators include other generic manufacturer defendants in MDL 2724 such as Akorn, Inc., Breckenridge Pharmaceutical, Inc., Epic Pharma, LLC, Hi-Tech Pharmacal Co., Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma USA, Inc., Morton Grove Pharmaceuticals, Inc., Teligent, Inc., Upsher-Smith Laboratories, Inc., West-Ward Pharmaceuticals Corp., Wockhardt USA LLC, Jeffrey Glazer, and Jason Malek.  Co-conspirators also include generic manufacturers that are not currently defendants in MDL 2724 such as, for example, Ascend Laboratories, LLC ("Ascend").  At the proper time in this litigation, Plaintiffs will necessarily seek to join these co-conspirators and Defendants identified herein into one complaint.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

73.     Various other persons, firms, entities, and corporations, not named as defendants in this Complaint, have participated as co-conspirators with defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

74.     The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs may amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

75.     At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

76.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

77.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## IV.    INTERSTATE TRADE AND COMMERCE

78.     Defendants are leading manufacturers and suppliers of the Named Generic Drugs sold in the United States.

79.     The Named Generic Drugs are produced by, or on behalf of Defendants, or their affiliates, in the United States or overseas.

- 23 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

80.     During the Class Period, Defendants, directly or through one or more of their affiliates, sold the Named Generic Drugs throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

81.     The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

82.     Defendants' and their co-conspirators' conduct, including the marketing and sale of the generic drugs in question, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

83.     The combination and conspiracy alleged herein has directly and substantially affected interstate commerce, in that Defendants deprived Direct Purchaser Class Plaintiffs of the benefits of free and open competition in the purchase of the Named Generic Drugs within the United States.

84.     The agreement and conspiracy between Defendants and their co-conspirators to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of generic drugs, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing the prices of generic drugs, including the Named Generic Drugs, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## V.     FACTUAL ALLEGATIONS

**A.     Competition Between Generic Drugs Historically Has Been Keen.**

**1.     Generic drugs should lead to lower prices.**

85.     Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the Food and Drug Administration (the "FDA")

- 24 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

requires rigorous testing to ensure it has the same strength, quality, safety, and performance as the brand. By law, generics must have the same amount of active ingredient and must be "therapeutically equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product."[19]

86.     To encourage the production and sale of generic drugs, the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") simplified the regulatory hurdles that generic drug manufacturers have to clear before marketing and selling generic drugs. Instead of filing a lengthy and costly New Drug Application, the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion.

87.     To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs; "abbreviated" because so long as the ANDA includes data showing bioequivalence to the brand, the ANDA sponsor can reference efficacy data supporting approval of the brand (described in the regulations as the "Reference Listed Drug" or "RLD" for short) instead of repeating all the same clinical trials. Upon the FDA's determination that bioequivalence to the brand has been established, the ANDA will be approved and may be marketed in the United States as substitutable with the RLD.

88.     Although equivalent from a safety and efficacy standpoint, generic versions of brand name drugs are priced significantly below their brand counterparts, and because of this, they rapidly gain market share from the brand beginning immediately following launch. Indeed, in every state, pharmacists are permitted (and in many states required) to substitute a generic

---

[19] FDA, *Drugs@FDA Glossary of Terms*, *available at* http://www.fda.gov/Drugs/ InformationOnDrugs/ucm079436.htm#G.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

product for a brand product barring a note from a doctor that the brand product must be dispensed as written.

89.     It is well established in economic literature that competition by generic products should result in lower prices for drug purchasers.  In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price largely free from normal competitive market forces.  But once the first lower-priced generic enters, a brand drug rapidly loses sales due to automatic pharmacy substitution, and generics capture as much as 80% of the market or more within months of launch.  And as more generics become available, generic prices only decline further due to competition among generics.  These cost reductions to drug purchasers were the very legislative purpose behind the abbreviated regulatory pathway for generic approval under the Hatch Waxman Act.

90.     Generic competition, under lawful and competitive circumstances, reduces drug costs by driving down the prices of both generic versions of the brand drug and often the brand drug itself, and every year generic drugs should result in hundreds of billions of dollars in savings to direct purchasers, consumers, and insurers.

91.     A Federal Trade Commission study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[20]  A mature generic market has several generic competitors.  Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature and the basis

---

[20] Federal Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions*, at 8 (Jan. 2010), *available at* https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

for competition among manufacturers.[21]  Over time, generics' pricing should near the generic

manufacturers' marginal costs.

92.     Generic competition usually enables purchasers to purchase generic versions of

the brand drug at a substantially lower price than the brand drug. Generic competition to a single

blockbuster brand drug can result in billions of dollars in savings to direct purchasers,

consumers, insurers, local, state, and federal governments, and others.

**2.      Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive.**

93.     Ordinarily, the price for a consumer product is set by the retailer based on the

amount the typical consumer is willing to pay.  But because of the unique features of the

prescription drug marketplace, prescription drug pricing for most consumers is not determined

between the retailer and the consumer.  Rather, because most consumers' prescription drug

purchases are reimbursed by public or private health plans, consumer pricing for prescription

drugs is often set in reference to reimbursement agreements between these prescription drug

payers, *i.e.*, health plans and their prescription benefit managers, and the pharmacies that

dispense drugs to the payers' insured customers.

94.     Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC")

for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The

WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or

---

[21] *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales. Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.

95.     Generic drug manufacturers may charge different amounts for an equally interchangeable, *i.e.*, therapeutically equivalent, multisource drug. But manufacturers are usually constrained in their ability to price generic drugs by the Maximum Allowable Cost ("MAC").[22] MAC is a contractually based payment model that, in the private sector, is commonly established by a pharmacy benefits manager ("PBM"), who manages an insurance plan, and that is paid to the pharmacies within the plan's network.[23] A MAC price sets the upper limit that a pharmacy will be paid by the PBM for procuring and dispensing a particular generic medication.

96.     While PBMs usually do not disclose publicly which drugs they subject to MAC pricing, what the MAC price is, or what factors they apply to set MAC prices, it is believed that PBMs rely on a wide variety of market-wide pricing information or plan-specific data.[24] In recent years, 79% of employer prescription drug plans and 45 state Medicaid programs have been using MAC prices to control the cost of generic drugs.[25]

---

[22] To define therapeutic categories, MAC pricing typically relies on the FDA's Orange Book, which lists approved prescription drugs and their therapeutic equivalents. An "A"-rated drug is one that the FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products. *See* U.S. FDA Website, Orange Book Preface, *available at* https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#tecode.

[23] Academy of Managed Care Pharmacy, *Where We Stand, Maximum Allowable Cost (MAC) Pricing* (Dec. 2013), *available at* www.amcp.org/Sec.aspx?id=9287. For the purposes of this Complaint, MAC prices refer solely to prices that limit a pharmacy's reimbursement for generic drugs, not the amounts PBMs charge to the insurance plans, which may also be referred to as a MAC price. *See* National Community Pharmacists Association, *The Need for Legislation Regarding "Maximum Allowable Cost" (MAC) Reimbursement*, *available at* http://www.ncpa.co/pdf/leg/mac-one-pager.pdf.

[24] *Id.*

[25] Express Scripts, *MAC Pricing Incents More Affordable Rx* (Feb. 24, 2016), *available at* http://lab.express-scripts.com/lab/insights/drug-options/mac-pricing-incents-more-affordable-rx.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

97.     MAC prices give pharmacies an incentive to procure and dispense the lowest-priced drug product available for a particular multisource drug. If a generic drug is subject to MAC pricing, a pharmacy purchasing a higher-priced generic product will make less profit or potentially even lose money when it dispenses a higher-priced product.[26]

98.     MAC pricing is neither uniform nor transparent, and it may be subject to frequent changes.  So whether a generic manufacturer's products are even subject to MAC pricing, or how that MAC pricing is set for any particular generic drug, is not easy for the manufacturers to decipher.  PBMs typically exercise control over the selection of generic drugs that will be subjected to MAC pricing, and they fiercely guard the secrecy of their MAC price lists.[27] Industry groups, like the Academy of Managed Care Pharmacy, actively oppose government regulation of MAC pricing and any efforts to disclose MAC prices or the methods of calculating them.[28]

99.     By setting a ceiling for reimbursement of any particular generic drug at the pharmacy level, MAC prices indirectly affect the price at which generic drug manufacturers may sell their products to direct purchasers.  Because many generic drugs are subject to MAC pricing, generic drug manufacturers have an incentive to price their generic drug products competitively to maintain demand by pharmacies.

100.     MAC pricing can penalize the generic drug manufacturer that raises price on its own when its competitors do not.  A unilateral price increase in a competitive generic drug market that is subject to MAC pricing is likely to send buyers to a lower-priced alternative.

---

[26] *See supra* Academy of Managed Care Pharmacy article.
[27] *See supra* National Community Pharmacists Association article.
[28] *See supra* Academy of Managed Care Pharmacy article.

- 29 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

101.    MAC pricing has little effect, however, if generic drug manufacturers collectively increase their prices for a multi-source drug.  First, PBMs generally permit pharmacies – who may be contractually obligated to dispense an unprofitable prescription – to challenge MAC prices under a MAC appeals process.[29]  If the price of a generic drug has been increased by a majority of generic drug manufacturers, then these MAC appeals may be successful in getting the PBM to increase the MAC price allowed.  Second, PBMs typically have a policy of revising MAC prices under certain contingencies.[30]  One large PBM, Express Scripts, for example, states that its MAC price list is frequently updated to reflect "the current market dynamics."[31]

102.    MAC pricing provides yet another reason that Defendants' stark increases in the price of the generic drugs in question are indicative of coordinated pricing activity.  Knowing that they hold an overwhelming majority share of the market for these drugs, Defendants had the capacity to dictate the market price and to influence the MAC prices set by PBMs, but only if they acted collectively.  Absent collusion, individual Defendants and co-conspirators could not have increased their prices to the high levels they did (or maintain high prices in the face of a competitor's significantly lower price) without incurring the loss of a significant volume of sales.

**B.     Defendants and Their Co-Conspirators Participated in an Overarching Fair Share Agreement to Thwart Competition in the Generic Drug Industry.**

103.    During the Class Period, generic drug manufacturers – including Defendants and their co-conspirators – conspired, combined, and contracted with one another pursuant to the Fair Share Agreement to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of generic drugs, including the Named Generic Drugs.

---

[29] *Id.*

[30] *Id.*

[31] *See supra* Express Scripts article.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

104.     This Fair Share Agreement had the effect of maintaining artificially inflated

pricing for the Named Generic Drugs, and creating an appearance of competition when in fact

none existed.  It also had the intended and actual effect of causing Direct Purchaser Class

Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above

prices that would exist if a competitive market had determined prices.

105.     As part of their Fair Share Agreement, Defendants acted to render particular

generic drug markets – including the Named Generic Drugs – "stable" by assenting to a division

of proportional market share.  Defendants and their co-conspirators initiated communications to

achieve this market share and customer distribution, and, in fact, Defendants and their co-

conspirators routinely contacted each other pursuant to, and in furtherance of, their Fair Share

Agreement.

106.     Each of Defendants' conspiratorial actions described herein sought to further this

Fair Share Agreement by achieving either or both of its two main goals:

   a.     Defendants and their co-conspirators sought to avoid competition within

          the generic drug industry, instead maintaining the stability of the relative

          market shares assigned to each competitor.

   b.     Without the threat of competition, Defendants and their co-conspirators

          sometimes dramatically raised prices on a generic drug or generic drugs.

          Defendants' agreements also introduced artificially inflated pricing even

          where dramatic price increases were not observed as might be the case

          where a *quid pro quo* market or customer allocation had taken place.

107.     Defendants and their co-conspirators communicated their respective priorities and

goals in order to divide the market among each other.  Once these market share ratios were set,

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

Defendants and their co-conspirators would jointly evaluate customer bids and contracts with an eye to maintaining these ratios.

108.   Defendants and their co-conspirators repeatedly engaged in decision-making that was against their financial self-interest, turning down or walking away from potentially profitable business opportunities in order to uphold their Fair Share Agreement and allow other Defendants or co-conspirators to gain or maintain predetermined market share.

109.   For example, if a particular generic manufacturer wanted to increase its market share, it contacted the other market players to discuss an acceptable way to do so without upsetting the artificial price levels that the participants had agreed to maintain.

110.   Generic drug manufacturers – including Defendants and their co-conspirators – also planned and executed coordinated price increases.  Before raising prices for their customers, generic manufacturers would communicate and agree on a price increase strategy.  Typically, this involved – pursuant to the Fair Share Agreement – one manufacturer taking the lead with the price increase, and the other manufacturers matching by increasing their pricing in step with the leader (knowing that their ostensible competitors would not undercut the elevated pricing).

111.   There was an understanding between all Defendants and their co-conspirators that it was permissible to initiate and maintain collusive communications at any time in order to effectuate the goals of this Fair Share Agreement and more effectively manipulate the generic drug industry.  This behavior is repeated again and again in the specific generic drug examples described below.

112.   The casual nature by which this combination and conspiracy was executed further illustrates its pervasive, comprehensive nature.  For instance, the allegations below highlight at least several examples where a Defendant was invited into an ongoing price increase scheme

- 32 -

merely upon expressing its intention to enter the market for that drug.   In these situations, the other Defendants were not concerned about involving an additional party, because that party had already expressed, both impliedly and through overt communication, its willingness to participate in the Fair Share Agreement.

113.    Further, the regularity of Defendants and their co-conspirators' illegal communications, contacts, and meetings at trade associations and elsewhere demonstrates that they were complicit in the overarching Fair Share Agreement.[32]

114.    Defendants were aware that the Fair Share Agreement was illegal, and they took substantial steps to conceal their conspiratorial conduct, including by cautioning against discussing price increases for the Named Generic Drugs in emails, text messages and other communications – both internal to and between various Defendants.  Instead, Defendants opted to speak by telephone when an in-person meeting was not practical, and they met and discussed their plans at industry events and other venues when possible.  Out of fear of detection, many communications were intentionally destroyed by Defendants and their co-conspirators.

115.    In formulating and effectuating the combination and conspiracy, Defendants and their co-conspirators' engaged in numerous anticompetitive activities, including, among other things:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of at least the generic drugs identified in this Complaint;

(b)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for at

---

[32] For example, the Plaintiff States provide charts with *thousands* of instances of phone and text communications among many generic pharmaceutical manufacturers including Defendants and their co-conspirators.  Plaintiff States' CAC at ¶¶ 93-95 and Tables 1, 2.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

least the generic drugs identified in this Complaint;

(c)    Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for at least the generic drugs identified in this Complaint;

(d)    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers regarding at least the generic drugs identified in this Complaint;

(e)    Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)    Selling at least the generic drugs identified in this Complaint in the United States at collusive and noncompetitive prices; and

(g)    Accepting payment for at least the generic drugs identified in this Complaint sold in the United States at collusive and noncompetitive prices.

116.    Multiple factors corroborate the existence of the Fair Share Agreement.  In fact, the evidence is overwhelming:

- The many generic drugs that are already part of MDL 2724.  Exhibit A (MDL 2724 Generic Drugs as of June 2018).

- The confessions of Glazer and Malek, other public revelations to date in the ongoing government investigations, and other public reports indicating widespread collusion.  *See* Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry); Exhibit C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena Relating to Anticompetitive Conduct in the Generic Drug Industry).

- The extensive contacts among generic drug manufacturers including almost constant trade association meetings.  *See, e.g.*, Exhibit D (Trade Association

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

Contacts as to the Named Generic Drugs); Exhibit E (Generic Pharmaceutical Association Board of Directors 2010 to 2017).

- Economic factors relating to the generic drug industry.  Exhibit F (Summary of Economic Factors Indicating Collusion in the Generic Drug Industry).

- Defendants' public communications to investors.  Exhibit G (Defendants' Investor Communications).

**C.    Pursuant to the Fair Share Agreement, Defendants and Their Co-Conspirators Agreed to Fix, Maintain, Stabilize, and Raise Prices, Rig Bids, and Engage in Market and Customer Allocation of Generic Drugs**

117.    Defendants' Fair Share Agreement began at least as early as 2011.  Over time, and with the success of Defendants' collusive efforts, the Fair Share Agreement expanded to encompass larger and larger swaths of the market for generic drugs.  The below timeline notes the known start of collusive conduct as to the generic drugs currently in MDL 2724:

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

### Timeline of Known Collusive Conduct for MDL 2724 Drugs[33]

| Timeline | Known Collusive Conduct |
|---|---|
| Summer 2011 | **nystatin** (cream and ointment); **metronidazole** (cream, jelly, lotion) |
| Fall 2011 | |
| Winter 2012 | |
| Spring 2012 | **acetazolamide** (tablets) |
| Summer 2012 | **nimodipine** |
| Fall 2012 | doxycycline (hyclate RR); **paromomycin; verapamil** (tablets) |
| Winter 2013 | |
| Spring 2013 | albuterol; desonide; **meprobamate; nimodipine; nystatin** (tablets); propranolol (capsules); **zoledronic acid** |
| Summer 2013 | clomipramine; divalproex; doxycycline (hyclate DR and monohydrate); levothyroxine; pravastatin; **verapamil** (capsules) |
| Fall 2013 | **acetazolamide** (tablets); benazepril; digoxin |
| Winter 2014 | baclofen |
| Spring 2014 | doxycycline (hyclate DR); lidocaine-prilocaine; **theophyline;** ursodiol |
| Summer 2014 | **acetazolamide** (capsules); amitriptyline; clobetasol; econazole; fluocinonide; **fosi-HCTZ; glipizide-metformin;** glyburide; **glyburide-metformin; leflunomide; nystatin** (tablets); **paromomycin; theophylline; verapamil** (tablets) |
| Fall 2014 | |
| Winter 2015 | propranolol (tablets); **metronidazole** (vaginal) |
| Spring 2015 | **leflunomide; verapamil** (capsules) |

118.     The linchpin of the Fair Share Agreement was frequent communications between purported competitors.  These communications were made via telephone, text message, email, and through messaging platforms such as LinkedIn or WhatsApp.  The inter-competitor communications sometimes took place between very high-level executives (*see* Section V.C.h (nimodipine)) discussing a contact between Heritage President Jason Malek and Ascend Executive Vice President John Dillaway).  More often, however, the conspiratorial

---

[33] **Bold** = Named Generic Drugs in this Complaint.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

communications involved National Account Managers and employees at comparable positions. However, very senior executives (such as Heritage President Malek) sometimes directed their subordinates to reach out to competitors and to report back.

119.     The substance of these inter-competitor communications varied depending on the particular issues presented by a drug.  For example, if the conspirators believed they could increase prices for a particular drug, collusive communications focused on a future price increase. *See, e.g.*, Section V.C.a.2 (acetazolamide capsules).  Other times, conspiratorial communications focused on rigging bids to particular customers (*see, e.g.*, Section Section V.C.h (nimodipine)) or refusing to engage in competition for the business of certain customers (*see, e.g.*, Section V.C.i.3 (nystatin tablets).  If a new market for a generic drug was opening up due to the expiration of a patent, conspiratorial communication sometimes consisted of a discussion of market share allocation. *See, e.g.*, Section V.C.m (zoledronic acid).

120.     Consistent with the overarching Fair Share Agreement, a single communication between conspirators would often span multiple drugs.  For instance, during an April 15, 2014 telephone conversation, Heritage President Jason Malek and Nisha Patel of Teva coordinated regarding price increases for several drugs, including acetazolamide capsules, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, and nystatin tablets.

121.     Further, Defendants' agreements on one drug were interrelated with agreements concerning other drugs.  For instance, Mylan agreed to give up two major customers for doxy DR to Heritage based, in part, on Heritage permitting Mylan to profitably enter a market for a different generic drug. *See* Section V.D.a.1 (doxy DR).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

122.     Keeping the existence of these communications secret was of paramount importance.  Senior level executives repeatedly directed their subordinates not to leave any written documentation of their communications with competitors.

123.     In addition to the inter-competitor communications at the heart of the Fair Share Agreement, Defendants also worked internally to ensure the execution of the Fair Share Agreement.  For instance, in April and May of 2014, Heritage held multiple internal meetings to confirm that the prices for drugs that had been the subject of conspiratorial communication would in fact be increased, and to address logistical issues like the timing of price increase notices.

124.     The effectiveness of the Fair Share Agreement was facilitated by certain characteristics of the generic drug industry.

125.     First, the generic drug industry is a tight-knit community.  For instance, many generic drug manufacturer employees (including, for example, so called National Account Managers or "NAMs" as well as certain senior executives) moved from generic drug manufacturer to generic drug manufacturer while preserving former co-worker contacts, and thus furthered the interwoven, cooperative generic drug industry culture.  Some examples include: Malik worked at Ranbaxy (now Defendant Sun) and Defendant Sandoz before working at Defendant Mylan; Dan Lukasiewicz worked at Defendants Aurobindo and Zydus before working at Defendant Heritage; Susan Knoblauch worked at Defendant Sun before leaving to work as a NAM at Citron; Jan Bell worked at Defendant G&W before working at Defendant Mylan; and Joseph Papa left Defendant Perrigo to become Chairman and CEO of Defendant Valeant.  The benefits of prior employment relationships were not confined to those existing across purported competitors.  Nisha Patel, who joined Teva in 2013, previously worked for a drug wholesaler.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

While working for the drug wholesaler, Patel was in contact with Heritage President Jason Malek because Heritage supplied drugs to wholesalers. The prior relationship between Patel and Malek was an important precursor to collusive communications that occurred after Patel arrived at Teva.

126.     Second, there are myriad opportunities in the generic drug industry for employees of various generic drug manufacturers to interact with one another.  As shown in Exhibit D, numerous trade association meetings and industry events were held during the time period where collusion was taking place.  Indeed, in several instances, these opportunities for in-person interactions took place in the midst of other communications (*e.g.*, phone calls, text messages) between conspirators.  *See* Sections V.C.a.2; V.C.b; V.C.h; V.C.i.1; V.C.i.2 (discussing acetazolamide capsules, fosi-HCTZ, nimodipine, nystatin cream, and nystatin ointment).

127.     As a result of the conspiratorial conduct described herein, Defendants and their co-conspirators enjoyed artificially inflated prices (and correspondingly inflated profits).

### a.     acetazolamide

128.     Acetazolamide has been available in the United States since 1952. It is used to treat a variety of conditions, including glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure.  Due to, among other things, its clinical efficacy and safety, acetazolamide has been designated as an essential medicine by the World Health Organization.

129.     The market for acetazolamide is mature.  At all relevant times, there have been multiple manufacturers of generic acetazolamide.

130.     The relevant manufacturers of acetazolamide are Defendants Heritage, Lannett, Taro, Teva, and Zydus.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

### (1)   acetazolamide tablets

131.      Defendants Lannett and Taro dominate the market for acetazolamide tablets.
Upon information and belief, since at least the spring of 2012, Lannett and Taro have
coordinated pricing and allocated market share for acetazolamide tablets.

132.      Acetazolamide tablets come in two dosage strengths: 125 and 250 mg. Both Taro
and Lannett make the 250 mg dosage, which is the predominant form. Only Taro makes the 125
mg dosage, which is less widely used.  However, as described below, the 125 mg dosage was
included in the agreement between Taro and Lannett to artificially inflate prices of
acetazolamide tablets.

133.      Prior to the spring of 2012, ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

134.      ████████████████████████████████████
████████████████████████████████████████████████

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45



<hr />

[34] Pricing per unit and market share data are obtained from QuintilesIMS Inc. (referred to in previous complaints as "IMS Health," but, as of late 2017, operating under the name IQVIA). IMS Health/IQVIA is the largest vendor of physicians' prescribing data in the United States and is widely relied upon in the pharmaceutical industry and elsewhere. When pricing charts are used in this Complaint, they show "effective prices," which represent actual transaction prices, as reported by IMS Health/IQVIA. Direct Purchaser Class Plaintiffs calculated Defendants' effective prices based on National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]" IMS Institute for Health Informatics, HSRN Data Brief: National Sales Perspectives, at 1. Similar changes in pricing are also reflected in other data sets. *See, e.g.*, End-Payer Class Action Complaint, No. 2:18-cv-02401-CMR, ECF 1 (filed on June 7, 2018) (describing, among other data sets, wholesale acquisition cost ("WAC") and average wholesale price ("AWP")).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45



135. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

136.     The United States Government Accountability Office ("GAO") noted that acetazolamide tablets had an "extraordinary price increase."[35]

137.     By the middle of 2013, Taro and Lannett worked out a ████████████████

████████████████████████████████████████████████████████████

138.     ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[35] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/679055.pdf ("GAO Report").

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45



139.

140.     The ability of Taro and Lannett to reach agreement regarding acetazolamide tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  For instance, in August 2013, representatives from Lannett and Taro attended the NACDS Total Store Expo in Las Vegas.  In October 2013, representatives from Taro and Lannett, among other Defendants, attended the GPhA Fall Tech Conference in Bethesda, Maryland.  *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

141.

142.

143.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

144.     The agreement between at least Defendants Taro and Lannett was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

- 43 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

bids, and engage in market and customer allocation for generic drugs, including acetazolamide tablets.

**(2)    acetazolamide capsules**

145.    The vast majority of the acetazolamide capsule market is accounted for by Defendants Heritage, Teva and Zydus.

146.    Since at least 2014, Heritage, Teva, and Zydus have coordinated pricing and allocated market share for acetazolamide capsules.



147.    During the week of April 14, 2014, Heritage President Jason Malek met with two Heritage employees and asked them to start analyzing the impact of price increases for different generic drugs, including acetazolamide, carisoprodol, cidofovir, doxy mono, fosinopril-HCTZ,

- 44 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, methimazole, nimodipine, nystatin, paromomycin, theophylline and verapamil.

148.     Immediately after beginning Heritage's internal efforts to initiate a price increase, Malek reached out to an established contact at an erstwhile competitor, Nisha Patel at Teva. On April 15, 2014, Malek had a 17 minute telephone conversation with Patel. Malek knew Patel from her prior employment with a major drug wholesaler, which was a customer of Heritage. Patel left the wholesaler and joined Teva in April 2013. When Patel arrived at Teva in 2013, she reached out to Malek and provided her new contact information. Patel also inquired as to the generic drugs sold by both Teva and Heritage, and Malek identified several. Malek took this opportunity to note to Patel that Heritage was planning to raise prices of some generics soon and, thus, the timing of Patel's arrival at Teva was opportune.  Patel responded that she was still getting up to speed on Teva's business but understood that Teva usually leads price increases or quickly matches them.  This initial connection between Malek and Patel after Patel's arrival at Teva began to bear fruit in 2014.

149.     During their April 15, 2014 phone call, Patel agreed that if Heritage increased the price of acetazolamide capsules (and a series of other drugs), Teva would match the price increases – or at least not challenge Heritage's price increases by underbidding Heritage's customers. Teva's Patel was willing to agree to price increases for these drugs, including acetazolamide capsules, because if Teva supported Heritage on the price increase in this and other drugs, Teva could count on Heritage supporting it for other increases. Indeed, for two drugs – nystatin and theophylline – Teva already knew that Heritage would support Teva's efforts to raise prices or at least not challenge the increases.  Malek and Patel would speak many times

- 45 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

over the next several months to confirm their agreement to raise prices and keep up-to-date on the progress of Heritage's price increases.

150.     On April 16, 2014, the day after Malek spoke to Teva's Patel, Patel called an employee at Zydus to discuss the pricing of acetazolamide capsules.  The two spoke for nearly 20 minutes, and spoke again the next day for nearly 12 minutes.  Over the next several months, Teva's Patel and her contact at Zydus communicated frequently.

151.     On April 22, 2014, Heritage's Malek held an internal telephone conference with the Heritage sales team and dictated a pricing strategy that targeted several different drugs, including acetazolamide capsules, for a price increase.  Prior to the call, Malek circulated a spreadsheet to his sales team, which identified each drug slated for a price increase, the competitor for each drug, and their respective market shares.

152.     In addition to communicating with his own sales team at Heritage, Malek believed it was also important to "socialize" the idea of an acetazolamide capsule price increase with competitors before implementing it.

153.     To that end, on April 24, 2014, Heritage's Malek contacted a Zydus employee through the website LinkedIn to discuss at least acetazolamide capsules. That Zydus employee responded to Malek later the same day.

154.     Shortly after, on April 26-29, 2014, Heritage CEO Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from at least multiple Defendants, including Teva and Zydus.

155.     In May 6 and 7, 2014 email communications, after Heritage's Malek confirmed his agreement with competitors to raise the price of acetazolamide capsules, Heritage refused a large GPO customer's request for a price reduction.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

156.     During this time, Heritage also avoided bidding on any potential customers where Zydus was already supplying acetazolamide capsules.  Heritage did this in contravention of its own independent self-interest and in furtherance of Defendants' Fair Share Agreement.

157.     During May 2014, employees at Teva and Zydus were also in close contact. For instance, on May 14, 2014, employees of Teva and Zydus exchanged numerous text messages.

158.     In addition to these known communications, Defendants had opportunities to speak in person about these agreements at industry conferences.  Between April and October 2014, Heritage, Teva, and Zydus attended meetings such as those organized by NASCD, HDMA, or GPhA.  *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

159.     For instance, on June 1-4, 2014, the HDMA held its annual Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona.  The Business Leadership Conference was attended by representatives from Heritage (including known conspirators, Associate Director of National Accounts Neal O'Mara and National Account Manager Anne Sather), Teva (including known conspirator Nisha Patel), and Zydus.

160.     On June 23, 2014, the Heritage sales team had an internal meeting where they discussed the specific percentage amounts they would seek to increase on the identified drugs and their strategy for doing so.  The proposed increase for acetazolamide capsules was 75%.

161.     On June 25, 2014, Malek spoke with Teva's Patel for 14 minutes, during which he reported that Heritage's price increase notices would be mailed on June 26, 2014 for acetazolamide capsules and several other drugs for which Heritage and Teva had agreed to raise prices

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

162.    On June 26, 2014, Heritage began sending out price increase notices to its customers for nine different drugs, including acetazolamide. By July 9, 2014, Heritage had raised the price of acetazolamide capsules to at least 17 different customers nationwide.

163.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

164.    This agreement between at least Defendants Heritage, Teva, and Zydus was part of an overarching conspiracy between the Defendants to artificially inflate prices for generic drugs, including acetazolamide capsules.

**b.    fosinopril hydrochlorothiazide**

165.    Fosinopril hydrochlorothiazide ("fosi-HCTZ") is used to treat high blood pressure, thereby helping to prevent strokes, heart attacks, and kidney problems.

166.    The market for fosi-HCTZ is mature.  At all relevant times, there have been multiple manufacturers of generic fosi-HCTZ.

167.    The relevant manufacturers of fosi-HCTZ are Defendants Aurobindo, Citron, Glenmark, Heritage, and Sandoz.

168.    As of April 2014, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

169.    As discussed above, during the week of April 14, 2014, Heritage's Malek tasked two Heritage employees with analyzing price increases for several generic drugs, including fosi-HCTZ.  On April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases.  Fosi-HCTZ was on the list.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

170.     Heritage National Account Manager Dan Lukasiewicz (who had previously worked at Zydus and Aurobindo) was deputized by Heritage CEO Glazer to coordinate with competitors regarding the fosi-HCTZ price increase.  Glazer cautioned Lukasiewicz not to document any of his communications in writing.

171.     In May 2012, executives from Heritage, Aurobindo and Glenmark began communicating frequently about a collusive price increase for fosi-HCTZ.  On May 2, 2014, a Heritage executive contacted a Glenmark executive on LinkedIn. On May 8, 2014, a Heritage executive (likely Lukasiewicz) had a 16 minute telephone conversation with an executive at Aurobindo. The same day, a Heritage executive (again, likely Lukasiewicz) called an executive at Glenmark, and they spoke for 14 minutes.  The following day, May 9, 2014, an Aurobindo executive and a Glenmark executive held a 9 minute telephone call.

172.     While these inter-company communications were taking place regarding fosi-HCTZ, Heritage was making internal preparations for a price increase on fosi-HCTZ.  On May 9, 2014, Heritage held an internal conference call that confirmed that fosi-HCTZ (among other drugs) was designated for a price increase.

173.     On May 14, 2014, executives from Heritage, Aurobindo and Sandoz met in person to discuss a fosi-HCTZ price increase at an MMCAP conference in Minnesota.  The two executives from Aurobindo and Sandoz continued to discuss the price increase the next day (May 15, 2014) via text message and telephone.

174.     Also on May 15, 2014, Heritage, acting contrary to its independent self-interest, conceded a valuable customer to Aurobindo based on a recent conversation between representatives of those Defendants confirming that Aurobindo would cooperate in the Fair Share Agreement.

- 49 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

175.    Collusive contacts between the fosi-HCTZ manufacturers continued in June 2014. During the week from June 4-10, 2014, executives from Aurobindo, Glenmark and Sandoz called and texted each other multiple times concerning the planned fosi-HCTZ price increase. On June 16, 2014, an executive of Glenmark called an Aurobindo executive and they spoke for 22 minutes.

176.    Around this same time, Heritage decided to significantly increase its prices, including a 200% price increase for fosi-HCTZ.

177.    On June 25, 2014 – the day before Heritage issued price increase letters for numerous drugs, including fosi-HCTZ – sales executives from Heritage and Aurobindo spoke by phone for 18 minutes.

178.    Also on June 25, 2014, Glenmark and Citron executives made contact and confirmed that Citron would also be entering the fosi-HCTZ market.  Citron was then apprised of the price increase scheme.

179.    On June 26, 2014, Heritage began implementing its fosi-HCTZ price increase as planned.

180.    The collusive communications continued after Heritage's price increase implementation as other Defendants prepared to implant Heritage's fosi-HCTZ price increase. On June 27, 2014, executives from Aurobindo and Glenmark spoke by telephone.

181.    On July 1, 2014, the same Citron executive who had spoken with someone at Glenmark (on June 25) reached out to a contact at Heritage and had a nearly 13 minute discussion regarding price increases for fosi-HCTZ and glyburide.  Evidence also shows that the Citron executive warned her Heritage counterpart about contacting Citron by email concerning fosi-HCTZ pricing, and she suggested that communications be done by phone.

- 50 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

182.     The next day, on July 2, 2014, the same two executives from Heritage and Citron had a nearly 22 minute conversation.

183.     On July 9, 2014, Citron confirmed internally that it would try to match Heritage's fosi-HCTZ price increases, and it began implementing its own price increases on July 15, 2014.

184.     On July 14, 2014 – the day before Citron was to implement its fosi-HCTZ price increase – executives of Citron and Glenmark had two telephone conversations, lasting 7 and 13 minutes.

185.     On July 18, 2014, a Heritage employee and a Glemark employee had a 23 minute telephone conversation.  The same individuals from Heritage and Glenmark had a 5 minute follow up conversation on July 30, 2014.

186.     By early 2015, Defendants Heritage, Aurobindo, Citron, Glenmark, and Sandoz had implemented the agreed-upon fosi-HCTZ price increases.

187.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

188.     The agreement between at least at least Defendants Aurobindo, Citron, Glenmark, Heritage, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including fosi-HCTZ.

### c.     glipizide-metformin

189.     Glipizide-metformin is used to treat high blood sugar levels associated with diabetes.

190.     The market for glipizide-metformin is mature.  At all relevant times, there have been multiple manufacturers of generic glipizide-metformin.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

191.    The relevant generic manufacturers of glipizide-metformin are Defendants Heritage, Mylan, and Teva.

192.    As of April 2014, ███████████████████████████████████ ████████████████████

193.    As discussed above, on April 15, 2014, Heritage's Malek had a 17 minute telephone conversation with Nisha Patel at Teva (whom Malek knew from Patel's prior employment) regarding, among other things, glipizide-metformin price increases.  The two Defendants reached an agreement whereby Teva would match Heritage's price increase for glipizide-metformin and would not attempt to underbid it.  This agreement was confirmed in subsequent conversations between Heritage's Malek and Teva's Patel during the next few months.

194.    Shortly before reaching an understanding with Teva, Malek had already began laying the internal groundwork at Heritage for a price increase.  During the week of April 14, 2014, Heritage's Malek tasked two Heritage employees with analyzing price increases for several generic drugs, including glipizide-metformin.  On April 22, 2014, the Heritage sales team held an internal teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases. Glipizide-metformin was on the list.

195.    Neal O'Mara of Heritage was responsible for communicating with Defendant Mylan through his contact, James Nesta, regarding the glipizide-metformin price increase.  On April 23, 2014, O'Mara spoke with Nesta at Mylan and reported the results of these communications to Malek.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

196.     Teva and Mylan maintained regular communication in advance of the glipizide-metformin price increase.  For instance, on May 9, 2014, personnel from Mylan and Teva spoke multiple times, including a call that lasted 7 minutes.

197.     Meanwhile, also on May 9, 2014, Heritage held an internal conference call that confirmed that glipizide-metformin was designated for a price increase.

198.     On June 25, 2014, Malek spoke with Teva's Patel for 14 minutes, during which he reported that Heritage's price increase notices would be mailed on June 26, 2014 for glipizide-metformin and several other drugs for which Heritage and Teva had agreed to raise prices.

199.     On June 26, 2014, a Heritage employee informed her contact at a large wholesaler that glipizide-metformin prices would be increasing by 100% effective July 1, 2014.  Heritage began to distribute price increase notices for glipizide-metformin on the same date.

200.     As of early July 2014, Heritage had increased prices for approximately 27 customers.  Teva and Mylan matched and did not attempt to underbid Heritage.  In fact, Teva actually increased its glipizide-metformin prices during the same time period.

201.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

202.     The agreement between at least Defendants Heritage, Mylan, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including glipizide-metformin.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

### d.   glyburide-metformin

203.     Glyburide-metformin is used to treat type 2 diabetes.

204.     The market for glyburide-metformin is mature.  At all relevant times, there have

been multiple manufacturers of generic glyburide-metformin.

205.     The relevant manufacturers of glyburide-metformin are Defendants Actavis,

Aurobindo, Citron, Heritage, Impax, and Teva.

206.     In approximately April 2014, ████████████████████████████

████████████████████████████ Heritage desired to raise prices and

contacted its competitors regarding a proposed price increase.

207.     For example, on April 15, 2014, Heritage's Malek had a 17 minute telephone

conversation with a contact at Teva during which they discussed a glyburide-metformin price

increase.  An agreement was reached that Teva would match, or at least not challenge, Heritage's

elevated bid.  Malek and his Teva contact spoke on several other occasions and confirmed their

agreement.

208.     Another individual at Heritage was responsible for contacting Actavis regarding a

price increase.  At least one telephone conversation occurred, on April 22, 2014, wherein

representatives at Heritage and Actavis agreed to the proposed price increase for glyburide-

metformin (and verapamil).  News of the agreement between Heritage and Actavis to raise prices

for glyburide-metformin was circulated internally at Actavis.

209.     After learning of the understanding between Heritage and Actavis regarding

glyburide-metformin, on May 1, 2014, an individual at Actavis contacted a Teva representative,

and they spoke for 5 minutes.  On May 6, 2014, the same individuals at Actavis and Teva spoke

three times, including one 15 minute telephone conversation.  These employees of Actavis and

Teva stayed in communication over the next several months.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

210.    Heritage employees also established contact with one or more individuals at Aurobindo regarding price increases for glyburide-metformin, including a 16 minute telephone conversation held on May 8 and an in-person conversation on May 14.

211.    As discussed above, on May 8, 2014, Malek contacted the Heritage sales team to obtain a report on communications with representatives from other generic manufacturers regarding pricing for, among other drugs, glyburide-metformin.

212.    The next day, on May 9, 2014, Heritage held an internal conference call during which glyburide-metformin was identified (along with other drugs) as designated for a price increase.

213.    Executives of Actavis and Aurobindo were also in communication in the spring of 2014. On May 12, 2014, an Actavis executive spoke twice with Bob Cunard, CEO of Aurobindo. Between May 19 and 22, 2014, the same Actavis executive exchanged 30 text messages with a Teva executive.

214.    During the next two months, representatives at Actavis, Aurobindo, and Heritage maintained communication regarding glyburide-metformin price increases, including through telephone conversations and text messages.   At least Defendant Citron also became involved in these communications.

215.    By July 2014, Heritage and Teva had increased their WAC prices for glyburide-metformin.  Impax's prices also started to increase around that time.

216.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

217.    The agreement between at least Defendants Actavis, Aurobindo, Citron, Heritage, Impax, and Teva was part of an overarching conspiracy between generic drug manufacturers to

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including glyburide-metformin.

       **e.   leflunomide**

218.      Leflunomide is used to treat active moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

219.      The market for leflunomide is mature.  At all relevant times, there have been multiple manufacturers of generic leflunomide.

220.      The relevant manufacturers of leflunomide are Defendants Apotex, Heritage, and Teva.

221.      In April 2014, ████████████████████████████████████
████████████████████████████████████████████████████████████████
██████

222.      Leflunomide prices were also discussed during the 17 minute telephone conversation between Heritage's Malek and Nisha Patel at Teva on April 15, 2014.  The two Defendants reached an agreement whereby Teva would match Heritage's price increase for leflunomide, and not attempt to underbid it.  This agreement was confirmed in subsequent conversations between Heritage's Malek and Teva's Patel during the next few months.

223.      Heritage National Account Manager Matt Edelson was responsible for coordinating with Apotex regarding leflunomide pricing.  On May 2, 2014, Edelson spoke with Beth Hamilton at Apotex for 13 minutes.  Shortly thereafter, during a two-day period, on May 6-7, 2014, a Heritage employee (likely Edelson again) had four phone calls with Hamilton at Apotex.  These Heritage/Apotex phone calls occurred shortly after Heritage learned that Teva would be leaving the leflunomide market.  In other words, Heritage was cementing its

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

understanding with the company (Apotex) that would be the only other manufacturer of leflunomide left after Teva's exit.

224.     On May 8, 2014, Malek contacted the Heritage sales team to obtain a report on communications with representatives from other generic manufacturers regarding pricing for, among other drugs, leflunomide.

225.     At the May 9, 2014 Heritage internal conference call Heritage confirmed that leflunomide (along with other drugs) was designated for a price increase.

226.     On May 27, 2014, Heritage learned that Apotex implemented a price increase for leflunomide.

227.     In late June 2014, Heritage began sending out price increase notices to its customers for leflunomide. As of July 2014, Heritage had increased its leflunomide price for approximately 15 different customers.

228.     At the same time Heritage and Apotex were implementing their price increases for leflunomide, Teva began to exit the leflunomide market, consistent with what Heritage had learned in May.

229.     As a result of the mid-2014 price increases (as well as later price increases), prices of leflunomide were artificially inflated.

230.     No non-collusive market factors can explain Defendants' artificially inflated prices.

231.     The agreement between at least Defendants Apotex, Heritage, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including leflunomide.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

f.      meprobamate

232.      Meprobamate is a generic pharmaceutical used for the short-term relief of anxiety.

233.      The market for meprobamate is mature.  At all relevant times, there have been multiple manufacturers of generic meprobamate.

234.      The relevant manufacturers of meprobamate are Defendants Actavis, Dr. Reddy's, and Heritage.

235.      In early 2013, Actavis exited the market for meprobamate, leaving Defendants Heritage and Dr. Reddy's as the remaining sellers of meprobamate.

236.      On March 21, 2013, Heritage's Malek emailed Heritage Associate Director of National Accounts Neal O'Mara and Heritage National Account Manager Matt Edelson and directed them to contact Dr. Reddy's and advise Dr. Reddy's that Heritage wanted to take a large price increase on meprobamate.

237.      The next day, on March 22, 2013, Heritage's O'Mara had a 9 minute telephone conversation with a contact at Dr. Reddy's, during which the two companies agreed to raise the price of meprobamate. Following the conversation, also on March 22, 2013, O'Mara sent an email to Malek advising that Dr. Reddy's was "on board" with the meprobamate price increase. On March 25, 2013, O'Mara sent another email to Malek stating that Dr. Reddy's would "follow suit" on a meprobamate price increase.

238.      In approximately April 2013, Dr. Reddy's contacted Heritage about acquiring additional market share for meprobamate.  The two companies then worked out an agreement whereby Heritage gave some of its existing business – specifically a large pharmacy chain – to Dr. Reddy's.

239.      Heritage and Dr. Reddy's continued their conspiratorial communications regarding meprobamate in May 2013. On May 17, 2013, Heritage's Malek communicated with

- 58 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45

his contact at Dr. Reddy's.  This contact was followed by a 7 minute telephone conversation between Malek and a Dr. Reddy's executive on May 21, 2013.

240.    Through their communications and resulting agreements, these two Defendants significantly raised meprobamate prices during this same period.  Heritage's price increases went into effect in April 2013, and Dr. Reddy's price increases went into effect about a month later.



REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45



241.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

242.    The agreement between at least Defendants Heritage and Dr. Reddy's was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including meprobamate.

       **g.    metronidazole**

243.    Metronidazole is a generic antibiotic.  Due to, among other things, its clinical efficacy and safety, metronidazole has been designated as an essential medicine by the World Health Organization.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 45