# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| AHOLD USA, INC.;<br>CÉSAR CASTILLO, INC.;<br>FWK HOLDINGS, L.L.C.;<br>KPH HEALTHCARE SERVICES, INC., a/k/a<br>KINNEY DRUGS, INC.; and<br>ROCHESTER DRUG CO-OPERATIVE, INC.;<br>on behalf of themselves and all others similarly<br>situated,<br><br>               Plaintiffs,<br><br>v.<br><br>ACTAVIS HOLDCO U.S., INC.;<br>APOTEX CORP.;<br>AUROBINDO PHARMA USA, INC.;<br>CITRON PHARMA LLC;<br>DR. REDDY'S LABORATORIES, INC.;<br>FOUGERA PHARMACEUTICALS INC.;<br>G&W LABORATORIES, INC.;<br>GLENMARK PHARMACEUTICALS, INC.;<br>HERITAGE PHARMACEUTICALS, INC.;<br>IMPAX LABORATORIES, INC.;<br>LANNETT COMPANY, INC.;<br>MYLAN INC.;<br>MYLAN PHARMACEUTICALS INC.;<br>OCEANSIDE PHARMACEUTICALS, INC.;<br>RAJIV MALIK;<br>PAR PHARMACEUTICAL COMPANY, INC.;<br>PERRIGO NEW YORK, INC.;<br>SANDOZ, INC.;<br>SUN PHARMACEUTICAL INDUSTRIES,<br>INC.;<br>TARO PHARMACEUTICALS U.S.A., INC.;<br>TEVA PHARMACEUTICUALS USA, INC.;<br>VALEANT PHARMACEUTICALS NORTH<br>AMERICA LLC;<br>VALEANT PHARMACEUTICALS<br>INTERNATIONAL; and<br>ZYDUS PHARMACEUTICALS (USA), INC.,<br><br>               Defendants. | 18-CV-02641<br><br>HON. CYNTHIA M. RUFE<br><br>JURY TRIAL DEMANDED |

## DIRECT PURCHASERS' FIRST AMENDED CLASS ACTION COMPLAINT

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

    A.    Each of the Generic Drugs in MDL 2724 is Part of An Overarching Fair Share Agreement in the Generic Drug Industry..................................................3

    B.    The Generic Drug Industry's Closely-Knit and Highly Social Culture Enabled the Overarching Fair Share Agreement to Thrive for Years. ........................................6

        1.    The Fair Share Agreement was applied across multiple generic drugs at a time and was especially effective when new entrants came to market or when generic drug manufacturers decided to exit a market. ......................7

        2.    The conspirators disciplined conduct inconsistent with the Fair Share Agreement and took steps to conceal their activities..................................9

    C.    Generic Drug Manufacturers Continue to Be Under Extensive Scrutiny by Government Regulators. ........................................................................10

    D.    The Existence of the Fair Share Agreement within the Generic Drug Industry and as to the Named Generic Drugs Is Supported by Other Factors. ...........................14

    E.    Direct Purchasers Paid More Than They Would Have for the Named Generic Drugs But-For the Fair Share Agreement..................................................15

II.   JURISDICTION AND VENUE ........................................................15

III.  PARTIES ...........................................................................................16

    A.    Plaintiffs...................................................................................16

    B.    Defendants ...............................................................................17

    C.    Co-Conspirators .......................................................................25

IV.   INTERSTATE TRADE AND COMMERCE .....................................26

V.    FACTUAL ALLEGATIONS .............................................................27

    A.    Competition Between Generic Drugs Historically Has Been Keen. ....................27

        1.    Generic drugs should lead to lower prices....................................27

        2.    Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive...............29

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

B.   Defendants and Their Co-Conspirators Participated in an Overarching Fair Share
     Agreement to Thwart Competition in the Generic Drug Industry.........................33

C.   Pursuant to the Fair Share Agreement, Defendants and Their Co-Conspirators
     Agreed to Fix, Maintain, Stabilize, and Raise Prices, Rig Bids, and Engage in
     Market and Customer Allocation of Generic Drugs.............................................37

     a.   acetazolamide................................................................................41

          (1)   acetazolamide tablets .......................................................42

          (2)   acetazolamide capsules ....................................................46

     b.   doxy mono .....................................................................................50

     c.   fosinopril hydrochlorothiazide........................................................54

     d.   glipizide-metformin .......................................................................58

     e.   glyburide-metformin.......................................................................60

     f.   leflunomide ....................................................................................62

     g.   meprobamate...................................................................................64

     h.   metronidazole.................................................................................67

          (1)   metronidazole cream ........................................................68

          (2)   metronidazole jelly...........................................................70

          (3)   metronidazole lotion .........................................................72

          (4)   metronidazole vaginal......................................................74

     i.   nimodipine .....................................................................................77

     j.   nystatin ...........................................................................................80

          (1)   nystatin cream ..................................................................80

          (2)   nystatin ointment..............................................................84

          (3)   nystatin tablets .................................................................87

     k.   paromomycin ..................................................................................93

     l.   theophylline....................................................................................95

- iii –

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

m.      verapamil..........................................................................98

(1)      verapamil tablets ............................................................98

(2)      verapamil capsules ........................................................100

n.      zoledronic acid ..........................................................103

D.      Defendants' Anticompetitive Conduct Relating to Doxy DR and Glyburide
Further Demonstrates Defendants' Overarching Fair Share Agreement.............105

a.      doxy DR..........................................................................106

b.      glyburide .......................................................................113

E.      The Existence of the Fair Share Agreement within the Generic Drug Industry and
as to the Named Generic Drugs Is Supported by Other Factors. .........................115

VI.     CLASS ACTION ALLEGATIONS ...........................................................116

VII.    ANTITRUST INJURY .........................................................................118

VIII.   TOLLING OF THE STATUTE OF LIMITATIONS.......................................119

IX.     CLAIM FOR RELIEF .........................................................................122

X.      PRAYER FOR RELIEF .......................................................................124

XI.     JURY TRIAL DEMANDED...................................................................124

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

## EXHIBITS

| | |
|---|---|
| **EXHIBIT A** | MDL 2724 GENERIC DRUGS AS OF DECEMBER 2018 |
| **EXHIBIT B** | HISTORY OF GOVERNMENT INVESTIGATIONS AND OTHER PUBLIC REPORTS CONCERNING ANTICOMPETITIVE CONDUCT IN THE GENERIC DRUG INDUSTRY |
| **EXHIBIT C** | LIST OF GENERIC DRUG MANUFACTURERS KNOWN TO HAVE RECEIVED A DOJ SUBPOENA AND/OR CID RELATING TO ANTICOMPETITIVE CONDUCT IN THE GENERIC DRUG INDUSTRY |
| **EXHIBIT D** | TRADE ASSOCIATION CONTACTS AS TO THE NAMED GENERIC DRUGS |
| **EXHIBIT E** | GENERIC PHARMACEUTICAL ASSOCIATION BOARD OF DIRECTORS 2010 TO 2017 |
| **EXHIBIT F** | SUMMARY OF ECONOMIC FACTORS INDICATING COLLUSION IN THE GENERIC DRUG INDUSTRY |
| **EXHIBIT G** | DEFENDANTS' INVESTOR COMMUNICATIONS |

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

## I.    INTRODUCTION

1.      In the pharmaceutical industry the entry of generic versions of branded drugs should result in aggressive price competition, which, in turn, dramatically reduces prices for drug wholesalers, retail pharmacies, consumers, and third-party payors.  Thus, traditionally, generic drugs have been a relative healthcare bargain.  However, due to alleged anticompetitive activity by Defendants and co-conspirators, pricing dynamics in the generic drug industry changed.

2.      Government investigations have revealed that this change in pricing dynamics was the result of widespread and long-running collusion among generic manufacturers to thwart the economic benefits of generic competition.[1]  The scope of this collusion is massive, encompassing myriad drugs and involving nearly all of the significant generic drug manufacturers operating in the United States.  Pursuant to this overarching scheme (the "Fair Share Agreement"), generic drug manufacturers agreed to suppress competition among themselves so that they could fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of many dozens (if not hundreds) of generic drugs.

3.      MDL 2724 encompasses claims that certain pharmaceutical companies engaged in an unlawful scheme or schemes to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocations of certain generic drugs.  This Amended Class Complaint – filed by Direct Purchaser Plaintiffs'[2] in this multidistrict litigation ("DPPs' Heritage-Related

---

[1] *See, e.g.*, Plaintiff States' Consolidated Amended Complaint ("Plaintiff States' Heritage-Related Multi-Drug Complaint"), No. 2:17-cv-03768, ECF 14 (public version) & ECF 15 (under seal version) (filed June 18, 2018), at ¶ 11 ("the conduct is pervasive and industry-wide and the schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition").  *See also In re Generic Pharm. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 854 (E.D. Pa. 2018) (allowing Plaintiff States to file Plaintiff States' Heritage-Related Multi-Drug Complaint).

[2] Ahold USA, Inc., César Castillo, Inc., FWK Holdings, L.L.C., KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc., and Rochester Drug Co-Operative, Inc.

- 1 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Multi-Drug Complaint") – concerns additional generic drugs that were also subject to the Fair

Share Agreement: acetazolamide, doxycycline monohydrate ("doxy mono"), fosinopril

hydrochlorothiazide ("fosi-HCTZ"), glipizide-metformin, glyburide-metformin, leflunomide,

meprobamate, metronidazole, nimodipine, nystatin, paromomycin, theophylline, verapamil and

zoledronic acid ("Named Generic Drugs").

      4.     The Defendants as to the Named Generic Drugs in DPPs' Heritage-Related Multi-

Drug Complaint are Actavis Holdco U.S., Inc. ("Actavis"); Apotex Corp. ("Apotex"); Aurobindo

Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories,

Inc. ("Dr. Reddy's"); G&W Laboratories, Inc. ("G&W"); Glenmark Pharmaceuticals, Inc.

("Glenmark"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax");

Lannett Company, Inc. ("Lannett"); Mylan Inc. and Mylan Pharmaceuticals, Inc. (together,

"Mylan"); Par Pharmaceutical, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc.

and Fougera Pharmaceuticals Inc. (together, "Sandoz"); Sun Pharmaceutical Industries, Inc.

("Sun"); Taro Pharmaceuticals U.S.A., Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva");

Valeant Pharmaceuticals North America LLC, Valeant Pharmaceuticals International (now

known as Bausch Health Companies Inc.), and Oceanside Pharmaceuticals, Inc. (together,

"Valeant"), Zydus Pharmaceuticals USA, Inc. ("Zydus"), and Rajiv Malik ("Malik"). Each of

the Defendants and their co-conspirators (defined *infra* at ¶¶ 76-82) are generic drug

manufacturers or employees of generic drug manufacturers.

      5.     The allegations herein are based on Direct Purchaser Class Plaintiffs' personal

knowledge of the matters relating to themselves and upon information and belief as to all other

matters. Parts of Direct Purchaser Class Plaintiffs' allegations are based on information made

public during ongoing government investigations into anticompetitive conduct in the generic

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

drug industry. Other parts of Direct Purchaser Class Plaintiffs' allegations are based on

investigation conducted by and under the supervision of Direct Purchaser Class Plaintiffs'

counsel. Yet other parts of Direct Purchaser Class Plaintiffs' allegations are based on

documentary evidence disclosed in the version of the Plaintiff States' Heritage-Related Multi-

Drug Complaint filed under seal, to which all MDL parties were permitted access on August 15,

2018.[3] The DPPs' Heritage-Related Multi-Drug Complaint implicates many of the same generic

drugs as the Plaintiff States' Heritage-Related Multi-Drug Complaint.

**A.     Each of the Generic Drugs in MDL 2724 is Part of An Overarching Fair Share Agreement in the Generic Drug Industry.**

6.      MDL 2724 encompasses actions in which:

> (a) plaintiffs assert claims for price fixing of generic drugs in violation of the Sherman Act and/or state antitrust laws on behalf of overlapping putative nationwide classes of direct or indirect purchasers of generic pharmaceuticals; (b) the average market price of the subject generic pharmaceutical is alleged to have increased between 2012 and the present; (c) defendants are alleged to have effectuated the alleged conspiracy through direct company-to-company contacts and through joint activities undertaken through trade associations, in particular meetings of the Generic Pharmaceutical Association; and (d) the allegations stem from the same government investigation into anticompetitive conduct in the generic pharmaceuticals industry.[4]

---

[3] MDL Doc. No. 680 (Pretrial Order No. 50).

[4] MDL Doc. No. 194; *see also* MDL Doc. Nos. 417, 425 (transferring state actions). It is now apparent that the conduct began before 2012. *See also* Plaintiff States' Heritage-Related Multi-Drug Complaint at ¶ 91 (noting that "general rules of the road have been in place since at least 2006"); End-Payer Class Action Complaint, No. 2:18-cv-02401-CMR, ECF 1 (filed on June 7, 2018), at ¶ 101 ("Inter-defendant communications were commonplace in the industry and dated as far back as 2006. Starting in at least 2011, if not before, Defendants implemented anti-competitive agreements to increase the prices and allocate the markets of at least the Drugs at Issue, and possibly many more."); *see also infra* at ¶ 12 and specific allegations as to metronidazole and nystatin. The DOJ is known to have issued CIDs requesting information concerning price-fixing and market allocation in the generic pharmaceutical industry back to 2009.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

7.      In August 2017, Direct Purchaser Class Plaintiffs filed consolidated amended class action complaints concerning generic drug manufacturers' unlawful Fair Share Agreement to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of numerous generic drugs: albuterol, amitriptyline, baclofen, benazepril hydrochlorothiazide, clobetasol, clomipramine, desonide, digoxin, divalproex, doxycycline hyclate,[5] econazole, fluocinonide, glyburide, levothyroxine, lidocaine-prilocaine, pravastatin, propranolol,[6] and ursodiol.  Although it is true that, in August 2017, Direct Purchaser Class Plaintiffs proceeded with separate complaints as to separate generic drugs, even those 16 month-old complaints alleged that conduct as to those generic drugs "is part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals."[7] *See* Exhibit A (MDL 2724 Generic Drugs as of December 2018).

8.      The Court has sustained allegations concerning clobetasol, digoxin, divalproex, doxycycline hyclate, econazole, and pravastatin.[8]  In so doing, the Court agreed that Plaintiffs' individual drug complaint allegations regarding ongoing government investigations and Heritage executives' guilty pleas were "probative of broadly anticompetitive conduct in the generic

---

[5] Doxycycline hyclate regular release ("doxy RR") and doxycycline hyclate delayed release ("doxy DR").

[6] For propranolol, Direct Purchaser Class Plaintiffs filed a notice of the previously filed complaint and a copy thereof because the Honorable Jed S. Rakoff of the United States District Court for the Southern District of New York denied the fully briefed and argued motion to dismiss in that case.  *See* Notice Regarding Propranolol Complaint, No. 2:16-PP-27241-CMR, ECF 62 (filed on Aug. 15, 2017).

[7] *See, e.g.*, Consolidated Direct Purchaser Class Action Complaint, No. 16-DX-27241-CMR, ECF 83, at ¶ 3 (filed on Aug. 15, 2017); MDL Doc. No. 721 (Opinion dated Oct. 16, 2018, at 3) ("Class Plaintiffs contend Defendants engaged in anticompetitive conduct that was part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals.").

[8] *In re Generic Pharm. Pricing Antitrust Litig.*, --- F. Supp. 3d ---, 2018 WL 5003450 (E.D. Pa. Oct. 16, 2018).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

pharmaceutical industry."[9]  The Court also noted allegations that "Defendants engaged in

anticompetitive conduct that was part of a larger conspiracy or series of conspiracies involving

many generic pharmaceutical manufacturers and many generic pharmaceuticals"[10] and that

government investigations "have uncovered the existence of a broad, well-coordinated and long-

running series of schemes to fix the prices and allocate markets for a number of generic

pharmaceuticals in the United States.'"[11]

      9.     As described herein, Defendants and their co-conspirators' anticompetitive

conduct as to the Named Generic Drugs is part of an industry-wide, overarching "fair share"

conspiracy (Fair Share Agreement) involving at least the Named Generic Drugs and the

numerous generic drugs previously-filed on.  Under this Fair Share Agreement, each generic

drug manufacturer was entitled to its fair share of the generic drug industry "sandbox."  Pursuant

to this overarching scheme, generic drug manufacturers agreed to suppress competition among

themselves so that they could fix, stabilize, and raise prices, rig bids, and engage in market and

customer allocation of many dozens (if not hundreds) of generic drugs.

      10.    Each conspirator's share was determined through various factors, such as the

timing of market entry, number of ostensible competitors already in the market, and relationships

between the conspirators concerning other generic drugs.  Generally speaking, under the Fair

Share Agreement, if a generic manufacturer is the first to enter with a particular generic drug

then it is entitled to a larger share of the market; conversely, generic manufacturers that enter

later are typically entitled to a smaller share.  The common understanding and goal of the Fair

Share Agreement is for generic drug manufacturers to achieve artificially inflated prices because

---

[9] *Id.* at *30.

[10] *Id.* at *1.

[11] *Id.* at *9.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

no generic manufacturer is incentivized to compete for additional market share by eroding price. Thus, under the Fair Share Agreement generic drug manufacturers simply had no need to compete because each generic drug manufacturer was "playing nice in the sandbox."

11.     "Playing nice in the sandbox" entailed, among other things, getting along with ostensible competitors, communicating with them frequently about customers, new drug launches, prices, bids, and generally not disturbing their share of the generic drug industry sandbox.  If everyone adhered to the Fair Share Agreement and regularly socialized to keep information flowing then additional profits were guaranteed for each generic drug manufacturer without the hassle of free market competition.  This is what happened – at the expense of Direct Purchaser Class Plaintiffs and the proposed Class.

**B.      The Generic Drug Industry's Closely-Knit and Highly Social Culture Enabled the Overarching Fair Share Agreement to Thrive for Years.**

12.     Playing nice in the sandbox was facilitated by generic manufacturer employees frequently communicating and socializing both in-person at near constant trade association events, via telephone and texting, or via other electronic means (*e.g.*, email, social media platforms, LinkedIn, WhatsApp).  *See, e.g.*, Exhibit D (Trade Association Contacts as to the Named Generic Drugs); Exhibit E (Generic Pharmaceutical Association Board of Directors 2010 to 2017); *infra* at ¶¶ 115-20, and *infra* allegations as to specific generic drugs.[12]  In addition to in-person communications at trade association events, generic drug manufacturers' employees

---

[12] Such trade associations include, but are not limited to, the Generic Pharmaceutical Association ("GPhA") (now called the Association for Accessible Medicines), the Healthcare Distribution Management Association ("HDMA") (now called the Healthcare Distribution Alliance), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), the National Association of Chain Drug Stores ("NACDS"), Efficient Collaborative Retail Marketing ("ECRM"), and the National Pharmacy Forum ("NPF").  *See also, e.g.,* Consolidated Direct Purchaser Class Action Complaint, No. 16-DX-27241-CMR, ECF 83, at Section V.C (filed on Aug. 15, 2017) (trade association and generic drug industry communication allegations as to doxycycline hyclate).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

frequently met in less formal settings such as happy hours, events for women in the industry,

dinners, lunches, golf outings, ██████████ , ████████████ , etc. Impromptu gatherings were

readily scheduled because many generic pharmaceutical manufacturers are headquartered in

relatively close geographic proximity throughout the mid-Atlantic region.

13.     In addition to the numerous opportunities for interaction, many generic drug

manufacturer employees and executives (including, for example, so called National Account

Managers or "NAMs") moved from generic drug manufacturer to generic drug manufacturer

while preserving former co-worker contacts, and thus furthered the interwoven, cooperative

generic drug industry culture.

14.     The coziness and chattiness among generic drug manufacturer employees

facilitated "playing nice in the sandbox" and allowed for the overarching fair share conspiracy to

blossom. Open communications with ostensible competitors were merely part of the "toolkit" by

which employees were successful in their jobs and achieved higher profits for their employers.

15.     Because generic drug manufacturers and their employees are repeat players who

routinely encounter the same ostensible competitors, their Fair Share Agreement – to eschew

price competition and allocate markets and customers – became the "rules of the road" that

govern their overarching conspiracy. There are indications that such general fair share rules of

the road have been in place in some corners of the generic drug industry as far back as 2006 and

may have governed behavior concerning hundreds of generic drugs.

**1.     The Fair Share Agreement was applied across multiple generic drugs at a time and was especially effective when new entrants came to market or when generic drug manufacturers decided to exit a market.**

16.     The overarching anticompetitive conduct was often not conducted on a generic

drug by generic drug basis. Defendants' communications often involved multiple generic drugs.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

17.    Generic drug manufacturers were generally aware of each manufacturer's entire portfolio of generic drugs, as well as pending and/or approved Abbreviated New Drug Applications ("ANDAs"),[13] and, thus, were ostensible competitors on many drugs.  As such, achieving a fair share as to one generic drug could involve horse trading across other generic drugs.  For instance, generic drug manufacturers might give up customers on one generic drug based as a quid pro quo for customers from other generic drug manufacturers on a different generic drug (i.e., "walking away" from business).

18.    This understanding regarding fair share was particularly effective when a new generic drug manufacturer entered the market – a time when, in a competitive market, prices should go down.  As part of the Fair Share Agreement, a generic drug manufacturer set to launch a generic drug would often approach or be approached by existing generic drug manufacturers prior to market entry.  This allowed for a fair share understanding to be reached prior to the new generic manufacturer entering the market and allowed for artificially inflated prices to be maintained.

19.    The Fair Share Agreement allowed generic drug manufacturers to enjoy high profits without the threat of competition.  Further, as the industry grew more comfortable with the Fair Share Agreement, generic drug manufacturers became bolder and would, at times, substantially raise generic drug prices.  Although such large price increases would be risky in a competitive market where customers could simply buy from lower priced rivals, the conspirators knew that competition would not be forthcoming pursuant to their overarching Fair Share Agreement.  The conspirators reached an understanding that their industry compatriots would not

---

[13] As discussed further below, to obtain marketing approval for a generic drug, an ANDA must be filed with the U.S. Food and Drug Administration's Center for Drug Evaluation and Research, Office of Generic Drugs.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

violate the rules of the road; that is, to maintain artificially inflated prices by allocating generic drugs and customers.

**2.    The conspirators disciplined conduct inconsistent with the Fair Share Agreement and took steps to conceal their activities.**

20.    The means and methods of how the overarching combination and conspiracy operated included rebalancing market share as well as disciplining conduct inconsistent with the Fair Share Agreement.

21.    For example, the conspirators periodically rebalanced market share by allocating customers. For instance, if it was determined that Generic Drug Manufacturer A had less than its fair share, then, pursuant to the overarching Fair Share Agreement, Generic Manufacturer B would "walk away" from a customer or customers by informing them of a significant price increase. Generic Drug Manufacturer A would then submit a bid at an amount slightly less than Generic Drug Manufacturer B. Generic Drug Manufacturer A and Generic Drug Manufacturer B would continue to engage in such conduct until they reached their agreed-upon fair share.

22.    Rebalancing of market share could also occur prior to a new entrant launching a drug. Indeed, the Fair Share Agreement was particularly effective when new entrants came on the market and there were communications in advance of such entry.

23.    The conspirators also disciplined any generic drug manufacturer who behaved inconsistently with the Fair Share Agreement. Take, as another example, a situation where Generic Drug Manufacturer C violates the larger understanding of fair share and attempts to compete on price and gain market share. In such instances, Generic Drug Manufacturer C would be viewed as "irresponsible" and would be disciplined by employees of Generic Manufacturers A and B.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

24.     Generic drug manufacturers knew that their conduct was illegal, and they took extensive measures to conceal their activities even, in some instances, intentionally destroying evidence of their incriminating communications.  For instance, conspirators warned their employees not to leave any written or electronic record of their collusive contacts with erstwhile competitors.

## C.   Generic Drug Manufacturers Continue to Be Under Extensive Scrutiny by Government Regulators.

25.     Defendants' and their co-conspirator generic drug manufacturers' conduct has resulted in extensive scrutiny by federal and state regulators, including by the Civil and Antitrust Divisions of the United States Department of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and the Plaintiff States.[14]

26.     Since that time, the Plaintiff States' case has significantly expanded.  The Plaintiff States represented to this Court that:

> To date Plaintiff States have identified evidence of illegal agreements relating to nearly 200 additional drugs – and that number is expected to increase as the investigation develops further.   For some [generic drug] manufacturers, the anticompetitive agreements affect most, if not all, of the products they sell.[15]

---

[14] See Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry).

[15] Opp. by Plaintiff States Connecticut and New York to Certain Defs.' Mot. to Enforce the Court's Procedural and Discovery Orders, MDL Doc. No. 600 (filed May 31, 2018), at 7-8; id. at 3 ("Plaintiff States' ongoing investigation . . . is much broader [than the 15 Heritage-focused drugs in the Plaintiff States' Consolidated Amended Complaint] and has greatly expanded since filing the Consolidated Complaint in October 2017.  Plaintiff States are currently investigating collusive conduct relating to nearly 200 additional drugs – and expect to file one or more additional lawsuits based on that conduct at the appropriate time.  A large majority of the conduct under investigation is not the subject of any action pending in this MDL."); id. at 4 ("the additional potential corporations and individuals involved in this collusion vastly exceed those named in the Consolidated Complaint [] [and] the time periods of the collusion being investigated often differs significantly from the time periods of the collusion in the Consolidated Complaint").

- 10 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

27.     The DOJ has also continued to issue subpoenas.  For example, in April 2018,

Aceto Corporation (which acquired certain generic products from Defendant Citron) reported

that:

> In connection with the DOJ's ongoing investigation into marketing
> and pricing practices throughout the generic pharmaceutical
> industry, Aceto Corporation (the "Company") received a subpoena
> from the Antitrust Division of the U.S. Department of Justice (the
> "DOJ"). The Company is one of many operating companies in the
> generic pharmaceutical industry to receive a subpoena from the
> DOJ relating to its years-long investigation into the industry. The
> Company is currently preparing its response to the subpoena.[16]

28.     In May 2018, Mallinckrodt plc reported that it too had received a subpoena:

> *Generic Pricing Subpoena.* In March 2018, the Company received
> a grand jury subpoena issued by the U.S. District Court for the
> Eastern District of Pennsylvania pursuant to which the Antitrust
> Division of the Department of Justice is seeking documents
> regarding generic products and pricing, communications with
> generic competitors and other related matters. The Company is in
> the process of responding to this subpoena, and the Company
> intends to cooperate fully in the investigation.[17]

29.     In April 2018, Defendant Impax received a civil investigative demand ("CID")

from the DOJ "regarding the pricing and sale of Impax's pharmaceuticals and Impax's

interactions with other generic pharmaceutical manufacturers" in relation to an investigation

concerning "allegations that generic pharmaceutical manufacturers, including Impax, engaged in

market allocation and price-fixing agreements[.]"[18]

30.     In June 2018, Defendants Taro and Dr. Reddy's separately reported in SEC filings

that they had recently received CIDs from the DOJ:

---

[16] Aceto Corporation 10-Q (filed on May 7, 2018).

[17] Mallinckrodt plc 10-Q (filed on May 8, 2018).

[18] Amneal Pharmaceuticals 10-Q (filed on Nov. 7, 2018).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

On May 10, 2018, Taro U.S.A. received a Civil Investigative Demand from the United States Department of Justice pursuant to the False Claims Act seeking information relating to corporate and employee records, generic pharmaceutical products and pricing, communications and/or agreements with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters. Taro U.S.A. is in the process of reviewing and responding to the Civil Investigative Demand.[19]

On May 15, 2018, Dr. Reddy's Laboratories, Inc. received a Civil Investigative Demand from the Civil Division of the U.S. DOJ, enquiring whether there have been any violations of the U.S. False Claims Act, arising from allegations that generic pharmaceutical manufacturers, including us, have engaged in market allocation or price fixing agreements, or paid illegal remuneration, and caused false claims to be submitted in violation of the said Act. We intend to fully cooperate with the DOJ in responding to the demand and cooperate with the investigation.[20]

31.    In August 2018, Defendants Lannett, Mylan, and Teva separately reported in SEC filings that they had also recently received CIDs from the DOJ:

The Company [Lannett] received a Civil Investigative Demand ("CID") from the Department of Justice on May 14, 2018. The CID requests information regarding allegations that the generic pharmaceutical industry engaged in market allocation, price fixing, payment of illegal remuneration and submission of false claims. The CID requests information from 2009-present. The Company is in the process of responding to the CID.[21]

On May 10, 2018, a subsidiary of Mylan N.V. received a civil investigative demand from the Civil Division of the DOJ seeking information relating to the pricing and sale of its generic drug products.[22]

In May 2018, Teva received a civil investigative demand from the U.S. Department of Justice Civil Division, pursuant to the federal False Claims Act, seeking documents and information produced since January 1, 2009 relevant to the Civil Division's investigation concerning allegations that generic pharmaceutical manufacturers,

---

[19] Taro 20-F (filed on June 21, 2018).
[20] Dr. Reddy's 20-F (filed on June 15, 2018).
[21] Lannett 10-K (filed on Aug. 28, 2018).
[22] Mylan 10-Q (filed on Aug. 8, 2018).

- 12 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

including Teva, engaged in market allocation and price-fixing agreements, paid illegal remuneration, and caused false claims to be submitted in violation of the False Claims Act. Teva is cooperating fully with this subpoena.[23]

32.     In November 2018, Defendant Par reported in SEC filings that it too had received a CID from the DOJ.[24]

33.     These recent subpoenas and investigative demands are in addition to the many other generic manufacturers that have publicly reported that they too have received subpoenas. *See* Exhibit C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to Anticompetitive Conduct in the Generic Drug Industry). It was reported in July 2018 that the DOJ may have two investigations proceeding in parallel.[25]

34.     During a rare public comment on the DOJ's investigation at the American Bar Association's May 2018 Antitrust in Healthcare Conference, a DOJ official stated:

> [T]he Division's focus on detecting and deterring collusion in crucial industries for U.S. consumers includes an investigation into price fixing, bid rigging, and market allocation agreements in the generic pharmaceuticals industry. Millions of Americans purchase prescription drugs every year to treat acute and chronic health conditions. In 2017, for example, nearly 3.9 billion generic prescriptions were dispensed, accounting for 89% of all prescriptions filled in the United States, but only 26% of drug spend. Because so many Americans rely on access to these generic drugs as a more affordable alternative to brand-name drugs, it is critical that those markets remain competitive.
>
> In recent years, however, there have been large price spikes for certain generic drugs – and the Division's investigation into this

---

[23] Teva 10-Q (filed on Aug. 2, 2018).

[24] Endo International 10-Q (filed on Nov. 8, 2018).

[25] Joshua Sisco, *Generic drugmakers scrutinized for alleged False Claims Act violations related to price-fixing*, MLEX (July 6, 2018) ("The civil and antitrust divisions are two separate litigating sections at the [DOJ] and each division could bring charges under different laws."), *available at* https://mlexmarketinsight.com/insights-center/editors-picks/antitrust/north-america/generic-drugmakers-scrutinized-for-alleged-false-claims-act-violations-related-to-price-fixing.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

market has revealed that some corporations and executives have sought to enrich themselves at the expense of consumers who rely on these critical medications. It is hard to imagine a more brazen antitrust crime than colluding to take money out of the pockets of seniors and others whose health depends on prescription drugs.

The Division filed its first charges in this investigation in late 2016. Two executives, the former CEO and former president of a generic pharmaceutical company, were charged with price fixing, bid rigging and customer allocation for an antibiotic and a drug used to treat diabetes. Both have pleaded guilty and both have agreed to cooperate in the Antitrust Division's investigation, which is ongoing.[26]

**D.      The Existence of the Fair Share Agreement within the Generic Drug Industry and as to the Named Generic Drugs Is Supported by Other Factors.**

35.      In addition to the data analysis and conspiracy evidence set forth herein, other factors support the existence of the Fair Share Agreement as to the Named Generic Drugs:

1)  the sweeping ongoing investigations by the DOJ and the Plaintiff States' of "pervasive and industry-wide" collusion among many generic pharmaceutical manufacturers, as well as other public reports indicating widespread collusion;[27]

2)  frequent communications and meetings among generic drug manufacturers' employees including the Defendants here;[28]

3)  factors showing that the generic pharmaceutical industry is susceptible to collusion;[29] and

4)  investor communications reflecting, among other things, that Defendants' profits increased during the relevant time period.[30]

---

[26] Barry Nigro, Principal Deputy Assistant Attorney General, DOJ Antitrust Division, Keynote Remarks at the American Bar Association's Antitrust in Healthcare Conference (May 17, 2018).

[27] Plaintiff States' Heritage-Related Multi-Drug Complaint at ¶ 11; *see also* Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry); Exhibit C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to Anticompetitive Conduct in the Generic Drug Industry).

[28] Exhibit D (Trade Association Contacts as to the Named Generic Drugs); Exhibit E (Generic Pharmaceutical Association Board of Directors 2010 to 2017).

[29] Exhibit F (Summary of Economic Factors Indicating Collusion in the Generic Drug Industry).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

E.    **Direct Purchasers Paid More Than They Would Have for the Named Generic Drugs But-For the Fair Share Agreement.**

36.    The DPPs' Heritage-Related Multi-Drug Complaint provides specific allegations regarding illegal agreement as to the specific Named Generic Drugs, but these Named Generic Drugs are part and parcel of the larger overarching conspiracy.  Direct Purchaser Class Plaintiffs are investigating additional generic drugs and will likely file additional complaints at the appropriate time.

37.    As a result of Defendants' and their co-conspirators' efforts to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of the Named Generic Drugs, direct purchasers paid, and continue to pay, supra-competitive prices for the Named Generic Drugs.

38.    Direct Purchaser Class Plaintiffs, on behalf of themselves and members of the proposed Class, seek damages caused by Defendants' and co-conspirators' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, as to the Named Generic Drugs.

## II.    JURISDICTION AND VENUE

39.    This Court has jurisdiction over the subject matter of this action as it arises under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15.  Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

40.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because, during the Class Period, Defendants transacted business throughout the United States, including in this District, Defendants resided, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

---

[30] Exhibit G (Defendants' Investor Communications).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

41.     During the Class Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce, which included sales of the Named Generic Drugs in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

42.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of the Named Generic Drugs throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to artificially inflate prices that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.     PARTIES

**A.     Plaintiffs**

43.     Plaintiff Ahold USA, Inc. ("Ahold") is a Maryland corporation with its principal places of business in Quincy, Massachusetts and Carlisle, Pennsylvania.  During the Class Period, Ahold purchased one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, Ahold paid supra-competitive prices for these purchases and was injured by the illegal conduct alleged herein.

44.     Plaintiff César Castillo, Inc. ("CCI") is a Puerto Rico corporation with its principal place of business in Rio Piedras, Puerto Rico.  During the Class Period, CCI purchased one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, CCI paid supra-competitive prices for these purchases and was injured by the illegal conduct alleged herein.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

45.     Plaintiff FWK Holdings, LLC ("FWK") is an Illinois corporation with its principal place of business in Glen Ellyn, Illinois.  FWK is the assignee of antitrust claims possessed by Frank W. Kerr Company ("Kerr") and brings this action as successor-in-interest to Kerr's claims arising from its purchase of one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, FWK, through assignor Kerr, paid supra-competitive prices for these purchases and was injured by the illegal conduct alleged herein.

46.     Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("KPH") is a New York corporation with its principal place of business in Gouverneur, New York.  KPH operates retail and online pharmacies in the Northeast under the name Kinney Drugs, Inc. During the Class Period, KPH purchased one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, KPH paid supra-competitive prices for these purchases and was injured by the illegal conduct alleged herein.

47.     Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a New York corporation with its principal place of business in Rochester, New York.  During the Class Period, RDC purchased one or more of the Named Generic Drugs directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, RDC paid supra-competitive prices for these purchases and was injured by the illegal conduct alleged herein.

**B.     Defendants**

*Actavis*

48.     Defendant Actavis Holdco U.S., Inc. ("Actavis") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceuticals U.S., Inc. acquired Allergan plc's generics business (including Actavis).  During the Class Period, Actavis sold one or more of the Named Generic Drugs directly to purchasers in this

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

District and throughout the United States and engaged in unlawful conduct in violation of

Sections 1 and 3 of the Sherman Act as alleged herein.

*Apotex*

49.     Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal

place of business in Weston, Florida.  During the Class Period, Apotex sold one or more of the

Named Generic Drugs directly to purchasers in this District and throughout the United States and

engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged

herein.

*Aurobindo*

50.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware

corporation with its principal place of business in Dayton, New Jersey.  During the Class Period,

Aurobindo sold one or more of the Named Generic Drugs directly to purchasers in this District

and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and

3 of the Sherman Act as alleged herein.

*Citron*

51.     Defendant Citron Pharma LLC ("Citron") is a New Jersey corporation with its

principal place of business in East Brunswick, New Jersey.  During the Class Period, Citron sold

one or more of the Named Generic Drugs directly to purchasers in this District and throughout

the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the

Sherman Act as alleged herein.

*Dr. Reddy's*

52.     Defendant Dr. Reddy's Laboratories ("Dr. Reddy's") is a Delaware corporation

with its principal place of business in Princeton, New Jersey.  During the Class Period, Dr.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Reddy's sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*G&W*

53.     Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey.  During the Class Period, G&W sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Glenmark*

54.     Defendant Glenmark Pharmaceuticals, Inc. ("Glenmark") is a Delaware corporation with its principal place of business in Mahwah, New Jersey.  During the Class Period, Glenmark sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Heritage*

55.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in East Brunswick, New Jersey.  Heritage is a subsidiary of Emcure Pharmaceuticals Ltd. ("Emcure").  During the Class Period, Heritage sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

*Impax*

56.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business in Hayward, California.  In 1999, Global Pharmaceutical Corporation merged with Impax Pharmaceuticals, Inc. to become Impax.  Impax continues to sell generic drugs through its Global Pharmaceutical division.  In May 2018, Impax completed a merger with Amneal Pharmaceuticals, Inc. to become the fifth largest generics business in the United States. During the Class Period, Impax sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Lannett*

57.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  During the Class Period, Lannett sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Mylan*

58.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

59.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.

60.     Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Here, Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are referred to together as "Mylan."  During the Class Period, Mylan sold

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

61.　Defendant Rajiv Malik ("Malik") is an individual residing at 605 Grandview Drive, Gibsonia, Pennsylvania.  During the Class Period, Malik has acted as the President and Executive Director of at least Mylan N.V., which is the parent company of Defendants Mylan Inc. and Mylan Pharmaceuticals, Inc.  In his role as President of Mylan N.V., Malik is responsible for overseeing the sales and marketing of Mylan's generic pharmaceutical business, which is accomplished at least in part through acting on behalf of Defendant Mylan.  During the time Malik was employed by Mylan, he also worked for other Mylan entities such as Mylan, Inc. Before coming to Mylan, Malik worked at various other generic pharmaceutical manufacturers such as Matrix Laboratories Limited, Ranbaxy Laboratories (now part of Sun), and Sandoz.

*Par*

62.　Defendant Par Pharmaceutical Companies, Inc. ("Par") is a Delaware corporation with its principal place of business in Chestnut Ridge, New York.  Par is a subsidiary of Endo International plc ("Endo"), an Irish pharmaceutical company.  During the Class Period, Par sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Perrigo*

63.　Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in the Bronx, New York. During the Class Period, Perrigo sold one or more of the Named Generic Drugs directly to

- 21 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Sandoz*

64.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey.

65.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  Foguera is a wholly-owned subsidiary of Defendant Sandoz, Inc,

66.     Here, Sandoz Inc. and Fougera Pharmaceuticals Inc. are referred to together as "Sandoz."  During the Class Period, Sandoz sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Sun*

67.     Defendant Sun Pharmaceutical Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.  In late 2012, Sun acquired URL Pharma, Inc. ("URL") with its principal place of business in Philadelphia, Pennsylvania.  URL is a wholly-owned subsidiary of Sun.  URL as a group includes five wholly-owned subsidiaries, including Mutual Pharmaceutical Company, Inc. ("Mutual").  Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997.  During the Class Period, Sun sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

- 22 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

*Taro*

68.      Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation

with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary

of Taro Pharmaceutical Industries, Ltd., an Israeli pharmaceutical company.  In 2010, Sun

Pharmaceutical Industries, Inc.'s Indian-parent company Sun Pharmaceutical Industries Ltd.

acquired a controlling stake in Taro Pharmaceutical Industries, Ltd.  During the Class Period,

Taro sold one or more of the Named Generic Drugs directly to purchasers in this District and

throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of

the Sherman Act as alleged herein.

*Teva*

69.      Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Pennsylvania

corporation with its principal place of business in North Wales, Pennsylvania.  During the Class

Period, Teva sold one or more of the Named Generic Drugs directly to purchasers in this District

and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and

3 of the Sherman Act as alleged herein.

*Valeant*

70.      Defendant Valeant Pharmaceuticals International ("Valeant International") is a

Canadian company with its principal place of business in Bridgewater, New Jersey.  Valeant

International was a California company until September 2010, when it merged with Biovail

Corporation, a Canadian company.  To lower its overall tax rate, Valeant International structured

the merger to make Biovail the technical acquirer, but the combined company kept Valeant's

name and executives and is managed out of Valeant's New Jersey offices.  Valeant also has a

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

dozen other United States commercial locations and manufacturing facilities. In July 2018, Valeant Pharmaceuticals International, Inc. changed its name to Bausch Health Companies Inc.

71.    Defendant Valeant Pharmaceuticals North America LLC ("Valeant North America") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.  Valeant North America is a wholly-owned subsidiary of Valeant International.

72.    Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Aliso Viejo, California.  Oceanside is a wholly-owned subsidiary of Defendant Valeant.

73.    Here, Valeant International (now known as Bausch Health Companies Inc.), Valeant North America, and Oceanside are referred to together as "Valeant."  During the Class Period, Valeant sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

*Zydus*

74.    Defendant Zydus is a New Jersey corporation with its principal place of business in Pennington, New Jersey.  During the Class Period, Zydus sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

75.    Defendants and their officers, agents, employees, or representatives engaged in the conduct alleged herein while actively involved in the management of Defendants' business and affairs.

- 24 -

## C.    Co-Conspirators

76.    Known and unknown co-conspirators also participated in the Fair Share Agreement as alleged herein.

77.    Defendants' co-conspirators include other generic manufacturer defendants in MDL 2724 ("MDL Defendants") such as Akorn, Inc., Breckenridge Pharmaceutical, Inc., Epic Pharma, LLC, Hi-Tech Pharmacal Co., Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma USA, Inc., Morton Grove Pharmaceuticals, Inc., Teligent, Inc., Upsher-Smith Laboratories, Inc., West-Ward Pharmaceuticals Corp., Wockhardt USA LLC, Jeffrey Glazer, and Jason Malek.  Co-conspirators also include generic manufacturers that are not currently MDL Defendants such as, for example, Ascend Laboratories, LLC ("Ascend").  At the proper time in this litigation, Plaintiffs will necessarily seek to join these co-conspirators and Defendants identified herein.

78.    Various other persons, firms, entities, and corporations, not named as Defendants in DPPs' Heritage-Related Multi-Drug Complaint, have participated as co-conspirators with Defendants and MDL Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

79.    The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs may amend DPPs' Heritage-Related Multi-Drug Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

80.    At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

81.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized

- 25 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

82.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## IV.     INTERSTATE TRADE AND COMMERCE

83.     Defendants are among the leading manufacturers and suppliers of the Named Generic Drugs sold in the United States.

84.     The Named Generic Drugs are produced by, or on behalf of Defendants, or their affiliates, in the United States or overseas.

85.     During the Class Period, Defendants, directly or through one or more of their affiliates, sold the Named Generic Drugs throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

86.     The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

87.     Defendants' and their co-conspirators' conduct, including the marketing and sale of the generic drugs in question, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

88.     The combination and conspiracy alleged herein has directly and substantially affected interstate commerce, in that Defendants deprived Direct Purchaser Class Plaintiffs of the benefits of free and open competition in the purchase of the Named Generic Drugs within the United States.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

89.     The agreement and conspiracy between Defendants and their co-conspirators to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of generic drugs, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing the prices of generic drugs, including the Named Generic Drugs, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## V.     FACTUAL ALLEGATIONS

**A.      Competition Between Generic Drugs Historically Has Been Keen.**

**1.      Generic drugs should lead to lower prices.**

90.     Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the FDA requires rigorous testing to ensure it has the same strength, quality, safety, and performance as the brand.  By law, generics must have the same amount of active ingredient and must be "therapeutically equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product."[31]

91.     To encourage the production and sale of generic drugs, the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") simplified the regulatory hurdles that generic drug manufacturers have to clear before marketing and selling generic drugs.  Instead of filing a lengthy and costly New Drug Application, the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion.

92.     To obtain marketing approval for a generic drug, an ANDA must be filed with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs; "abbreviated"

---

[31] FDA, *Drugs@FDA Glossary of Terms*, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

because so long as the ANDA includes data showing bioequivalence to the brand, the ANDA

sponsor can reference efficacy data supporting approval of the brand (described in the

regulations as the "Reference Listed Drug" or "RLD" for short) instead of repeating all the same

clinical trials.  Upon the FDA's determination that bioequivalence to the brand has been

established, the ANDA will be approved and may be marketed in the United States as

substitutable with the RLD.

93.     Although equivalent from a safety and efficacy standpoint, generic versions of

brand name drugs are priced significantly below their brand counterparts, and because of this,

they rapidly gain market share from the brand beginning immediately following launch.  Indeed,

in every state, pharmacists are permitted (and in many states required) to substitute a generic

product for a brand product barring a note from a doctor that the brand product must be

dispensed as written.

94.     It is well established in economic literature that competition by generic products

should result in lower prices for drug purchasers.  In the period before generic entry, a brand

drug commands 100% of the market share for that drug and the brand manufacturer can set the

price largely free from normal competitive market forces.  But once the first lower-priced

generic enters, a brand drug rapidly loses sales due to automatic pharmacy substitution, and

generics capture as much as 80% of the market or more within months of launch.  And as more

generics become available, generic prices only decline further due to competition among

generics.  These cost reductions to drug purchasers were the very legislative purpose behind the

abbreviated regulatory pathway for generic approval under the Hatch Waxman Act.

95.     Generic competition, under lawful and competitive circumstances, reduces drug

costs by driving down the prices of both generic versions of the brand drug and often the brand

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

drug itself, and every year generic drugs should result in hundreds of billions of dollars in savings to direct purchasers, consumers, and insurers.

96.     A Federal Trade Commission study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[32]   A mature generic market has several generic competitors.  Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature and the basis for competition among manufacturers.[33]   Over time, generics' pricing should near the generic manufacturers' marginal costs.

97.     Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others.

**2.     Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive.**

98.     Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay.  But because of the unique features of the prescription drug marketplace, prescription drug pricing for most consumers is not determined between the retailer and the consumer.  Rather, because most consumers' prescription drug

---

[32] Federal Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions*, at 8 (Jan. 2010), *available at* https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff.

[33] *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

purchases are reimbursed by public or private health plans, consumer pricing for prescription drugs is often set in reference to reimbursement agreements between these prescription drug payers, *i.e.*, health plans and their prescription benefit managers, and the pharmacies that dispense drugs to the payers' insured customers.

99.     Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs. WAC prices represent the manufacturer's benchmark or reported list price. The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales. Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.

100.     Generic drug manufacturers may charge different amounts for an equally interchangeable, *i.e.*, therapeutically equivalent, multisource drug. But manufacturers are usually constrained in their ability to price generic drugs by the Maximum Allowable Cost ("MAC").[34] MAC is a contractually based payment model that, in the private sector, is commonly established by a pharmacy benefits manager ("PBM"), who manages an insurance plan, and that is paid to the pharmacies within the plan's network.[35] A MAC price sets the upper limit that a pharmacy will be paid by the PBM for procuring and dispensing a particular generic medication.

---

[34] To define therapeutic categories, MAC pricing typically relies on the FDA's Orange Book, which lists approved prescription drugs and their therapeutic equivalents. An "A"-rated drug is one that the FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products. *See* U.S. FDA Website, Orange Book Preface, *available at* https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#tecode.

[35] Academy of Managed Care Pharmacy, *Where We Stand, Maximum Allowable Cost (MAC) Pricing* (Dec. 2013), *available at* www.amcp.org/Sec.aspx?id=9287. For the purposes of the DPPs' Heritage-Related Multi-Drug Complaint, MAC prices refer solely to prices that limit a pharmacy's reimbursement for generic drugs, not the amounts PBMs charge to the insurance plans, which may also be referred to as a MAC price. *See* National Community Pharmacists

- 30 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

101.    While PBMs usually do not disclose publicly which drugs they subject to MAC pricing, what the MAC price is, or what factors they apply to set MAC prices, it is believed that PBMs rely on a wide variety of market-wide pricing information or plan-specific data.[36] In recent years, 79% of employer prescription drug plans and 45 state Medicaid programs have been using MAC prices to control the cost of generic drugs.[37]

102.    MAC prices give pharmacies an incentive to procure and dispense the lowest-priced drug product available for a particular multisource drug. If a generic drug is subject to MAC pricing, a pharmacy purchasing a higher-priced generic product will make less profit or potentially even lose money when it dispenses a higher-priced product.[38]

103.    MAC pricing is neither uniform nor transparent, and it may be subject to frequent changes.  So whether a generic manufacturer's products are even subject to MAC pricing, or how that MAC pricing is set for any particular generic drug, is not easy for the manufacturers to decipher.  PBMs typically exercise control over the selection of generic drugs that will be subjected to MAC pricing, and they fiercely guard the secrecy of their MAC price lists.[39] Industry groups, like the Academy of Managed Care Pharmacy, actively oppose government regulation of MAC pricing and any efforts to disclose MAC prices or the methods of calculating them.[40]

---

Association, *The Need for Legislation Regarding "Maximum Allowable Cost" (MAC) Reimbursement*, *available at* http://www.ncpa.co/pdf/leg/mac-one-pager.pdf.

[36] *Id.*

[37] Express Scripts, *MAC Pricing Incents More Affordable Rx* (Feb. 24, 2016), *available at* http://lab.express-scripts.com/lab/insights/drug-options/mac-pricing-incents-more-affordable-rx.

[38] *See supra* Academy of Managed Care Pharmacy article.

[39] *See supra* National Community Pharmacists Association article.

[40] *See supra* Academy of Managed Care Pharmacy article.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

104.    By setting a ceiling for reimbursement of any particular generic drug at the pharmacy level, MAC prices indirectly affect the price at which generic drug manufacturers may sell their products to direct purchasers.  Because many generic drugs are subject to MAC pricing, generic drug manufacturers have an incentive to price their generic drug products competitively to maintain demand by pharmacies.

105.    MAC pricing can penalize the generic drug manufacturer that raises price on its own when its competitors do not.  A unilateral price increase in a competitive generic drug market that is subject to MAC pricing is likely to send buyers to a lower-priced alternative.

106.    MAC pricing has little effect, however, if generic drug manufacturers collectively increase their prices for a multi-source drug.  First, PBMs generally permit pharmacies – who may be contractually obligated to dispense an unprofitable prescription – to challenge MAC prices under a MAC appeals process.[41]  If the price of a generic drug has been increased by a majority of generic drug manufacturers, then these MAC appeals may be successful in getting the PBM to increase the MAC price allowed.  Second, PBMs typically have a policy of revising MAC prices under certain contingencies.[42]  One large PBM, Express Scripts, for example, states that its MAC price list is frequently updated to reflect "the current market dynamics."[43]

107.    MAC pricing provides yet another reason that Defendants' stark increases in the price of the generic drugs in question are indicative of coordinated pricing activity.  Knowing that they hold an overwhelming majority share of the market for these drugs, Defendants had the capacity to dictate the market price and to influence the MAC prices set by PBMs, but only if they acted collectively.  Absent collusion, individual Defendants and co-conspirators could not

---

[41] *Id.*

[42] *Id.*

[43] *See supra* Express Scripts article.

- 32 -

have increased their prices to the high levels they did (or maintain high prices in the face of a competitor's significantly lower price) without incurring the loss of a significant volume of sales.

**B.      Defendants and Their Co-Conspirators Participated in an Overarching Fair Share Agreement to Thwart Competition in the Generic Drug Industry.**

108.   During the Class Period, generic drug manufacturers – including Defendants and their co-conspirators – conspired, combined, and contracted with one another pursuant to the Fair Share Agreement to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of generic drugs, including the Named Generic Drugs.

109.   This Fair Share Agreement had the effect of maintaining artificially inflated pricing for the Named Generic Drugs, and creating an appearance of competition when in fact none existed.  It also had the intended and actual effect of causing Direct Purchaser Class Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices.

110.   As part of their Fair Share Agreement, Defendants acted to render particular generic drug markets – including the Named Generic Drugs – "stable" by assenting to a division of proportional market share.  Defendants and their co-conspirators initiated communications to achieve this market share and customer distribution, and, in fact, Defendants and their co-conspirators routinely contacted each other pursuant to, and in furtherance of, their Fair Share Agreement.

111.   Each of Defendants' conspiratorial actions described herein sought to further this Fair Share Agreement by achieving either or both of its two main goals:

      a.      Defendants and their co-conspirators sought to avoid competition within the generic drug industry, instead maintaining the stability of the relative market shares assigned to each competitor.

- 33 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

b.  Without the threat of competition, Defendants and their co-conspirators sometimes dramatically raised prices on a generic drug or generic drugs. Defendants' agreements also introduced artificially inflated pricing even where dramatic price increases were not observed as might be the case where a *quid pro quo* market or customer allocation had taken place.

112.  Defendants and their co-conspirators communicated their respective priorities and goals in order to divide the market among each other. Once these market share ratios were set, Defendants and their co-conspirators would jointly evaluate customer bids and contracts with an eye to maintaining these ratios.

113.  Defendants and their co-conspirators repeatedly engaged in decision-making that was against their financial self-interest, turning down or walking away from potentially profitable business opportunities in order to uphold their Fair Share Agreement and allow other Defendants or co-conspirators to gain or maintain predetermined market share.

114.  For example, if a particular generic manufacturer wanted to increase its market share, it contacted the other market players to discuss an acceptable way to do so without upsetting the artificial price levels that the participants had agreed to maintain.

115.  Generic drug manufacturers – including Defendants and their co-conspirators – also planned and executed coordinated price increases. Before raising prices for their customers, generic manufacturers would communicate and agree on a price increase strategy. Typically, this involved – pursuant to the Fair Share Agreement – one manufacturer taking the lead with the price increase, and the other manufacturers matching by increasing their pricing in step with the leader (knowing that their ostensible competitors would not undercut the elevated pricing).

- 34 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

116.    There was an understanding between all Defendants and their co-conspirators that it was permissible to initiate and maintain collusive communications at any time in order to effectuate the goals of this Fair Share Agreement and more effectively manipulate the generic drug industry.  This behavior is repeated again and again in the specific generic drug examples described below.

117.    The casual nature by which this combination and conspiracy was executed further illustrates its pervasive, comprehensive nature.  For instance, the allegations below highlight at least several examples where a Defendant was invited into an ongoing price increase scheme merely upon expressing its intention to enter the market for that drug.   In these situations, the other Defendants were not concerned about involving an additional party, because that party had already expressed, both impliedly and through overt communication, its willingness to participate in the Fair Share Agreement.

118.    Further, the regularity of Defendants and their co-conspirators' illegal communications, contacts, and meetings at trade associations and elsewhere demonstrates that they were complicit in the overarching Fair Share Agreement.[44]

119.    Defendants were aware that the Fair Share Agreement was illegal, and they took substantial steps to conceal their conspiratorial conduct, including by cautioning against discussing price increases for the Named Generic Drugs in emails, text messages and other communications – both internal to and between various Defendants.  Instead, Defendants opted to speak by telephone when an in-person meeting was not practical, and they met and discussed

---

[44] For example, the Plaintiff States provide charts with *thousands* of instances of phone and text communications among many generic pharmaceutical manufacturers including Defendants and their co-conspirators.  Plaintiff States' Heritage-Related Multi-Drug Complaint at ¶¶ 93-95 and Tables 1, 2.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

their plans at industry events and other venues when possible.  Out of fear of detection, many

communications were intentionally destroyed by Defendants and their co-conspirators.

120.     In formulating and effectuating the combination and conspiracy, Defendants and

their co-conspirators' engaged in numerous anticompetitive activities, including, among other

things:

(a)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of at least the generic drugs identified in the DPPs' Heritage-Related Multi-Drug Complaint;

(b)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for at least the generic drugs identified in the DPPs' Heritage-Related Multi-Drug Complaint;

(c)     Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for at least the generic drugs identified in the DPPs' Heritage-Related Multi-Drug Complaint;

(d)     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers regarding at least the generic drugs identified in the DPPs' Heritage-Related Multi-Drug Complaint;

(e)     Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)     Selling at least the generic drugs identified in the DPPs' Heritage-Related Multi-Drug Complaint in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for at least the generic drugs identified in the DPPs' Heritage-Related Multi-Drug Complaint sold in the United States at collusive and noncompetitive prices.

121.     Multiple factors corroborate the existence of the Fair Share Agreement.  In fact,

the evidence is overwhelming:

- The many generic drugs that are already part of MDL 2724.  Exhibit A (MDL 2724 Generic Drugs as of December 2018).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

- The confessions of Glazer and Malek, other public revelations to date in the ongoing government investigations, and other public reports indicating widespread collusion. *See* Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry); Exhibit C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to Anticompetitive Conduct in the Generic Drug Industry).

- The extensive contacts among generic drug manufacturers including almost constant trade association meetings. *See, e.g.*, Exhibit D (Trade Association Contacts as to the Named Generic Drugs); Exhibit E (Generic Pharmaceutical Association Board of Directors 2010 to 2017).

- Economic factors relating to the generic drug industry. Exhibit F (Summary of Economic Factors Indicating Collusion in the Generic Drug Industry).

- Defendants' public communications to investors. Exhibit G (Defendants' Investor Communications).

**C.    Pursuant to the Fair Share Agreement, Defendants and Their Co-Conspirators Agreed to Fix, Maintain, Stabilize, and Raise Prices, Rig Bids, and Engage in Market and Customer Allocation of Generic Drugs**

122.    Defendants' Fair Share Agreement began at least as early as 2011. Over time, and with the success of Defendants' collusive efforts, the Fair Share Agreement expanded to encompass larger and larger swaths of the market for generic drugs. The below timeline notes the known start of collusive conduct as to the generic drugs currently in MDL 2724:

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Timeline of Known Collusive Conduct for MDL 2724 Drugs[45]

| Timeline | Known Collusive Conduct |
|---|---|
| Summer 2011 | **nystatin** (cream and ointment); **metronidazole** (cream, jelly, lotion) |
| Fall 2011 | |
| Winter 2012 | |
| Spring 2012 | **acetazolamide** (tablets) |
| Summer 2012 | **nimodipine** |
| Fall 2012 | doxy RR; **paromomycin; verapamil** (tablets) |
| Winter 2013 | |
| Spring 2013 | albuterol; desonide; **meprobamate; nimodipine; nystatin** (tablets); propranolol (capsules); **zoledronic acid** |
| Summer 2013 | clomipramine; divalproex; doxy DR; **doxy mono;** levothyroxine; pravastatin; **verapamil** (capsules) |
| Fall 2013 | **acetazolamide** (tablets); benazepril; digoxin |
| Winter 2014 | baclofen |
| Spring 2014 | doxy DR; lidocaine-prilocaine; **theophyline;** ursodiol |
| Summer 2014 | **acetazolamide** (capsules); amitriptyline; clobetasol; econazole; fluocinonide; **fosi-HCTZ; glipizide-metformin;** glyburide; **glyburide-metformin; leflunomide; nystatin** (tablets); **paromomycin; theophylline; verapamil** (tablets) |
| Fall 2014 | |
| Winter 2015 | propranolol (tablets); **metronidazole** (vaginal) |
| Spring 2015 | **leflunomide; verapamil** (capsules) |

123.     The linchpin of the Fair Share Agreement was frequent communications between purported competitors. These communications were made via telephone, text message, email, and through messaging platforms such as LinkedIn or WhatsApp. The inter-competitor communications sometimes took place between very high-level executives (*see* Section V.C.i (nimodipine)) discussing a contact between Heritage President Jason Malek and Ascend Executive Vice President John Dillaway). More often, however, the conspiratorial communications involved National Account Managers and employees at comparable positions.

---

[45] **Bold** = Named Generic Drugs in the DPPs' Heritage-Related Multi-Drug Complaint.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

However, very senior executives (such as Heritage President Malek) sometimes directed their subordinates to reach out to competitors and to report back.

124.     The substance of these inter-competitor communications varied depending on the particular issues presented by a drug.  For example, if the conspirators believed they could increase prices for a particular drug, collusive communications focused on a future price increase.  *See, e.g.*, Section V.C.a.2 (acetazolamide capsules).  Other times, conspiratorial communications focused on rigging bids to particular customers (*see, e.g.*, Section V.C.i (nimodipine)) or refusing to engage in competition for the business of certain customers (*see, e.g.*, Section V.C.j.3 (nystatin tablets).  If a new market for a generic drug was opening up due to the expiration of a patent, conspiratorial communication sometimes consisted of a discussion of market share allocation.  *See, e.g.*, Section V.C.n (zoledronic acid).

125.     Consistent with the overarching Fair Share Agreement, a single communication between conspirators would often span multiple drugs.  For instance, during an April 15, 2014 telephone conversation, Heritage President Jason Malek and Nisha Patel of Teva coordinated regarding price increases for several drugs, including acetazolamide capsules, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, and nystatin tablets.

126.     Further, Defendants' agreements on one drug were interrelated with agreements concerning other drugs.  For instance, Mylan agreed to give up two major customers for doxy DR to Heritage based, in part, on Heritage permitting Mylan to profitably enter a market for a different generic drug. *See* Section V.D.a (doxy DR).

127.     Keeping the existence of these communications secret was of paramount importance.  Senior level executives repeatedly directed their subordinates not to leave any written documentation of their communications with competitors.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

128.     In addition to the inter-competitor communications at the heart of the Fair Share Agreement, Defendants also worked internally to ensure the execution of the Fair Share Agreement.  For instance, in April and May of 2014, Heritage held multiple internal meetings to confirm that the prices for drugs that had been the subject of conspiratorial communication would in fact be increased, and to address logistical issues like the timing of price increase notices.

129.     The effectiveness of the Fair Share Agreement was facilitated by certain characteristics of the generic drug industry.

130.     First, the generic drug industry is a tight-knit community.  For instance, many generic drug manufacturer employees and executives (including, for example, so called National Account Managers or "NAMs" as well as certain senior executives) moved from generic drug manufacturer to generic drug manufacturer while preserving former co-worker contacts, and thus furthered the interwoven, cooperative generic drug industry culture.  Some examples include: Malik worked at Ranbaxy (now Defendant Sun) and Defendant Sandoz before working at Defendant Mylan; Dan Lukasiewicz worked at Defendants Aurobindo and Zydus before working at Defendant Heritage; Susan Knoblauch worked at Defendant Sun before leaving to work as a NAM at Citron; Jan Bell worked at Defendant G&W before working at Defendant Mylan; Joseph Papa left Defendant Perrigo to become Chairman and CEO of Defendant Valeant; Carole Ben-Maimon who worked in different roles at Defendants Impax, Par, and Teva; and Bhaskar Chaudhuri who was the General Manager of the Dermatology Division at Defendant Mylan before later becoming President of Defendant Valeant and a member of MDL Defendant Teligent's board of directors.  The benefits of prior employment relationships were not confined to those existing across purported competitors.  Nisha Patel, who joined Teva in 2013, previously

- 40 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

worked for a drug wholesaler. While working for the drug wholesaler, Patel was in contact with Heritage President Jason Malek because Heritage supplied drugs to wholesalers. The prior relationship between Patel and Malek was an important precursor to collusive communications that occurred after Patel arrived at Teva.

131.    Second, there are myriad opportunities in the generic drug industry for employees of various generic drug manufacturers to interact with one another.  As shown in Exhibit D, numerous trade association meetings and industry events were held during the time period where collusion was taking place. Indeed, in several instances, these opportunities for in-person interactions took place in the midst of other communications (*e.g.*, phone calls, text messages) between conspirators. *See* Sections V.C.a.2; V.C.c; V.C.i; V.C.j.1; V.C.j.2 (discussing acetazolamide capsules, fosi-HCTZ, nimodipine, nystatin cream, and nystatin ointment).

132.    As a result of the conspiratorial conduct described herein, Defendants and their co-conspirators enjoyed artificially inflated prices (and correspondingly inflated profits).

        **a.    acetazolamide**

133.    Acetazolamide has been available in the United States since 1952. It is used to treat a variety of conditions, including glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure.  Due to, among other things, its clinical efficacy and safety, acetazolamide has been designated as an essential medicine by the World Health Organization.

134.    The market for acetazolamide is mature.  At all relevant times, there have been multiple manufacturers of generic acetazolamide.

135.    The relevant manufacturers of acetazolamide are Defendants Heritage, Lannett, Taro, Teva, and Zydus.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

### (1)    acetazolamide tablets

136.    Defendants Lannett and Taro dominate the market for acetazolamide tablets. Upon information and belief, since at least the spring of 2012, Lannett and Taro have coordinated pricing and allocated market share for acetazolamide tablets.

137.    Acetazolamide tablets come in two dosage strengths: 125 and 250 mg. Both Taro and Lannett make the 250 mg dosage, which is the predominant form. Only Taro makes the 125 mg dosage, which is less widely used.  However, as described below, the 125 mg dosage was included in the agreement between Taro and Lannett to artificially inflate prices of acetazolamide tablets.

138.    Prior to the spring of 2012,



139.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



<hr />

[46] Pricing per unit and market share data are obtained from QuintilesIMS Inc. (referred to in previous complaints as "IMS Health," but, as of late 2017, operating under the name IQVIA). IMS Health/IQVIA is the largest vendor of physicians' prescribing data in the United States and is widely relied upon in the pharmaceutical industry and elsewhere.  When pricing charts are used in the DPPs' Heritage-Related Multi-Drug Complaint, they show "effective prices," which represent actual transaction prices, as reported by IMS Health/IQVIA.  Direct Purchaser Class Plaintiffs calculated Defendants' effective prices based on National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]"  IMS Institute for Health Informatics, HSRN Data Brief: National Sales Perspectives, at 1.  Similar changes in pricing are also reflected in other data sets. *See, e.g.*, End-Payer Class Action Complaint, No. 2:18-cv-02401-CMR, ECF 1 (filed on June 7, 2018) (describing, among other data sets, wholesale acquisition cost ("WAC") and average wholesale price ("AWP")).

- 43 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



140.

141.    The United States Government Accountability Office ("GAO") noted that acetazolamide tablets had an "extraordinary price increase."[47]

142.    By the middle of 2013, Taro and Lannett worked out a

143.

---

[47] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/679055.pdf ("GAO Report").

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



144. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

145.     The ability of Taro and Lannett to reach agreement regarding acetazolamide tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  For instance, in August 2013, representatives from Lannett and Taro attended the NACDS Total Store Expo in Las Vegas.  In October 2013, representatives from Taro and Lannett, among other Defendants, attended the GPhA Fall Tech Conference in Bethesda, Maryland.  *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

146. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████

147. ██████████████████████████████████████████████████
████████████████████████████████████████████████

148.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

149.     The agreement between at least Defendants Taro and Lannett was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

bids, and engage in market and customer allocation for generic drugs, including acetazolamide tablets.

**(2)  acetazolamide capsules**

150.    The vast majority of the acetazolamide capsule market is accounted for by Defendants Heritage, Teva and Zydus.

151.    Since at least 2014, Heritage, Teva, and Zydus have coordinated pricing and allocated market share for acetazolamide capsules.



152.    During the week of April 14, 2014, Heritage President Jason Malek met with two Heritage employees and asked them to start analyzing the impact of price increases for different generic drugs, including acetazolamide, carisoprodol, cidofovir, doxy mono, fosinopril-HCTZ,

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, methimazole, nimodipine, nystatin, paromomycin, theophylline and verapamil.

153.     Immediately after beginning Heritage's internal efforts to initiate a price increase, Malek reached out to an established contact at an erstwhile competitor, Nisha Patel at Teva. On April 15, 2014, Malek had a 17 minute telephone conversation with Patel. Malek knew Patel from her prior employment with a major drug wholesaler, which was a customer of Heritage. Patel left the wholesaler and joined Teva in April 2013. When Patel arrived at Teva in 2013, she reached out to Malek and provided her new contact information. Patel also inquired as to the generic drugs sold by both Teva and Heritage, and Malek identified several. Malek took this opportunity to note to Patel that Heritage was planning to raise prices of some generics soon and, thus, the timing of Patel's arrival at Teva was opportune.  Patel responded that she was still getting up to speed on Teva's business but understood that Teva usually leads price increases or quickly matches them.  This initial connection between Malek and Patel after Patel's arrival at Teva began to bear fruit in 2014.

154.     During their April 15, 2014 phone call, Patel agreed that if Heritage increased the price of acetazolamide capsules (and a series of other drugs), Teva would match the price increases – or at least not challenge Heritage's price increases by underbidding Heritage's customers. Teva's Patel was willing to agree to price increases for these drugs, including acetazolamide capsules, because if Teva supported Heritage on the price increase in this and other drugs, Teva could count on Heritage supporting it for other increases. Indeed, for two drugs – nystatin and theophylline – Teva already knew that Heritage would support Teva's efforts to raise prices or at least not challenge the increases.  Malek and Patel would speak many times

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

over the next several months to confirm their agreement to raise prices and keep up-to-date on the progress of Heritage's price increases.

155.    On April 16, 2014, the day after Malek spoke to Teva's Patel, Patel called ████ ████████████████████████████ at Zydus, to discuss the pricing of acetazolamide capsules.  The two spoke for nearly 20 minutes, and spoke again the next day for nearly 12 minutes.  Over the next several months, Teva's Patel and Zydus' ████ communicated frequently.

156.    On April 22, 2014, Heritage's Malek held an internal telephone conference with the Heritage sales team and dictated a pricing strategy that targeted several different drugs, including acetazolamide capsules, for a price increase.  Prior to the call, Malek circulated a spreadsheet to his sales team, which identified each drug slated for a price increase, the competitor for each drug, and their respective market shares.

157.    In addition to communicating with his own sales team at Heritage, Malek believed it was also important to "socialize" the idea of an acetazolamide capsule price increase with competitors before implementing it.

158.    To that end, on April 24, 2014, Heritage's Malek contacted ███████████ ████████████ at Zydus, through the website LinkedIn to ███████████████. ████ responded to Malek later the same day ███████████████████████████.

159.    Shortly after, on April 26-29, 2014, Heritage CEO Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from at least multiple Defendants, including Teva and Zydus.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

160.    In May 6 and 7, 2014 email communications, after Heritage's Malek confirmed his agreement with competitors to raise the price of acetazolamide capsules, Heritage refused a large GPO customer's request for a price reduction.

161.    During this time, Heritage also avoided bidding on any potential customers where Zydus was already supplying acetazolamide capsules. Heritage did this in contravention of its own independent self-interest and in furtherance of Defendants' Fair Share Agreement.

162.    During May 2014, ███████████████████████████ Teva, and ██████████████████████ at Zydus, were also in close contact. For instance, on May 14, 2014, ████ and ████ exchanged numerous text messages.

163.    In addition to these known communications, Defendants had opportunities to speak in person about these agreements at industry conferences. Between April and October 2014, Heritage, Teva, and Zydus attended meetings such as those organized by NASCD, HDMA, or GPhA. *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

164.    For instance, on June 1-4, 2014, the HDMA held its annual Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona. The Business Leadership Conference was attended by representatives from Heritage (including known conspirators, Associate Director of National Accounts Neal O'Mara and National Account Manager Anne Sather), Teva (including known conspirator Nisha Patel), and Zydus.

165.    On June 23, 2014, the Heritage sales team had an internal meeting where they discussed the specific percentage amounts they would seek to increase on the identified drugs and their strategy for doing so. The proposed increase for acetazolamide capsules was 75%.

166.    On June 25, 2014, Malek spoke with Teva's Patel for 14 minutes, during which he reported that Heritage's price increase notices would be mailed on June 26, 2014 for

- 49 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

acetazolamide capsules and several other drugs for which Heritage and Teva had agreed to raise prices

167.    On June 26, 2014, Heritage began sending out price increase notices to its customers for nine different drugs, including acetazolamide. By July 9, 2014, Heritage had raised the price of acetazolamide capsules to at least 17 different customers nationwide.

168.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

169.    This agreement between at least Defendants Heritage, Teva, and Zydus was part of an overarching conspiracy between the Defendants to artificially inflate prices for generic drugs, including acetazolamide capsules.

### b.    doxy mono

170.    Doxycycline monohydrate ("doxy mono") is an oral medication used to treat a wide variety of bacterial infections.  Doxy mono is known as a tetracycline antibiotic, and is also used to prevent malaria.

171.    During the relevant time period, Heritage, Lannett, Mylan, and Par collectively dominated the market for doxy mono tablets.

172.    In 2012, Heritage National Account Manager Anne Sather held conversations with Lannett National Account Manager Tracy Sullivan about a potential price increase for doxy mono.

173.    In February 2013, a customer advised Heritage that demand for doxy mono would increase significantly due to recent shortages of other doxycycline products.  Heritage viewed this potential increase in demand as an opportunity to increase prices on doxy mono above market levels and contacted Lannett, Mylan, and Par to institute an increase.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

174.    Starting in March 2013, Heritage's Sather communicated with Lannett about pricing for doxy mono.  On March 7, 2013, Heritage's Sather spoke to Lannett's Sullivan for 14 minutes about an opportunity Heritage had at Cardinal.

175.    Six days later, on March 13, 2013, Sather sent an email to Lannett's Sullivan about pricing for at least doxy mono.  They spoke later the same day for five minutes – again discussing a price increase for doxy mono.

176.    While Sather was coordinating a doxy mono price increase with Lannett, Malek was making internal preparations at Heritage for a doxy mono price increase.  Malek envisioned more than tripling the price of doxy mono and sought concurrence from Heritage CEO Glazer.

177.    On March 25, 2013, Lannett's Tracy Sullivan sent an email to her boss, ██████ ████████████ at Lannett. ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████.  Lannett's Sullivan and Heritage's Sather stayed in regular contact over the next several months regarding doxy mono via phone, text message, and in-person meetings.

178.    Meanwhile, as discussed above, in April 2013, Heritage CEO Glazer and Heritage President Malek traveled to India to meet with executives of Heritage's parent company, Emcure.  During the trip, Emcure's Satish Mehta and Vikas Thapar discussed how Heritage could coordinate with Mylan to minimize competition and avoid price erosion when Heritage entered the market for another doxycycline product, doxy DR. Mehta decided to reach out to Mylan's Malik to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

179.    Inter-competitor communications continued at the National Account Manager level. Either concurrent with or shortly after Heritage and Emcure's meeting in India, Heritage's Sather called Lannett's Sullivan and left a message on April 25, 2013. Sullivan returned her call the next day and they spoke for more than eight minutes.  Sather and Sullivan spoke again on May 13, 2013 for six minutes.  The following day, May 14, 2013, both Sather and Sullivan attended an industry conference where they discussed doxy mono in-person.  They also exchanged multiple text messages that day.

180.    On June 4, 2013, Heritage's Sather called and texted ████████████████. Sather sent these text messages while attending the HDMA's June 2-5, 2013 Business and Leadership Conference in Orlando. Lannett's Sullivan also attended the HDMA conference, as did sales executives from Mylan and Par.

181.    Defendants aimed to implement price increases for doxy mono in the late spring and summer of 2013.  Prior to the price increases, the four purported competitors selling doxy mono – Par, Lannett, Heritage, and Mylan – were in frequent communication.  For example on June 11, 2013 – the day before Lannett's price increase, Heritage National Account Manager Neal O'Mara spoke with ███████████████ for nearly 10 minutes.  Also during this period, ███████ at Lannett communicated with ███████████████████ ████████████ at Par, including phone calls on June 7, 2013 and June 13, 2013. ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

182.    Heritage's Sather kept in frequent communication with Lannett throughout 2013. She also met with ██████████████ and █████████████ while at a conference in

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Arizona on August 1 and 2. Following Sather's contacts in Arizona, there was a flurry of communications between Par, Mylan, Lannett, and Heritage.

183. On August 12, 2013, Heritage's Sather met with Lannett's Sullivan during NACDS Total Store Expo in Las Vegas and Sather sent Sullivan a follow up text (at Heritage President Malek's direction) after their in-person meeting. Sather and Sullivan exchanged additional text messages the following day, August 13, 2013. Also on August 13, 2013, ███████ ███████ of Lannett sent a text message to ███████████ at Par, and internal Par emails discussed doxy mono, ████████████████████████████████████████████████████ ███████████.

184. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████.

185. ████████████████████████████████████████████████████ ███████████.

186. By March 2014, Heritage was working on an across-the-board price increase on doxy mono, as well as price increases on several other drugs. As discussed above, on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss the strategy for obtaining price increases for eighteen different drugs, including doxy mono.

187. Right after the Heritage conference call on April 22, 2014, Heritage's Sather had a 29-minute phone conversation with Lannett's Sullivan during which they agreed to raise the price of doxy mono.

188. Similarly, on April 23, Neal O'Mara, the employee at Heritage who was primarily responsible for communicating with Mylan, contacted his counterpart at Mylan (either Aigner or

- 53 -

Nesta) and secured an agreement to raise prices on at least three different drugs, including doxy mono. Immediately after speaking with Mylan, O'Mara sent an email to Malek advising him of his discussions with Mylan.

189.    On May 8, 2014, Malek sent an email requesting an update on discussions with erstwhile competitors from the Heritage sales team. Sather responded to Malek's email, providing an update on her communications with three defendants about five drugs, including Lannett about doxy mono.

190.    Shortly thereafter, on May 14, 2014, Sather attended the MMCAP National Member Conference where she was able to confirm, among other agreements, an agreement with Lannett on doxy mono pricing.

191.    The agreement between Heritage, Lannett, Mylan, and Par regarding doxy mono was part of the Fair Share Agreement among generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Named Generic Drugs.

### c.    fosinopril hydrochlorothiazide

192.    Fosinopril hydrochlorothiazide ("fosi-HCTZ") is used to treat high blood pressure, thereby helping to prevent strokes, heart attacks, and kidney problems.

193.    The market for fosi-HCTZ is mature. At all relevant times, there have been multiple manufacturers of generic fosi-HCTZ.

194.    The relevant manufacturers of fosi-HCTZ are Defendants Aurobindo, Citron, Glenmark, Heritage, and Sandoz.

195.    As of April 2014, ██████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

196.     As discussed above, during the week of April 14, 2014, Heritage's Malek tasked two Heritage employees with analyzing price increases for several generic drugs, including fosi-HCTZ.  On April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases.  Fosi-HCTZ was on the list.

197.     Heritage National Account Manager Dan Lukasiewicz (who had previously worked at Zydus and Aurobindo) was deputized by Heritage CEO Glazer to coordinate with competitors regarding the fosi-HCTZ price increase.  Glazer cautioned Lukasiewicz not to document any of his communications in writing.

198.     In May 2012, executives from Heritage, Aurobindo and Glenmark began communicating frequently about a collusive price increase for fosi-HCTZ.  On May 2, 2014, ███████████████████████████████████████████ at Heritage, contacted ███████████ ███████████████████████ at Glenmark, on LinkedIn. On May 8, 2014, ███████████████ at Heritage had a 16-minute telephone conversation with ██████████████████████████████████████ ███████████ at Aurobindo. The same day, ████████████████████ called ████████████████████████ ███████████████ at Glenmark, and they spoke for 14 minutes.  The following day, May 9, 2014, ███████████████████████████████████████████ at Aurobindo, and ███████████████████████████████ ███████████████ at Glenmark, held a nine-minute telephone call.

199.     While these inter-company communications were taking place regarding fosi-HCTZ, Heritage was making internal preparations for a price increase on fosi-HCTZ.  On May 9, 2014, Heritage held an internal conference call that confirmed that fosi-HCTZ (among other drugs) was designated for a price increase.

- 55 -

200.     On May 14, 2014, executives from Heritage, Aurobindo and Sandoz met in person to discuss a fosi-HCTZ price increase at an MMCAP conference in Minnesota. ███ ███████████████████████████████████████████████████████████ ██████████████████████████████████. ████████ of Aurobindo and █████ of Sandoz continued to discuss the price increase the next day (May 15, 2014) via text message and telephone.

201.     Also on May 15, 2014, Heritage, acting contrary to its independent self-interest, conceded a valuable customer to Aurobindo based on a recent conversation between ███████████ █████████████████████ confirming that Aurobindo would cooperate in the Fair Share Agreement.

202.     Collusive contacts between the fosi-HCTZ manufacturers continued in June 2014. During the period from June 3-10, 2014, executives from Aurobindo (████████████), Glenmark (███████████) and Sandoz (█████████████) called and texted each other multiple times concerning the planned fosi-HCTZ price increase. On June 16, 2014, ████████████ ████████████████ at Glenmark, called █████████████████████████ ████████████ at Aurobindo, and they spoke for 22 minutes.

203.     Around this same time, Heritage decided to significantly increase its prices, including a 200% price increase for fosi-HCTZ.

204.     On June 25, 2014 – the day before Heritage issued price increase letters for numerous drugs, including fosi-HCTZ – █████████████████ from Heritage and ████████████ from Aurobindo spoke by phone for 18 minutes.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

205.     Also on June 25, 2014, ████████████ and ████████████ ████████████ at Citron, made contact and confirmed that Citron would also be entering the fosi-HCTZ market.  Citron was then apprised of the price increase scheme.

206.     On June 26, 2014, Heritage began implementing its fosi-HCTZ price increase as planned.

207.     The collusive communications continued after Heritage's price increase implementation as other Defendants prepared to implant Heritage's fosi-HCTZ price increase. On June 27, 2014, executives from Aurobindo and Glenmark spoke by telephone.

208.     On July 1, 2014, ████████████████████████ at Citron, reached out to ████████████ at Heritage and had a nearly 13-minute discussion regarding price increases for fosi-HCTZ and glyburide.  Evidence also shows that ████ warned ████████████ about contacting Citron by email concerning fosi-HCTZ pricing, and she suggested that communications be done by phone through ████████████████████████.

209.     The next day, on July 2, 2014, Anne Sather at Heritage and ████████████ at Citron had a nearly 22-minute conversation.

210.     On July 9, 2014, Citron confirmed internally that it would try to match Heritage's fosi-HCTZ price increases, and it began implementing its own price increases on July 15, 2014.

211.     On July 14, 2014 – the day before Citron was to implement its fosi-HCTZ price increase – ████████████ of Citron and ████████████ of Glenmark had two telephone conversations, lasting seven and 13 minutes.

212.     On July 18, 2014, ████████████ at Heritage and ████████████ at Glenmark had a 23-minute telephone conversation.  The same individuals from Heritage and Glenmark had a five-minute follow up conversation on July 30, 2014.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

213.    By early 2015, Defendants Heritage, Aurobindo, Citron, Glenmark, and Sandoz had implemented the agreed-upon fosi-HCTZ price increases.

214.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

215.    The agreement between at least at least Defendants Aurobindo, Citron, Glenmark, Heritage, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including fosi-HCTZ.

        **d.    glipizide-metformin**

216.    Glipizide-metformin is used to treat high blood sugar levels associated with diabetes.

217.    The market for glipizide-metformin is mature.  At all relevant times, there have been multiple manufacturers of generic glipizide-metformin.

218.    The relevant generic manufacturers of glipizide-metformin are Defendants Heritage, Mylan, and Teva.

219.    As of April 2014, ████████████████████████████████████████ ████████████████

220.    As discussed above, on April 15, 2014, Heritage's Malek had a 17-minute telephone conversation with Nisha Patel at Teva (whom Malek knew from Patel's prior employment) regarding, among other things, glipizide-metformin price increases.  The two Defendants reached an agreement whereby Teva would match Heritage's price increase for glipizide-metformin and would not attempt to underbid it.  This agreement was confirmed in subsequent conversations between Heritage's Malek and Teva's Patel during the next few months.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

221.    Shortly before reaching an understanding with Teva, Malek had already began laying the internal groundwork at Heritage for a price increase. During the week of April 14, 2014, Heritage's Malek tasked two Heritage employees with analyzing price increases for several generic drugs, including glipizide-metformin. On April 22, 2014, the Heritage sales team held an internal teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases. Glipizide-metformin was on the list.

222.    Neal O'Mara of Heritage was responsible for communicating with Defendant Mylan through his contact, ▮▮▮▮▮, regarding the glipizide-metformin price increase. On April 23, 2014, O'Mara spoke with ▮▮▮ at Mylan and reported the results of these communications to Malek and ▮▮▮.

223.    Teva and Mylan maintained regular communication in advance of the glipizide-metformin price increase. For instance, on May 9, 2014, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at Mylan, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at Teva, spoke multiple times, including a call that lasted 7 minutes.

224.    Meanwhile, also on May 9, 2014, Heritage held an internal conference call that confirmed that glipizide-metformin was designated for a price increase.

225.    On June 25, 2014, Malek spoke with Teva's Patel for 14 minutes, during which he reported that Heritage's price increase notices would be mailed on June 26, 2014 for glipizide-metformin and several other drugs for which Heritage and Teva had agreed to raise prices.

226.    On June 26, 2014, Heritage's ▮▮▮▮▮ informed her contact at a large wholesaler that glipizide-metformin prices would be increasing by 100% effective July 1, 2014. Heritage began to distribute price increase notices for glipizide-metformin on the same date.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

227.     As of early July 2014, Heritage had increased prices for approximately 27 customers.  Teva and Mylan matched and did not attempt to underbid Heritage.  In fact, Teva actually increased its glipizide-metformin prices during the same time period.

228.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

229.     The agreement between at least Defendants Heritage, Mylan, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including glipizide-metformin.

### e.     glyburide-metformin

230.     Glyburide-metformin is used to treat type 2 diabetes.

231.     The market for glyburide-metformin is mature.  At all relevant times, there have been multiple manufacturers of generic glyburide-metformin.

232.     The relevant manufacturers of glyburide-metformin are Defendants Actavis, Aurobindo, Citron, Heritage, Impax,[48] and Teva.

233.     In approximately April 2014, ████████████████████████████ ████████████████████████████.  Heritage desired to raise prices and contacted its competitors regarding a proposed price increase.

---

[48] Public records available in the FDA Approved Drug Products database demonstrate that Impax held at least two different ANDAs for glyburide-metformin during the relevant time period (ANDA Nos. 076345 & 076731).  Public records also indicate that Impax distributed Glyburide-Metformin under a third ANDA (ANDA No. 076716) that is owned by Actavis. *See* Glyburide and Metformin Tablets, *available at* https://www.drugs.com/pro/glyburide-and-metformin-tablets.html (manufactured by Actavis Elizabeth LLC and distributed by Impax Generics).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

234.    For example, on April 15, 2014, Heritage's Malek had a 17-minute telephone conversation with ███████ at Teva during which they discussed a glyburide-metformin price increase. An agreement was reached that Teva would match, or at least not challenge, Heritage's elevated bid. Malek and ████ spoke on several other occasions and confirmed their agreement.

235.    ██████████ at Heritage was responsible for contacting Actavis regarding a price increase. At least one telephone conversation occurred, on April 22, 2014, wherein █████ at Heritage and ██████████████████████████ at Actavis, agreed to the proposed price increase for glyburide-metformin (and verapamil). News of the agreement between Heritage and Actavis to raise prices for glyburide-metformin was circulated internally at Actavis.

236.    After learning of the understanding between Heritage and Actavis regarding glyburide-metformin, on May 1, 2014, ██████████████████████████████ ████████ at Actavis, contacted ████████████████████████ at Teva, and they spoke for 5 minutes. On May 6, 2014, the same individuals at Actavis and Teva spoke three times, including one 15-minute telephone conversation. These employees of Actavis and Teva stayed in communication over the next several months.

237.    Heritage employees also established contact with one or more individuals at Aurobindo regarding price increases for glyburide-metformin, including a 16-minute telephone conversation between ████████████████ and ███████████████████ held on May 8 and an in-person conversation between ████████████████████████████ ████████ on May 14.

238.    As discussed above, on May 8, 2014, Malek contacted the Heritage sales team to obtain a report on communications with representatives from other generic manufacturers regarding pricing for, among other drugs, glyburide-metformin.

- 61 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

239.    The next day, on May 9, 2014, Heritage held an internal conference call during which glyburide-metformin was identified (along with other drugs) as designated for a price increase.

240.    Executives of Actavis and Aurobindo were also in communication in the spring of 2014. On May 12, 2014, ██████████████████████████████████ at Actavis spoke twice with Bob Cunard, CEO of Aurobindo. Between May 19 and 22, 2014, ████ exchanged 30 text messages with ████████████████████████████████████.

241.    During the next two months, representatives at Actavis, Aurobindo, and Heritage maintained communication regarding glyburide-metformin price increases, including through telephone conversations and text messages.   At least Defendant Citron also became involved in these communications.

242.    By July 2014, Heritage and Teva had increased their WAC prices for glyburide-metformin.  Impax's prices also started to increase around that time.

243.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

244.    The agreement between at least Defendants Actavis, Aurobindo, Citron, Heritage, Impax, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including glyburide-metformin.

###### f.    leflunomide

245.    Leflunomide is used to treat active moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

246.    The market for leflunomide is mature.  At all relevant times, there have been multiple manufacturers of generic leflunomide.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

247.    The relevant manufacturers of leflunomide are Defendants Apotex, Heritage, and Teva.

248.    In April 2014, ██████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████

249.    Leflunomide prices were also discussed during the 17-minute telephone conversation between Heritage's Malek and Nisha Patel at Teva on April 15, 2014.  The two Defendants reached an agreement whereby Teva would match Heritage's price increase for leflunomide, and not attempt to underbid it.  This agreement was confirmed in subsequent conversations between Heritage's Malek and Teva's Patel during the next few months.

250.    Heritage National Account Manager Matt Edelson was responsible for coordinating with Apotex regarding leflunomide pricing.  On May 2, 2014, Edelson spoke with ████████████████████████████ at Apotex for 13 minutes.  Shortly thereafter, during a two-day period, on May 6-7, 2014, Heritage's Edelson had four phone calls with ████ at Apotex.  ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████  These Heritage/Apotex phone calls occurred shortly after Heritage learned that Teva would be leaving the leflunomide market.  In other words, Heritage was cementing its understanding with the company (Apotex) that would be the only other manufacturer of leflunomide left after Teva's exit.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

251.    On May 8, 2014, Malek contacted the Heritage sales team to obtain a report on communications with representatives from other generic manufacturers regarding pricing for, among other drugs, leflunomide.

252.    At the May 9, 2014 Heritage internal conference call Heritage confirmed that leflunomide (along with other drugs) was designated for a price increase.

253.    On May 27, 2014, Heritage learned that Apotex implemented a price increase for leflunomide.

254.    In late June 2014, Heritage began sending out price increase notices to its customers for leflunomide. As of July 2014, Heritage had increased its leflunomide price for approximately 15 different customers.

255.    At the same time Heritage and Apotex were implementing their price increases for leflunomide, Teva began to exit the leflunomide market, consistent with what Heritage had learned in May.

256.    As a result of the mid-2014 price increases (as well as later price increases), prices of leflunomide were artificially inflated.

257.    No non-collusive market factors can explain Defendants' artificially inflated prices.

258.    The agreement between at least Defendants Apotex, Heritage, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including leflunomide.

### g.    meprobamate

259.    Meprobamate is a generic pharmaceutical used for the short-term relief of anxiety.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

260.     The market for meprobamate is mature.  At all relevant times, there have been multiple manufacturers of generic meprobamate.

261.     The relevant manufacturers of meprobamate are Defendants Actavis, Dr. Reddy's, and Heritage.

262.     In early 2013, Actavis exited the market for meprobamate, leaving Defendants Heritage and Dr. Reddy's as the remaining sellers of meprobamate.

263.     On March 21, 2013, Heritage's Malek emailed Heritage Associate Director of National Accounts Neal O'Mara and Heritage National Account Manager Matt Edelson and directed them to contact Dr. Reddy's and advise Dr. Reddy's that Heritage wanted to take a large price increase on meprobamate.

264.     The next day, on March 22, 2013, Heritage's O'Mara had a nine-minute telephone conversation with Dr. Reddy's ███████████████████████████, during which the two companies agreed to raise the price of meprobamate. Following the conversation, also on March 22, 2013, O'Mara sent an email to Malek advising that Dr. Reddy's was "on board" with the meprobamate price increase. On March 25, 2013, O'Mara sent another email to Malek stating that Dr. Reddy's would "follow suit" on a meprobamate price increase.

265.     In approximately April 2013, Dr. Reddy's contacted Heritage about acquiring additional market share for meprobamate.  The two companies then worked out an agreement whereby Heritage gave some of its existing business – specifically a large pharmacy chain – to Dr. Reddy's.

266.     Heritage and Dr. Reddy's continued their conspiratorial communications regarding meprobamate in May 2013. On May 17, 2013, Heritage's ██████████████████ ██████ with his contact at Dr. Reddy's. This contact was followed by a seven-minute

- 65 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

telephone conversation between Malek and a Dr. Reddy's ▮▮▮▮▮▮▮▮▮ on May 21, 2013.

267.    Through their communications and resulting agreements, these two Defendants significantly raised meprobamate prices during this same period.  Heritage's price increases went into effect in April 2013, and Dr. Reddy's price increases went into effect about a month later.



REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



268.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

269.     The agreement between at least Defendants Heritage and Dr. Reddy's was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including meprobamate.

**h.     metronidazole**

270.     Metronidazole is a generic antibiotic.  Due to, among other things, its clinical efficacy and safety, metronidazole has been designated as an essential medicine by the World Health Organization.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

271.    The market for metronidazole is mature.  At all relevant times, there have been multiple manufacturers of generic metronidazole.

272.    The relevant manufacturers of metronidazole are Defendants G&W, Impax, Sandoz, Teva, and Valeant/Oceanside.

273.    There are different several different formulations of metronidazole.  For example, Heritage manufactured a capsule and tablet form of metronidazole.

### (1)    metronidazole cream

274.    Defendants G&W, Sandoz, and Teva ███████████████████████████ ████████████████████████████████████████████████████.

275.    ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



276.　　The GAO Report noted that metronidazole cream was among the generic drugs with an extraordinary price increase. ███████████████████████████ ██████████████████████████████████████████████████████████ █████████

277.　　Defendants' employees (including NAMs) had the opportunity to discuss pricing of metronidazole cream at numerous trade association and industry events during the relevant period such as: (1) the NACDS 2010 Pharmacy and Technology Conference in August 2010, (2) the ██████████████████████████████████████████, (3) the NACDS 2011 Annual Meeting in April/May 2011, (4) the HDMA 2011 Business and Leadership Conference in June 2011, and (5) the NACDS 2011 Pharmacy & Technology Meeting in August 2011. *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

278.   No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

279.   The agreement between at least Defendants G&W, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including metronidazole cream.

### (2)   metronidazole jelly



280.

281.

[49] In March 2012, Impax entered into a Development, Supply and Distribution Agreement with TOLMAR, Inc.  In June 2012, Impax and TOLMAR agreed to collaborate on nine generic drug products including metronidazole and lidocaine-prilocaine.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



282.    The GAO Report noted that metronidazole jelly was among generic drugs with an extraordinary price increase. ████████████████████████████████████

████████████████████████████████████████████████████

283.    The metronidazole jelly ████████ occurred shortly after trade association meetings where representatives (including NAMs) from G&W, Impax/Global, Sandoz, and Teva were in attendance such as: (1) the ████████████████████████████████████ ████████████, (2) the NACDS 2011 Annual Meeting in April/May 2011, (3) the NACDS 2011 Pharmacy & Technology Meeting in August 2011, (4) the ████████████████████████ ████████████████████████████, (5) the NACDS 2012 Annual Meeting in

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

April 2012, and (6) the NACDS 2012 Pharmacy and Technology Conference in August 2012. *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

284.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

285.    The agreement between at least Defendants G&W, Impax/Global, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including metronidazole jelly.

### (3)    metronidazole lotion

286.    Defendants Sandoz and Teva



287.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



288.     The GAO Report noted that metronidazole lotion was among the generic drugs with an extraordinary price increase. ███████████████████████████████

███████████████████████████████████████████████████████

███████

289.     The metronidazole lotion ██████████ occurred shortly after trade association meetings where representatives (including NAMs) from Sandoz and Teva were in attendance such as: (1) the NACDS 2010 Pharmacy and Technology Conference in August 2010, (2) the ████████████████████████████████████████████, (3) the NACDS 2011 Annual Meeting in April/May 2011, (3) the NACDS 2011 Pharmacy & Technology Meeting in August 2011, and (4) the HDMA 2011 Business and Leadership Conference in June 2011.  *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

- 73 -

290.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

291.     The agreement between at least Defendants Sandoz and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including metronidazole lotion.

### (4)     metronidazole vaginal

292.     Defendants Sandoz and Valeant/Oceanside 

. Prasco Laboratories ("Prasco") also manufactured a generic metronidazole vaginal during the relevant period.[50]   Additionally, Defendant Valeant manufactures a brand metronidazole drug under the name MetroGel vaginal.

293.

.

294.

.

---

[50] Prasco was selling a so-called "authorized generic" or "AG" of metronidazole vaginal. In or around February 2015, it appears that Prasco's contract to sell AG metronidazole vaginal expired.  Valeant then began selling the AG through its Oceanside division whereupon Sandoz and Valeant/Oceanside                                                  .  Valeant is known to have employed price increase tactics with other drugs shortly after acquiring them. *See, e.g.*, Press Release, *Sanders and Cummings Ramp Up Investigation of Staggering Drug Price Increases* (Aug. 14, 2015) ("We want to know why Valeant significantly raised the prices of these two vitally important drugs when the only thing that has changed about the drugs is the company that owns them."), *available at* https://www.sanders.senate.gov/newsroom/press-releases/sanders-and-cummings-ramp-up-investigation-of-staggering-drug-price-increases.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



295.   ████████████████████████████████████████

████████████████████████████████.

296.   Notably, █████████████████████████████████

██████ Defendant Valeant is known to have been dramatically raising prices on numerous

other pharmaceuticals.[51]   For example, shortly after Valeant acquired the pharmaceutical

company Medicis (which originally manufactured brand MetroGel vaginal) at the end of 2012,

_____

[51] *See* Jonathan D. Rockoff and Ed Silverman, *Pharmaceutical Companies Buy Rivals' Drugs, Then Jack Up the Prices*, THE WALL STREET JOURNAL (Apr. 26, 2015), *available at* https://www.wsj.com/articles/pharmaceutical-companies-buy-rivals-drugs-then-jack-up-the-prices-1430096431; Bethany McLean, *The Valeant Meltdown and Wall Street's Major Drug Problem*, VANITY FAIR (Summer 2016), *available at* https://www.vanityfair.com/news/2016/06/the-valeant-meltdown-and-wall-streets-major-drug-problem.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Valeant engaged in a series of multifold price increases on MetroGel vaginal in 2013 and 2014. Such price gouging is well-known to have been a major part of Valeant's business strategy.[52] Valeant was among the generic manufacturers that received a letter as part of the Congressional investigation into "skyrocketing" generic drug prices. *See* Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry). Other Defendants and MDL defendants who received such letters include: Actavis, Apotex, Dr. Reddy's, Heritage, Impax (Global), Lannett, Mylan, Par (Endo), Sun, Teva, West-Ward, and Zydus. *Id.* Valeant has also been subpoenaed by other government regulators looking into drug pricing practices. *Id.*

297.    The generic metronidazole vaginal ███████ occurred shortly after trade association meetings where representatives (including NAMs) from Valeant/Oceanside and Sandoz were in attendance such as: (1) the HDMA 2014 Business and Leadership Conference in June 2014, (2) the NACDS 2014 Foundation and Reception Dinner in December 2014, and (3) the NACDS 2015 Annual Meeting in April 2015. *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

298.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

299.    The agreement between at least Defendants Sandoz and Valeant/Oceanside was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including metronidazole vaginal.

---

[52] *See* Sanders and Cummings Press Release (questioning Valeant about why prices increased when the only thing that "changed about the drugs is the company that owns them").

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

### i.   nimodipine

300.     Nimodipine is a calcium channel blocker, which is used to relax blood vessels thereby preventing damage caused by brain aneurysms.

301.     The market for nimodipine is mature.

302.     The relevant manufacturers of nimodipine are Defendants Heritage, Sun, and Teva, as well as Ascend.

303.     Prior to June 2012, ███████████████████████████ ███████████████████.   In mid-2012, Teva decided to exit the market, and Heritage used Teva's exit as an opportunity to coordinate and further raise prices for nimodipine.

304.     In approximately June 2012, Heritage President Jason Malek, asked Heritage Senior Director of National Accounts Anne Sather to contact Susan Knoblauch at Defendant Sun's subsidiary, Caraco, to discuss a nimodipine price hike.  Sather followed Malek's instructions, maintaining regular contact with Knoblauch at Sun for the remainder of the month, including through text messages.  Sather kept Malek informed as to her communications with Sun concerning nimodipine.

305.     Eventually, an agreement hatched that involved coordinating prices to specific customers in order to artificially inflate nimodipine prices.  For instance, Heritage and Sun agreed to protect Sun's sales to Cardinal Health whereby Heritage would bid at a higher price, which would be communicated beforehand to Sun.  This in turn allowed Sun to raise its price and still maintain the Cardinal contract.  Similar agreements were used to stabilize and raise prices with other customers.

306.     In approximately late 2012 or early 2013, Sun's subsidiary Caraco was subject to an FDA recall for nimodipine due to manufacturing concerns.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

307.    Beginning in approximately April or May 2013, Malek, acting again through Sather, communicated with Sun and arranged for the resurrection and continuation of the prior pricing agreement upon Sun's return to the nimodipine market in summer 2013.  Ultimately, Sun/Caraco decided not to return to the nimodipine market.



308.    After Sun/Caraco's exit from the nimodipine market, Heritage was able to continue charging inflated prices for nimodipine as a result of its prior agreement with Sun/Caraco and also raised prices thereafter.

309.    No non-collusive market factors can explain Defendants' artificially inflated prices.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

310.     The agreement between at least Defendants Heritage, Sun, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including nimodipine.

311.     After receiving FDA approval, co-conspirator Ascend prepared to begin selling nimodipine in approximately April 2014.  Knowing that Ascend was preparing to launch nimodipine, Heritage's Malek contacted an Ascend executive via LinkedIn.

312.     In that same month, during its April 22, 2014 internal teleconference, Heritage identified nimodipine as one of approximately 18 drugs designated for a price increase.

313.     Malek assumed responsibility for communication with Ascend because he had a pre-existing relationship with John Dillaway, an Executive Vice President at Ascend. Acting through Malek, Heritage conspired to offer Ascend approximately one-third of the nimodipine market, in turn for an agreement not to compete on nimodipine price.

314.     On April 22, 2014 – the same day on which Heritage identified nimodipine as a drug targeted for a price increase, Malek had a 19 minute telephone conversation with ███ ███████ at Ascend.

315.     Upon information and belief, an agreement was reached whereby Heritage would bid at a high price to various nimodipine customers and Ascend would then enter the market at a high price to avoid price erosion.  In exchange, Heritage agreed not to pursue certain accounts that Ascend was interested in, with the result that Ascend was able to acquire these segments of the market at inflated prices.

316.     On May 9, 2014, Heritage had an internal conference during which it confirmed that it would raise prices on nimodipine (among other drugs).

- 79 -

317.     In June 2014, Malek emailed his Ascend's ███████ seeking to set up a phone call. When the phone call was not able to be scheduled, Malek suggested that they meet in-person during a NACDS conference in Boston in late August.

318.     By the end of June 2014, Heritage had implemented its price increase on nimodipine with at least 12 customers.

319.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

320.     The agreement between Defendant Heritage and co-conspirator Ascend was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including nimodipine.

        **j.     nystatin**

321.     Nystatin is an antifungal medicine.  Due to, among other things, its clinical efficacy and safety, nystatin has been designated as an essential medicine by the World Health Organization.

322.     The market for nystatin is mature.  At all relevant times, there have been multiple manufacturers of generic nystatin.

323.     The relevant manufacturers of nystatin are Defendants Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, and Teva.

324.     There are different several different formulations of metronidazole.  For example, Heritage manufactured a tablet form of nystatin.

        **(1)     nystatin cream**

325.     During the relevant time period, ████████████████████████████
████████████████████████████.

- 80 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

326. ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████.



327.    The GAO Report noted that nystatin cream was among generic drugs with an

extraordinary price increase.

328.    ███████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



329.

330.

331.

332.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████.

333.     Defendants' employees (including NAMs) had numerous opportunities to coordinate their pricing for nystatin cream at trade association meetings and industry events such as: (1) the ████████████████████████████, (2) the NACDS 2011 Annual Meeting in April/May 2011, (3) the NACDS 2011 Pharmacy & Technology Meeting in August 2011, (4) the GPhA CMC Workshop in June 2013, (5) the NACDS 2013 Total Store Expo in August 2013, and (6) the GPhA 2013 Fall Technical Conference in October 2013.  *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

334.     ██████████████████████████████ ████████████████████.

335.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.  In a competitive generic pharmaceutical market, prices tend to decline as the number of sellers in the market increases.  ████████████████ ████████████████████████████████████ ██████████████.

336.     The agreement between at least Defendants Actavis, Par, Perrigo, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including nystatin cream.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

(2)     **nystatin ointment**

337.     During the relevant time period, ███████████████████████

████████████████████████████ .



338.     ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████ .

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

339. 

340.

341.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



342. The GAO Report noted that nystatin ointment was among the generic drugs with an extraordinary price increase.

343. Defendants' employees (including NAMs) had the opportunity to discuss pricing of nystatin ointment at numerous trade association and industry events during the relevant period such as: (1) the ███████████████████████████████████ (2) the NACDS 2011 Annual Meeting in April/May 2011, (3) the NACDS 2011 Pharmacy & Technology Meeting in August 2011, (4) the ████████████████████████ ██████████████████, and (5) the NACDS 2012 Annual Meeting in April 2012. *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

344.   █████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████.

345.   No non-collusive market factors (*e.g.*, product shortages) can explain Defendants'

artificially inflated prices.  In a competitive generic pharmaceutical market, prices tend to decline

as the number of sellers in the market increases.  █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████.

346.   The agreement between at least Defendants Actavis, Perrigo, and Sandoz was part

of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise

prices, rig bids, and engage in market and customer allocation for generic drugs, including

nystatin ointment.

**(3)    nystatin tablets**

347.   During the relevant time period, ███████████████████████████

██████████████████████████████████████████████████████.

348.   In 2010 and 2011, the nystatin oral tablet market was split between Teva and Sun.

Teva held approximately 60% of the market, while Sun held 40%.  During that time, Teva and

Sun had nearly identical list prices for their nystatin tablets.

349.   In the summer of 2012, Heritage entered the market. Rather than price its Nystatin

tablets below that of the incumbent sellers, Heritage identically matched the list prices of Teva

and Sun.

350.   On April 15, 2013, Sun more than doubled its price for nystatin tablets. Sun, Teva

and Heritage had ongoing communications both before and after this increase. The day after Sun

- 87 -

increased its nystatin tablet prices, Sun Senior Sales Manager Susan Knoblauch called Heritage's

National Account Manager Ann Sather and they spoke for 40 minutes.

351.     In June 2013, Teva began internally discussing price increases for nystatin tablets

to bring its prices in line with the recent price increase by Sun. Teva reached out to Heritage

before raising its prices on nystatin tablets.  Accordingly, on July 9, 2013, Teva's Nisha Patel

called Heritage's Jason Malek and they spoke for 21 minutes. Malek knew Patel from her

previous job, but this was the first time the two had spoken since Patel joined Teva in April 2013

to ███████████████. They spoke throughout July 2013 – with a nearly 10 minute call on July

23 and two calls on July 30. The second call on July 30 lasted more than 12 minutes.

352.     While Heritage's Malek was speaking with Patel at Teva, Heritage remained in

contact with Sun. On July 30 – the same day Malek spoke with Teva's Patel twice – Malek also

spoke to ███████████████ at Sun for nearly 11 minutes.

353.     As these collusive communications continued, in late July 2013 Teva placed

nystatin tablets on its list of potential price increases.

354.     By August 2013, Heritage was also targeting a price increase for nystatin tablets.

Malek was centrally involved in this effort. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████

355.     The plans to raise prices of nystatin tablets were temporarily put on hold while

Teva's Patel was on maternity leave from mid-August 2013 through the end of the year.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

356.    Shortly after her return from maternity leave, in early 2014, Teva's Patel and Heritage's Malek began communicating again, including a call on February 5, 2014 that lasted more than an hour. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

357.    Throughout February and March 2014, Heritage's Malek and Teva's Patel continued to have a series of phone calls discussing price increases for multiple drugs, including nystatin tablets.

358.    Following these discussions, Teva implemented a price increase for nystatin tablets with an effective date of April 4, 2014. The increase more than doubled Teva's list price to a price nearly identical to Sun's.

359.    Buoyed by his success in colluding with Sun and Teva to inflate the prices of nystatin tablets, Malek was determined to expand his efforts to include other generic drugs and manufacturers. As discussed above, during the week of April 14, 2014, Malek met with two Heritage employees and asked them to start analyzing the impact of price increases for various generic drugs including nystatin.

360.    While Malek was working internally at Heritage to plan additional price increases on other drugs, he also continued to coordinate with Teva's Patel. On April 15, 2014, Heritage's Malek had a 17 minute phone conversation with Patel, during which they discussed several drugs, including nystatin. Malek and Patel agreed that if Heritage increased prices for five other drugs – acetazolamide, glipizide-metformin, glyburide, glyburide-metformin, and leflunomide – Teva would increase its prices for these drugs, or at a minimum, would not challenge Heritage's price increases.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

361.    Heritage's Malek and Teva's Patel spoke several times over the next several months to confirm their agreements on nystatin and other drugs.  Malek also kept Patel updated on the progress of Heritage's proposed price increases.

362.    On April 22, 2014, Heritage's Malek held an internal teleconference with his sales team.  On the call, Malek dictated a price increase strategy for the eighteen different drugs identified above to Heritage's National Account Managers. Prior to the conference call, Malek circulated a spreadsheet to his sales team, which identified each drug slated for a price increase, the competitors for each drug, and their respective market shares.

363.    Heritage National Account Manager Anne Sather was responsible for coordinating with Sun regarding nystatin tablets.[53]  On April 22, 2014, Sather and Susan Knoblauch at Sun spoke for 45 minutes. Knoblauch communicated to Sather that Sun was on board with Heritage's plan to raise prices for nystatin tablets.  After the call with Knoblauch, Sather emailed her superiors at Heritage, Malek and Glazer, to report that Sun agreed to raise prices for nystatin tablets.  Glazer responded to Sather's email with an admonition that Sather should not document collusive communications in writing.

364.    Four days after the Sather/Knoblauch phone call, on April 26-29, 2014, Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from at least Teva and Sun.

365.    On or about May 8, 2014, Malek requested an update on the status of Sather's negotiations with competitors ███████████████████████████████████ ████████████████████████████.

---

[53] Sather also spoke with Sun about paromomycin and spoke with Actavis to confirm agreements on glyburide-metformin and verapamil and with Lannett to confirm agreements on doxy mono.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

366.     On or about May 9, 2014, Heritage had an internal call to discuss the status of the proposed price increases for various drugs, including nystatin tablets.

367.     On June 23, 2014, the Heritage sales team had a ███ where they discussed the specific percentage amounts they would seek to increase on the drugs identified at the May 9, 2014 meeting. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██. Heritage planned a 95% price increase on nystatin tablets. This was confirmed in another internal Heritage ███ on June 25, 2014.

368.     Also on June 25, 2014, during the internal Heritage conference call, while Heritage was finalizing its plans for the massive nystatin tablet price increase, Heritage's Sather exchanged text messages with Sun's Knoblauch, providing her with details of Heritage's anticipated price increases.

369.     Heritage's Malek was also reaching out to an erstwhile competitor as Heritage prepared to implement its nystatin tablet price increase.  On June 25, 2014, Malek spoke with Teva's Patel for 14 minutes, during which he reported that Heritage's price increase notices would be mailed on June 26, 2014 for nystatin tablets and several other drugs for which Heritage and Teva had agreed to raise prices.

370.     Consistent with Malek's report to Patel, on June 26, 2014, Heritage began telling its customers that it was increasing its prices for nine drugs, including nystatin tablets.  By July 2014, among the other price increases it implemented, Heritage increased its nystatin oral tablet list prices to the identical level of Teva (and nearly identical to Sun).

371.     In accordance with their agreement, Teva refused to undercut Heritage's prices, even when approached by large potential customers.  For example, on July 8, 2014, a large retail

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

customer emailed a Teva representative asking for a quote for nystatin tablets because it recently

was notified of a large price increase from its current supplier. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████.

372.    Teva did not provide a competitive bid. The lack of a competitive bid was an

effort by Teva to maintain the Fair Share Agreement.

373.    ████████████████████████████████████████████████.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

374.    ████████████████████████████████████████████████

████████████████████████████████████    The AWP prices for Defendants'

- 92 -

products also were elevated to nearly identical levels.  These prices remained stable and elevated above competitive levels thereafter.

375.   No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

376.   The agreement between at least Defendants Heritage, Sun, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including nystatin tablets.

### k.   paromomycin

377.   Paromomycin is an antibiotic used to treat parasitic intestinal infections, such as amebiasis, giardiasis, leishmaniasis, and tapeworm infection.  Due to, among other things, its clinical efficacy and safety, paromomycin has been designated as an essential medicine by the World Health Organization.

378.   The market for paromomycin is mature.  At all relevant times, there have been multiple manufacturers of generic paromomycin.

379.   The relevant manufacturers of paromomycin are Defendants Heritage and Sun (through its Caraco division).

380.   ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████.

381.   As discussed above, on April 14, 2014, Heritage's Malek tasked two Heritage employees with analyzing price increases for several generic drugs, including paromomycin.  On April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases.  Paromomycin was on the list.

- 93 -

382.     As discussed above, Heritage Senior Director of National Accounts Anne Sather was responsible for coordinating with Sun regarding several generic drugs, including paramomycin. On the same day as the internal Heritage teleconference regarding price increases (April 22, 2014), Sather and Susan Knoblauch at Sun spoke for 45 minutes. After the call with Knoblauch, Sather emailed her superiors at Heritage, Malek and Glazer, to report on her discussion with Knoblauch. Glazer responded to Sather's email with an admonition that Sather should not document collusive communications in writing.

383.     On May 8, 2014, Malek emailed the Heritage sales team to obtain information regarding agreements with competitors relating to the price increases discussed on April 22, 2014. ██████████████████████████████████████.

384.     On May 9, 2014, Heritage held an internal conference call, wherein it was confirmed that paromomycin (among other drugs) was designated for a price increase.

385.     On May 20, 2014, ████████████ and Sun's ██████████) had a telephone conversation lasting more than 12 minutes. During that call, ████████ informed █████ that Sun needed to adjust its production of paromomycin. ████████ immediately reported this information to Malek ████████████████████████████████████.

386.     Despite its issues concerning paromomycin production, Sun maintained approximately 40% market share and continued to sell paromomycin through at least January 2015. Notwithstanding the presence of Sun in the market, Heritage continued to raise prices, secure in the knowledge that Sun would not undercut these increases.

387.     On June 23, 2014, Heritage hosted an internal conference call with its sales team during which paromomycin was designated for a 100% price increase. This decision was

- 94 -

confirmed on a subsequent call that took place on June 25, 2014. Price increase notices were sent to customers for paromomycin the next day, June 26, 2014.

388.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

389.    The agreement between at least Defendants Heritage and Sun was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including paromomycin.

### l.    theophylline

390.    Theophylline tablets are used to treat conditions causing airway obstruction, such as asthma, emphysema, and chronic bronchitis.

391.    The market for theophylline is mature.  At all relevant times, there have been multiple manufacturers of generic theophylline.

392.    The relevant manufacturers of theophylline are Heritage and Teva.

393.    ███████████████████████████████████████████████████████
████████████████.  The "ER" designation indicates that it is an extended release medication that is released into the body throughout the day.

394.    In early 2014, Teva began to contemplate raising the price of theophylline.  As discussed above, Heritage's Malek and Teva's Patel had a preexisting relationship based on Patel's prior employment.  On February 4, 2014, after Teva's Patel returned from maternity leave, Malek called her and left a voicemail. They connected the next day and had a telephone conversation lasting more than an hour.  This was the first in a series of conversations held between Malek and Patel in February and March 2014.

395.    In early April 2014, Teva implemented a price increase for theophylline.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

396.     At an internal Heritage meeting on April 22, 2014, Malek instructed the Heritage sales team to follow Teva's pricing lead for theophylline.

398.     On May 9, 2014, Heritage held an internal conference call with its sales team, wherein it was confirmed that prices of theophylline (among other drugs) would be increased.

399.     On June 23, 2014, Heritage hosted an internal conference call during which theophylline was designated for a 150% price increase.  This decision was confirmed on a subsequent internal Heritage call that took place on June 25, 2014.

400.     Following the June 25, 2014 internal Heritage call, Malek and Patel spoke regarding Heritage's dissemination of price increase notices for theophylline and other drugs.

401.     Heritage began sending price increase notices to customers the following day, June 26, 2014.

403.     As of July 2014, Heritage had raised theophylline prices for approximately 20 customers.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53





REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

404.     The GAO Report noted that theophylline had an extraordinary price increase.

405.     No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

406.     The agreement between at least Defendants Heritage and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including theophylline.

     **m.     verapamil**

407.     Verapamil is used in the treatment of high blood pressure, angina, and migraine headaches.  Due to, among other things, its clinical efficacy and safety, verapamil has been designated as an essential medicine by the World Health Organization.

408.     The market for verapamil is mature.  At all relevant times, there have been multiple manufacturers of generic verapamil.

409.     The relevant manufacturers of verapamil are Defendants Actavis, Heritage, and Mylan.

     **(1)     verapamil tablets**

410.     ████████████████████████████████████████████ ████████████████.

411.     ███████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████ ██████████████████.

412.     On April 23, 2014, Heritage's ██████████████████████ ████████ communicated with an Mylan's ██████████████████████ regarding price increases for verapamil and several other drugs.  They reached an agreement to

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

raise prices on verapamil and two other drugs.  █████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████

413.    Heritage's ██████ was in charge of communicating with Actavis regarding these

increases.  Following the internal Heritage meeting on April 22, 2014 regarding price increases

for several generic drugs, ██████ spoke to ███████████████████████████████████ at

Actavis and reached an agreement to raise the prices of verapamil and glyburide-metformin.

This news was then disseminated throughout the ranks at Actavis.  ██████████████████████
██████████████████████████████████████████████████████████████████████
████████████████████

414.    ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████.

415.    With Heritage having connected with both Mylan and Actavis regarding

verapamil pricing, a communication between Mylan and Actavis would cement the scheme.  On

May 9, 2014, ████████████████ spoke with ████████████████████████████ for 3 minutes. The

same individuals spoke on May 19, 2014 for almost 7 minutes. They continued to communicate

frequently over the next several months.

416.    On May 8, 2014, Malek asked his Heritage sales team for information regarding

the status of their agreements with competitors relating to price increases for verapamil and other

drugs. ██████████████████████████████████████████████.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

417.    On May 9, 2014, Heritage held an internal conference call, wherein it was confirmed that verapamil (among other drugs) was designated for a price increase.

418.    Heritage had raised verapamil prices for at least one customer as of July 2014.

419.    Communications from late summer 2014 reveal that at least Actavis and Heritage continued to communicate regarding verapamil (and glyburide-metformin) price increases. ███

██████████████████████████████████████████

███████████████. Additionally, during the relevant time period, there were ample opportunities for Defendants' employees to communicate at trade association events and related social gatherings. *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).

420.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

421.    The agreement between at least Defendants Heritage, Mylan, and Actavis was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including verapamil tablets.

                    **(2)    verapamil capsules**



423.

424.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

425. 



REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



426.    The verapamil capsule price increases occurred after trade association meetings where representatives (including NAMs) from Actavis and Mylan were in attendance. *See* Exhibit D (Trade Association Contacts as to the Named Generic Drugs).



427.    No non-collusive market factors (*e.g.*, product shortages) can explain Defendants' artificially inflated prices.

428.    The agreement between at least Defendants Actavis and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including verapamil capsules.

- 102 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

**n.    zoledronic acid**

429.    Zoledronic acid is used to treat high levels of calcium in the blood.

430.    At all relevant times, there have been multiple manufacturers of generic zoledronic acid.

431.    The relevant manufacturers of zoledronic acid are Defendants Dr. Reddy's and Heritage.

432.    As of early 2013, Defendants Dr. Reddy's and Heritage were the only companies prepared to enter the market for generic zoledronic acid, whose patent protection had recently expired.

433.    On January 21, 2013, Malek sent an internal Heritage email to Heritage Associate Director of National Accounts Neal O'Mara, copying Heritage CEO Glazer, and instructed O'Mara to contact John Adams at Dr. Reddy's about zoledronic acid.  After O'Mara made contact with Adams, O'Mara reported back to Malek that Dr. Reddy's was willing to divide up the generic zoledronic acid market but wanted to ensure it received a fair share, which would be 60% if Dr. Reddy's were first to market, and if Dr. Reddy's launched on the same day as Heritage, it wanted an even market share split ███████████████████████████████ ███████ ████████████████████████████████████.With Dr. Reddy's willingness to divvy up the zoledronic acid market confirmed, Heritage wanted to ensure that no other potential manufacturers were planning to enter the market.  To that end, Malek asked one or more Heritage employees to contact several other potential competitors to determine if they would be entering the zoledronic acid market.  For example, ██████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████. ██████████.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

434.     In approximately March 2013, Malek was concerned that Dr. Reddy's had offered Cardinal a lower price than expected, and emailed a contact at Dr. Reddy's regarding this issue.

435.     Throughout March and April 2013, Heritage and Dr. Reddy's continued to communicate regarding zoledronic acid market share and pricing. ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

436.     Throughout this time, Heritage employees knew what they were doing was illegal.  For example, █████████████████████████████████████████

████████████████████████████████████.  In another example, after receiving several emails from Heritage personnel regarding contacts with Dr. Reddy's, on April 19, 2013, Malek sent a text message to the Heritage sales team reminding them to refrain from written memorializations of contacts with purported competitors.

437.     Throughout 2013, Heritage and Dr. Reddy's continued to coordinate with one another, including concerning specific customers for zoledronic acid. ████████████████

████████████████████████████████████████████████████

███████.  Indeed, market shares remained stable with Dr. Reddy's maintaining 60% of the market and Heritage holding the remaining 40%.

438.     When Par finally entered the market in late 2013, it announced list prices even higher than Heritage and Dr. Reddy's.  As it had done with doxy mono (as discussed below), Par eschewed price competition.  Although it was the third generic manufacturer into the market, Par did not undercut the prices of Heritage and Dr. Reddy's in an effort to gain market share, as economic theory predicts of a competitive market.  Instead, consistent with the Fair Share

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Agreement, Par announced higher prices and attempted to prevent price erosion in the market for zoledronic acid.

439.    Prices for zoledronic acid are not explained by non-collusive market factors.

440.    The agreement between at least Defendants Dr. Reddy's, Heritage, and Par was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including zoledronic acid.

**D.    Defendants' Anticompetitive Conduct Relating to Doxy DR and Glyburide Further Demonstrates Defendants' Overarching Fair Share Agreement[54]**

441.    As set forth below, additional information concerning Defendants' efforts to artificially inflate prices for at least doxycycline hyclate delayed release ("doxy DR") and glyburide is consistent with Defendants' Fair Share Agreement as alleged in the DPPs' Heritage-Related Multi-Drug Complaint.  The conspiratorial conduct described below shares many of the same characteristics as the conspiratorial conduct relating to the generic drugs that are the subject of the DPPs' Heritage-Related Multi-Drug Complaint, including: (1) inter-competitor communications and contacts through, among other things, phone calls, text messages, messages via LinkedIn, and in-person meetings; (2) establishing inter-competitor communications and contacts through the use of preexisting personal relationships; (3) conspiratorial acts to, among other things, allocate market share, allocate customers, and elevate prices; (4) subordinates being directed to engage in conspiratorial communications by their superiors and providing regular updates to their superiors regarding those communications; (5) the use of trade association and

---

[54] The allegations concerning doxy DR and glyburide are presented solely for the purpose of illustrating Defendants' expansive Fair Share Agreement.  These allegations are not intended to amend Direct Purchaser Class Plaintiffs' operative complaints regarding doxy DR and glyburide.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

industry events as a backdrop for conspiratorial communications; and (6) efforts to avoid written documentation of conspiratorial communications.  The additional facts regarding these three drugs further demonstrate the broad scope and effect of generic drug manufacturers' Fair Share Agreement.

### a.    doxy DR

442.    Doxy DR is an antibiotic medication often used to treat acne.

443.    Heritage began selling doxy DR on July 2, 2013.  At the time, Mylan was the only other seller of generic doxy DR. Later, Mayne entered the doxy DR market in 2014.

444.    Prior to actually selling doxy DR, Heritage plotted to ensure that it would obtain its fair share of the doxy DR market without dragging down prices through competition with Mylan.  In mid-April 2013, as Heritage was preparing to enter the doxy DR market, Heritage CEO Jeffrey Glazer and Heritage President Jason Malek traveled to India to meet with executives of Emcure, Heritage's parent company.  During this meeting, Emcure CEO Satish Mehta and Emcure Senior Vice President of Corporate Development and Strategy Vik Thapar noted that the launch of doxy DR was a significant business opportunity for Heritage.  Satish then advised that he knew a senior executive at Mylan, Rajiv Malik, and that he would reach out to Mylan's Malik in an effort to coordinate Heritage's entry into the doxy DR market.

445.    In or about early May 2013, Satish advised Glazer that he had a phone call with Malik at Mylan.  After Glazer received this information from Satish, on May 7, 2013, Glazer sent an email to Malik at Mylan.  Malik responded to Glazer's email by advising that he was currently in England and providing a telephone number where he could be reached.

446.    Heritage's Glazer and Mylan's Malik had a telephone conversation on May 8, 2013.  During the call, Glazer advised that Heritage aimed to capture approximately 30% of the doxy DR market without engaging in price competition with Mylan.  Specifically, Heritage

- 106 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

intended to focus on selling doxy DR to two large customers with whom Heritage had well-established relationships – CVS and McKesson Corporation ("McKesson"). Glazer explained that, if Heritage could displace Mylan at CVS and McKesson, Heritage could achieve its desired 30% share of the doxy DR market. Mylan's Malik responded that Mylan would agree to give up its sales of doxy DR at CVS and McKesson to Heritage. Malik specifically noted that Mylan was willing to cede this doxy DR market share due to Heritage's prior agreement to permit Mylan to profitably enter the market for another generic drug. Malik further told Glazer that he would inform others at Mylan about their agreement on at least doxy DR. The agreement hatched by Glazer and Malik worked. In the months following Malik and Glazer's conversations, Mylan surrendered two accounts – McKesson and CVS – to Heritage.

447.    While Heritage's Glazer was focused on negotiating a fair share arrangement with Mylan's Malik, Heritage's Malek was establishing his own contacts at Mylan concerning doxy DR. On or about May 3, 2013, Malek of Heritage asked Heritage's ████ to set up a call between Malek and the Vice President of Sales at Mylan (███████). Malek was told that the Vice President of Sales had little to do with National Accounts and was instead directed to the person at Mylan who did have responsibility for such accounts. On information and belief, that latter person was Jan Bell ("Bell"), who was a Senior Key Account Manager at Mylan from September of 2010 to January of 2013 and has served as Director of National Accounts at Mylan since January of 2013.[55] On information and belief, Malek promptly contacted Bell through LinkedIn. Malek and Bell communicated by telephone on multiple occasions and continued to communicate about various drugs, including doxy DR.

---

[55] See Bell LinkedIn Profile, https://www.linkedin.com/in/jan-bell-51a3135/. Bell was previously employed by Defendant G&W.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

448.    After establishing the fair share arrangement for doxy DR in May 2013, in June
2013, defendants focused on implementing the agreement.  At the HDMA meeting held June 2-
5, 2013, Heritage's Malek met with a senior executive from a potential customer, a wholesaler
believed to be McKesson, to discuss Heritage products, including doxy DR. Heritage submitted a
detailed product sales proposal to the wholesaler shortly thereafter. Malek also continued to
express Heritage's interest in entering a supply agreement with the wholesaler.

449.    Heritage and Mylan representatives continued speaking with each other after the
meeting with the wholesaler.  On June 11, 2013, Mylan's ▮▮▮▮ called Heritage's ▮▮▮▮.
They spoke for 10 minutes. Immediately after the telephone call, ▮▮▮▮ called Malek and left a
voicemail recounting the call with Mylan. Malek called the Heritage employee back 15 minutes
later and they spoke for 7 minutes.

450.    On June 18, 2013, a senior manager at the wholesaler (again, believed to be
McKesson) contacted Mylan's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to inform him that
the wholesaler received an unsolicited bid for doxy DR from a new entrant (Heritage).  Mylan
was asked to submit a competing bid by the close of business on June 21, 2013 to retain the
business with the wholesaler.  Consistent with its agreement to cede its doxy DR business to
Heritage and contrary to its own independent self-interest, Mylan failed to submit a counterbid.

451.    On June 27, 2013, following Mylan's failure to bid, Heritage entered into a
distribution agreement with the wholesaler for doxy DR.

452.    Having executed the agreed-upon arrangement as to one customer, Heritage,
however, turned its focus to securing the second agreed-upon customer's doxy DR business.  On
July 8, 2013, Heritage submitted a proposal to a pharmacy (believed to be CVS) to supply doxy
DR.  The same day, Heritage's Glazer spoke with a Mylan executive (likely Malek).  The next

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

day, July 9, 2013, the pharmacy rejected the proposal as too high. Heritage submitted a revised bid to the pharmacy on July 11, 2013.

453. Heritage kept in close consultation with Mylan as it attempted to execute their doxy DR market allocation agreement and gain doxy DR business from the pharmacy (likely CVS). As part of this effort, Emcure's Mehta spoke to Mylan's Malik on July 18, 2013. Information about the call was communicated to Glazer by Emcure's ████████████████████ ████████████████████████ shortly after Mehta and Malik spoke.

454. In response to the email advising of the contact between Mehta and Malik, and ███████████████████, Glazer emailed Malik trying to schedule a phone call (also on July 18, 2013). Malik told Glazer they could speak in the evening, and later that evening, Malik left Glazer a voicemail. 15 minutes later, Glazer returned Malik's call and they spoke for 4 minutes. Heritage's Malek was standing next to Glazer while Glazer spoke with Mylan's Malik. During the call, Malik confirmed that Mylan would relinquish the doxy DR business with the pharmacy to Heritage. Glazer understood Malik's commitment to mean that Mylan would not put in a strong counterbid to Heritage's doxy DR proposal. Malik noted that Mylan was willing to do this because Heritage had previously "played fair" when Mylan was the second entrant to the market for another drug. Malik also told Glazer that he would inform the relevant Mylan personnel about the understanding between Mylan and Heritage regarding doxy DR. After Malik hung up from speaking with Glazer, he immediately communicated with his team at Mylan.

455. On July 22, 2013, Emcure's ██████ asked Glazer whether he had been in contact with Mylan. Glazer confirmed that he had.

456. Communications between Heritage and Mylan were also taking place at the National Account Manager level during this time period. For instance, Heritage Associate

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Director of National Accounts Neal O'Mara was in contact with counterparts at Mylan.  O'Mara also obtained assurances from Mylan personnel that Mylan would cede the doxy DR business at the pharmacy to Heritage. ██████████████████████████████████████████████ ████████████████.

457.    In August 2013, Mylan's ███████████████████████████████ was contacted by an executive at the pharmacy and told that the pharmacy had received an unsolicited bid for doxy DR. Mylan was given a chance to submit a counterbid. In response, Mylan submitted a bid that it knew would not be low enough to retain the pharmacy's business. When Mylan was given a second opportunity to lower its pricing, Mylan failed to submit a revised bid, consistent with its agreement with Heritage.  In September 2013, the pharmacy awarded its doxy DR business to Heritage.

458.    The business obtained from the wholesaler and the pharmacy accounts for more than 80% of Heritage's doxy DR business.

459.    After Heritage obtained the pharmacy's business, on several occasions Heritage walked away from other customer accounts and Mylan business in order to maintain the market share consistent with its agreement with Mylan.

460.    For example, in November 2013, Heritage did not try to seek additional business from a large account, believed to be Walmart, because the Walmart business was not allocated to Heritage as part of Heritage and Mylan's agreement regarding market share and pricing of doxy DR. Heritage (through Malek) and Mylan communicated to ensure continued adherence to the agreement concerning doxy DR. ████████████████████████████████████████████ ████████████████████████████████████████████████.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

461.    As a third Defendant, Mayne, prepared to enter the doxy DR market,

anticompetitive conversations continued.  On January 7, 2014, about a month before Mayne's

entry into the doxy DR market, Mayne ████████████████████████████ and

Heritage National Account Manager Anne Sather had a telephone conversation about agreeing

not to compete in the market for doxy DR that lasted 12 minutes.  These conversations continued

throughout early 2014, with Sather, continuing to communicate with ██████ via text messages

and email, including telephone conversations on March 13, 2014 and a March 17, 2014, with the

second call lasting 17 minutes.  ████████████████████████████████████

████████████████████████

462.    After Mayne entered the market, it targeted Mylan's customers while avoiding

competition with Heritage.  For example, Mayne made a bid to a large wholesaler where Mylan

was the incumbent provider, and the wholesaler asked Heritage to also submit a bid.  Heritage

stayed true to its agreement with Mylan and declined to submit a bid (contrary to its independent

self-interest).  Heritage provided a false, pretextual reason (inadequate supply) to the wholesaler.

Heritage's Malek orchestrated the dealings with the wholesaler, including providing the false

excuse regarding supply constraints.

463.    In March 2014, Mayne submitted a bid to supply doxy DR to one of Heritage's

nationwide pharmacy accounts.  This set off a flurry of telephonic, e-mail and text discussions

between representatives of Mayne and Heritage over the next several months, including a 17

minute conversation on March 17.  Upon information and belief, on April 1, 2014, Heritage's

Sather and a Mayne's ██████ spoke for 27 minutes.  Right after the call, Sather and Malek

exchanged text messages in quick succession.  The next day, April 2, 2014, Sather and ██████

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

spoke again for 11 minutes.  The same day, Malek emailed Heritage CEO Glazer to provide an

update on negotiations with Mayne.

464.     Heritage's Sather and a Mayne's ████ spoke for 3 minutes again on April 9,

2014, and the following day they exchanged multiple text messages.  Consistent with prior

practice, Sather reported these conversations to employees of Heritage, including at least Malek.

465.     Meanwhile, Heritage continued to avoid competition with Mylan regarding doxy

DR, including refusing to bid on an RFP issued by a Mylan customer in August 2014.

466.     In November of 2014, Mayne made offers to the One Stop Program of McKesson

(a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a group purchasing

organization ("GPO") that includes Express Scripts, Kroger, and Supervalu).  Heritage's Sather

contacted Mayne's ████ to discuss the situation and raised the idea that Heritage and Mayne

could allocate customers by agreeing to cede Endodisc to Mayne in exchange for Mayne

withdrawing its offer to McKesson and agreeing not to price doxy DR competitively.  Sather

immediately informed Malek of her discussion with Mayne.  Follow up communications

occurred in December 2014 by text message and an in-person meeting at a conference of the

American Society of Health-System Pharmacists held on December 9, 2014.

467.     These communications resulted in an agreement to eliminate price competition for

doxy DR.  In January 2015, Econdisc put its doxy DR business out for bid. Heritage, consistent

with its recent communications with Mayne, deliberately bid a higher price than Mayne, thereby

fulfilling its agreement to walk away from the Econdisc business.  Likewise, when Heritage was

requested to submit a bid by a large nationwide pharmacy chain in September of 2015, it

declined to do so after learning that Mayne was the incumbent supplier.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

468.    The agreement between Heritage, Mayne and Mylan regarding Doxy DR was part of the Fair Share Agreement among generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Named Generic Drugs.

### b.    glyburide

469.    Glyburide is used to treat elevated blood sugar levels associated with type 2 diabetes.

470.    As of April 2014, Aurobindo, Heritage, and Teva were the dominant sellers of glyburide. Defendant Citron entered the glyburide market in July of 2014.

471.    As discussed above, in mid-April 2013, Heritage CEO Glazer and Heritage President Malek traveled to India to meet executives of Emcure, Heritage's parent company. During this meeting, Malek revealed Emcure's Satish Mehta and Vikas Thapar that he had a preexisting relationship with Nisha Patel at Teva. Mehta and Thapar endorsed the idea of Malek communicating with Patel.

472.    As stated above, on April 15, 2014, Heritage's Malek called Teva's Patel and they discussed multiple drugs for which Teva was a competitor of Heritage, including glyburide. During their conversation, Teva's Patel agreed that, if Heritage raised the price of glyburide, Teva would match or, at a minimum, would not undercut Heritage's price increase.  Malek and Patel spoke several more times over the next several months to confirm and finalize agreements regarding glyburide and numerous other drugs.

473.    Heritage National Account Manager Dan Lukasiewicz was tasked with communicating with Aurobindo regarding glyburide.  On May 8, 2014, Heritage's ▮▮▮▮▮▮ and Aurobindo ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ had a 16 minute telephone conversation. A follow up contact between Heritage's ▮▮▮ and Aurobindo's ▮▮▮▮ was

- 113 -

made on May 14, 2014 at the MMCAP conference in Minnesota. ██████ made a report to Malek regarding the contact with Aurobindo at the MMCAP conference ████████████████████ ██████████.

474.    By June 23, 2014, Heritage had firmed up internal plans to increase glyburide prices.

475.    At the same time, Heritage was concerned about Citron's entry into the glyburide market.  On June 25, 2014, at the direction of Heritage's Malek, Anne Sather texted her friend, Citron's ████████████, to discuss whether Citron would be selling glyburide in the near future.  Once it was determined that Citron would be entering the glyburide market, Sather asked ██████████ to take Heritage's glyburide price increase into consideration. ████████████████ ███████████████████████████████. The next day Heritage began informing its customers about the glyburide price increase

476.    On July 1, 2014, Citron's ██████████ called Heritage's ██████████ and they spoke for 13 minutes.  During the call, ██████ confirmed Citron's agreement to raise prices on certain drugs, including glyburide. ██████ also told Heritage that they should not communicate with Citron through email, but should instead call to convey any sensitive information about pricing for glyburide or other drugs. ████████████████████████████

██████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

478.    By July 9, 2014, Heritage had successfully increased glyburide prices for at least

17 customers.  Teva also had increased pricing on glyburide.  Citron, after confirming internally

that Heritage had increased its list prices for glyburide, also increased its glyburide pricing in line

with the price increases on July 15, 2014.

479.    After the implementation of Heritage's price increase on glyburide, a Heritage

customer solicited bids from Teva and Aurobindo on glyburide. On July 25, 2014, Heritage

discussed the situation with its contacts at Teva and Aurobindo.  ████████████████████

████████████████████████████. After speaking with Heritage, Teva and Aurobindo

did not provide the requested bids to the Heritage customer.  ████████████████████

████████████████████████████████████████████████████████████████████.

The agreement between Aurobindo, Citron, Heritage, and Teva regarding glyburide was part of

the Fair Share Agreement among generic drug manufacturers to fix, stabilize, and raise prices,

rig bids, and engage in market and customer allocation for generic drugs, including Named

Generic Drugs.

**E.    The Existence of the Fair Share Agreement within the Generic Drug Industry and as to the Named Generic Drugs Is Supported by Other Factors.**

480.    In addition to the data analysis and conspiracy evidence set forth herein, the

existence of the Fair Share Agreement is supported by other factors:

1) There are many generic drugs that are already part of MDL 2724.  Exhibit A (MDL 2724

Generic Drugs as of December 2018).

2) The confessions of Glazer and Malek, the other public revelations to date in the ongoing

government investigations, and other public reports indicating widespread collusion. *See*

Exhibit B (History of Government Investigations and Other Public Reports Concerning

Anticompetitive Conduct in the Generic Drug Industry); Exhibit C (List of Generic Drug

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to

Anticompetitive Conduct in the Generic Drug Industry).

3) The extensive contacts among generic drug manufacturers including almost constant

trade association meetings. *See, e.g.*, Exhibit D (Trade Association Contacts as to the

Named Generic Drugs); Exhibit E (Generic Pharmaceutical Association Board of

Directors 2010 to 2017).

4) Economic factors relating to the generic drug industry.  Exhibit F (Summary of Economic

Factors Indicating Collusion in the Generic Drug Industry).

5) Defendants' public communications to investors.  Exhibit G (Defendants' Investor

Communications).

## VI.    CLASS ACTION ALLEGATIONS

481.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this

action on behalf of a Class defined as:

> All persons or entities that directly purchased one or more of the
> following drugs, from one or more of Defendants, in the United
> States and its territories and possessions, at any time during the
> period from March 2011 until the effects of the conspiracy cease
> (the "Class Period"): **acetazolamide** (capsule 500 mg and tablet
> 125, 250 mg), **doxycycline monohydrate** (tablet 50, 75, 100, 150
> mg), **fosinopril hydrochlorothiazide** (tablet 10-12.5, 20-12.5 mg),
> **glipizide-metformin** (tablet 2.5-250, 2.5-500, 5-500 mg),
> **glyburide-metformin** (tablet 1.25-250, 2.5-500, 5-500 mg),
> **leflunomide** (tablet 10, 20mg), **meprobamate** (tablet 200, 400
> mg), **metronidazole** (.75% cream, lotion, jelly, and vaginal),
> **nimodipine** (capsule 30 mg), **nystatin** (tablet, cream, and
> ointment), **paromomycin** (capsule 250 mg), **theophylline** (ER
> tablet), **verapamil** (tablet 80, 120 mg and capsule 120, 180, and
> 240mg), and **zoledronic acid** (infusion 4/mg/5ml, 5mg/100ml).
>
> Excluded from the Class are Defendants and their officers,
> directors, management, employees, subsidiaries, or affiliates,
> judicial officers and their personnel, and all governmental entities.

- 116 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

482.     Members of the Class are so numerous that joinder is impracticable.  Plaintiffs

believe that there are scores of Class members, geographically dispersed throughout the United

States, such that joinder of all Class members is impracticable.  Further, the Class members are

readily identifiable from information and records maintained by Defendants.

483.     Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other

Class members, and there are no material conflicts with any other member of the Class that

would make class certification inappropriate.  Plaintiffs and all members of the Class were

damaged by the same wrongful conduct of Defendants.

484.     Plaintiffs will fairly and adequately protect and represent the interests of the Class

and Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

485.     Plaintiffs are represented by counsel who are experienced and competent in the

prosecution of class action antitrust litigation.

486.     Questions of law and fact common to the members of the Class predominate over

questions that may affect only individual Class members because Defendants have acted on

grounds generally applicable to the Class.  Thus, determining damages with respect to the Class

as a whole is appropriate.  The common applicability of the relevant facts to claims of Plaintiffs

and the proposed Class is inherent in Defendants' wrongful conduct, because the overcharge

injuries incurred by Plaintiffs and each member of the proposed Class arose from the same

collusive conduct alleged herein.

487.     The common legal and factual questions do not vary among Class members and

may be determined without reference to individual circumstances, and include, but are not

limited to, the following:

    (a)     Whether Defendants and their co-conspirators engaged in a contract, combination,
            or conspiracy to eliminate competition and thereby increase prices of the drugs

- 117 -

identified in the DPPs' Heritage-Related Multi-Drug Complaint in the United States and in its territories and possessions;

(b) The duration and extent of the alleged contract, combination, or conspiracy between and among Defendants and their co-conspirators;

(c) Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

(d) The effect of the contract, combination, or conspiracy on prices of the drugs identified in the DPPs' Heritage-Related Multi-Drug Complaint in the United States and in its territories and possessions during the Class Period;

(e) Whether Defendants' conduct caused supra-competitive prices for the generic drugs named in this case;

(f) Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other members of the Class; and

(g) Whether the alleged contract, combination, or conspiracy violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

488. Treatment as a class action is the superior method for the fair and efficient adjudication of this controversy, as it will permit numerous similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, avoiding unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

489. Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII.   ANTITRUST INJURY

490. During the Class Period, Direct Purchaser Class Plaintiffs and Class members directly purchased the drugs identified in the DPPs' Heritage-Related Multi-Drug Complaint from Defendants. Because of Defendants' anticompetitive conduct, Plaintiffs and Class

- 118 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

members were forced to pay more for these drugs than they otherwise would have, and thus have suffered substantial overcharge damages at the hands of Defendants.  This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

491.    Defendants' unlawful conduct has successfully eliminated or suppressed competition in the market, and Plaintiffs and Class members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

492.    Defendants, through their unlawful conduct alleged herein, reduced competition in the generic drug market, increased prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges.

493.    Because Defendants' anticompetitive conduct is ongoing, Direct Purchaser Class Plaintiffs and the proposed Class continue to pay supra-competitive prices for the drugs named in this case through the present.

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

494.    The statute of limitations, as it applies to the alleged Sherman Act Sections 1 and 3 antitrust violations carried out by Defendants and any co-conspirators, were tolled due to one or more events.  These include, but are not limited to the following reasons.

495.    Plaintiffs had no actual or constructive knowledge of (and could not have had any actual or constructive knowledge of) the collusion alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs sufficiently suggested that any Defendant was involved in a conspiracy to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of generic drugs.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

496.     Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the Plaintiff States' redacted complaint.

497.     Many of the Defendants and their co-conspirators repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged in the DPPs' Heritage-Related Multi-Drug Complaint.  It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

498.     On December 12, 2016, the United States DOJ charged Glazer with a criminal violation of U.S. Antitrust laws.  The resulting criminal proceedings against Glazer toll the statute of limitations on Plaintiffs' claims, according to 15 U.S.C. § 16(i).  However, the charges against Glazer related to only doxycycline hyclate and glyburide.  The DOJ publicly stated that the charges against Glazer were part of an ongoing federal antitrust investigation into price fixing, bid rigging, and other anticompetitive conduct in the generic pharmaceutical industry.  In other words, the charges against Glazer only put Plaintiffs on notice as to a small portion of the overarching conspiracy.

499.     The earliest knowledge Plaintiffs had regarding the drugs in the DPPs' Heritage-Related Multi-Drug Complaint was derived from the redacted version of the Plaintiff States' Heritage-Related Multi-Drug Complaint.  Upon receiving the redacted version of the Plaintiff States' Heritage-Related Multi-Drug Complaint, Plaintiffs immediately began investigating the claims that are the subject of the DPPs' Heritage-Related Multi-Drug Complaint.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

500. For these reasons, the statutes of limitations as to Direct Purchaser Class Plaintiffs' claims under the federal antitrust laws did not begin to run, and have been tolled with respect to the claims that are alleged in the DPPs' Heritage-Related Multi-Drug Complaint.

501. In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.

502. Conspiracies, by their nature, must be concealed. Defendants and co-conspirators maintained their conspiracy through surreptitious meetings and communications. Defendants' and co-conspirators' affirmative and fraudulent concealment of their conspiratorial acts prevented Plaintiffs from discovering their causes of action and thereby tolled the statute of limitations on Plaintiffs' claims. Such acts included, without limitation:

    (i)    All Defendants made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made, because they were aware that their conduct was illegal;

    (ii)    Instructions were communicated among Defendants that they should not communicate through email, but should instead call or meet in person if they had information to convey;

    (iii)    The Defendants destroyed emails, text messages, and other documents to avoid detection of their collusive conduct – for example, Heritage executives utilized the lack of a company retention policy to routinely destroy emails and other documents that memorialized their illegal conduct;

    (iv)    Defendants made materially false and/or misleading public statements, including financial results, during earnings calls with shareholders and in SEC filings which had the effect of concealing, and/or failed to disclose, that they colluded to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of generic drugs, and, consequently, their revenues during the Class Period were in part the result of anti-competitive conduct; and

    (v)    As Defendants became more aware that they were under state and federal investigation, they failed to produce certain documents, including emails, in response to, for example, Connecticut's subpoena, even though the subpoena sought all such documents. In addition, Glazer, Malek and certain other employees of Defendants deleted all text messages from their company iPhones regarding their illegal communications with competitors.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

503.     Because of Defendants' affirmative concealment, and the fact that antitrust

conspiracies such as this one are inherently self-concealing, Plaintiffs could not have learned

about the conspiracy any earlier, despite the exercise of reasonable diligence.

504.     The filing and pendency of class action complaints against Defendants and co-

conspirators tolled the statute of limitations on Plaintiffs' claims.

505.     For these reasons, Direct Purchaser Class Plaintiffs' claims are timely.

506.     Further, even if the Court were to find that a statute of limitations had been

triggered, at a minimum, Direct Purchaser Class Plaintiffs' can still recover at least four years of

overcharges.

## IX.     CLAIM FOR RELIEF
### Conspiracy in Restraint of Trade in Violation of Sherman Act Sections 1 and 3

507.     Plaintiffs repeat and re-allege the foregoing as though fully set forth herein.

508.     In violation of Sections 1 and 3 of the Sherman Antitrust Act, Defendants and co-

conspirators entered into an overarching combination and conspiracy with one another

concerning the pricing of all the Named Generic Drugs in the United States.  This combination

and conspiracy was *per se* unlawful price-fixing.

509.     All of the Defendants and co-conspirators committed acts to further the

Agreement and overarching combination and conspiracy alleged in the DPPs' Heritage-Related

Multi-Drug Complaint.  Defendants' and co-conspirators' anticompetitive acts were intentional,

were directed at the sales of, *inter alia*: acetazolamide, doxy mono, fosinopril-HCTZ, glipizide-

metformin, glyburide-metformin, leflunomide, meprobamate, metronidazole, nimodipine,

nystatin, paromomycin, theophylline, verapamil, and zoledronic acid.

- 122 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

510.    The combination and conspiracy had its intended effect, because Defendants and co-conspirators have benefited – and continue to benefit – from their collusion and the elimination of competition, both of which artificially inflated prices of these drugs.

511.    This contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

a.    Prices charged to and paid by Direct Purchaser Class Plaintiffs and the proposed Class for all of the Named Generic Drugs in this case were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

b.    Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the sale of these drugs in the United States market (including its territories and possessions); and

c.    Competition in establishing the prices paid for these drugs was unlawfully restrained, suppressed, or eliminated.

512.    As a direct and proximate result of Defendants' and co-conspirators' unlawful conduct, Plaintiffs and members of the proposed Class have been injured in their business and property in that they have paid more for these drugs than they otherwise would have paid in the absence of Defendants' and co-conspirators' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

513.    All Defendants and co-conspirators are *per se* liable under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

514.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' and co-conspirators' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

- 123 -

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

515.    Defendants' and co-conspirators' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

## X.    PRAYER FOR RELIEF

WHEREFORE, Direct Purchaser Class Plaintiffs and members of the proposed Class pray for relief from this Court and request:

A.    Certification as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of Direct Purchaser Class Plaintiffs as Class representatives and their counsel of record as Class counsel;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act;

C.    A judgment against Defendants and co-conspirators, jointly and severally, for the damages sustained by Direct Purchaser Class Plaintiffs and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D.    An award to Direct Purchaser Class Plaintiffs and Class members of pre-judgment and post-judgment interest at the highest legal rate provided by law from and after the date of service of the first-filed complaint in this action;

E.    An award to Direct Purchaser Class Plaintiffs and Class members of the costs of this suit, including reasonable attorney fees; and

F.    An award of any further relief as the Court deems just and proper.

## XI.    JURY TRIAL DEMANDED

Direct Purchaser Class Plaintiffs hereby request a jury trial on all claims so triable.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Dated December 21, 2018

NASTLAW LLC

Dianne M. Nast (PA Bar No. 24424)
Erin C. Burns (PA Bar No. 89742)
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
215-923-9300
215-923-9302 (fax)
dnast@nastlaw.com
eburns@nastlaw.com

*LEAD AND LIAISON COUNSEL*

BERGER & MONTAGUE P.C.
David F. Sorensen
Candice J. Enders
Zachary D. Caplan
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
dsorensen@bm.net
cenders@bm.net
zcaplan@bm.net

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan
Elana Katcher
850 Third Avenue
New York, New York 10022
(212) 687-1980
rkaplan@kaplanfox.com
ekatcher@kaplanfox.com

ROBERTS LAW FIRM P.A.
Michael L. Roberts
Jana K. Law
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575
mikeroberts@robertslawfirm.us
janalaw@robertslawfirm.us

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
David S. Nalven
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts 02142
617-482-3700
tom@hbsslaw.com
davidn@hbsslaw.com

Barbara A. Mahoney
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
bmahoney@hbsslaw.com

NUSSBAUM LAW GROUP P.C.
Linda P. Nussbaum
Bart Cohen
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
(917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

*DIRECT PURCHASER PLAINTIFFS' STEERING COMMITTEE*

- 125 -